**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| JACQUELINE FARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-03279-SEM-TSH |
| | ) | |
| ERIC KOHLRUS, CHRISTINE BRANNON, | ) | |
| CLARA CHARRON, NORINE ASHLEY, LISA | ) | |
| JOHNSON, PATRICK KEANE, MIKE FUNK, | ) | |
| FELIPE ZAVALA, ALAN PASLEY, ALEX | ) | |
| ADAMS, LAURA JACKSON, JEFF GABOR, | ) | |
| TRINA SNYDER, ANGELA LOCKE, and the | ) | |
| ILLINOIS DEPARTMENT OF CORRECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS KEANE,
FUNK, AND PASLEY'S MOTION FOR SUMMARY JUDGMENT**

NOW COME Defendants PATRICK KEANE, MIKE FUNK, and ALAN PASLEY, by

and through their attorney, Kwame Raoul, Attorney General of the State of Illinois, and for their

memorandum of law in support of Defendants Keane, Funk, and Pasley's Motion for Summary

Judgment state the following:

## I.     INTRODUCTION

This case arises from a sexual encounter between Plaintiff while she was an inmate at

Logan Correctional Center and Defendant Kohlrus, who was a correctional officer at Logan, an

Illinois Department of Corrections prison. Plaintiff has sued Defendants Keane, Funk, and Pasley

under Section 1983 for deliberate indifference (Count III) and conspiracy (Count V), while also

suing them for the state-law tort of negligent spoliation of evidence (Count XIII). Throughout her

Second Amended Complaint and in this litigation, Plaintiff has invoked the Prison Rape

Elimination Act in an apparent attempt to point to shortcomings in compliance with that act.

Defendants Keane, Funk, and Pasley each has served as IDOC's PREA Coordinator, working to assist the agency in complying with the federal law. PREA, though, does not provide for a private cause of action, and negligence cannot satisfy Plaintiff's Section 1983 claims. Because they were not deliberately indifferent to a specific and substantial threat to Plaintiff's health or safety; because they did not conspire to deprive Plaintiff of her constitutional rights; because Plaintiff cannot establish the elements necessary for her spoliation of evidence claim; and because Defendants are entitled to qualified immunity, Defendants Keane, Funk, and Pasley move this Court to enter summary judgment as a matter of law in their favor and against the Plaintiff on Counts III, V, and XIII of her Second Amended Complaint.

## II.    UNDISPUTED MATERIAL FACTS

1.    Plaintiff Jacqueline Farris was incarcerated at the Illinois Department of Corrections ("IDOC") Logan Correctional Center in December 2015. (Doc. 171 (Answer) at 3).

2.    Defendant Eric Kohlrus was employed in December 2015 as a Correctional Officer at Logan Correctional Center. (Doc. 171 (Answer) at 4, 13).

3.    Plaintiff and Defendant Kohlrus had a sexual encounter on December 28, 2015, at Logan Correctional Center. (Doc. 171 (Answer) at 1).

4.    Defendant Mike Funk was employed by IDOC and served as an Agency PREA Coordinator. (Doc. 171 (Answer) at 7).

5.    Defendant Patrick Keane was employed by IDOC and served as an Agency PREA Coordinator. (Doc. 171 (Answer) at 7).

6.    Defendant Alan Pasley served as a back-up Agency PREA Coordinator. (Doc. 171 (Answer) at 8).

7.     Defendant Felipe Zavala served as a back-up Agency PREA Coordinator. (Doc. 171 (Answer) at 8).

8.     During a portion of the time Plaintiff was incarcerated at Logan Correctional Center, Defendant Keane served as the Illinois Department of Corrections' PREA Coordinator. (Ex. A (Keane dep.) at 16:24–17:2).

9.     Defendant Keane was named PREA Coordinator for IDOC in July 2013 due to the transfer of Defendant Pasley to Logan Correctional Center. (Ex. A (Keane dep.) at 28:17–20, 63:22–24, 64:11–14, 73:22–74:1).

10.     After becoming IDOC PREA Coordinator, Defendant Keane attended PREA training from the U.S. Department of Justice in 2013 and became a certified PREA auditor in 2014. (*See* Keane dep. at 88:7–21, 90:10–14, 253:16–18).

11.     Defendant Keane remained IDOC PREA Coordinator until November 13, 2015, when he took a position with the Illinois Department of Juvenile Justice. (Ex. A (Keane dep.) at 28:21–23).

12.     While he was backup IDOC PREA Coordinator and IDOC PREA Coordinator, Defendant Keane instituted a program of notification to inmates through an orientation video and orientation manuals their rights under PREA to a victim advocate or qualified agency staff member during forensic medical examinations and investigatory interviews. (Ex. A (Keane dep.) at 104:7–106:12; also 122:10–14).

13.     Inmates also were notified by postings in facilities including in medical and mental health areas as well as orientation classes explaining the orientation manual. (Ex. A (Keane dep.) at 107:4–13).

14.     Defendant Keane also placed a page on the IDOC website informing family and friends of inmates' PREA rights. (Ex. A (Keane dep.) at 106:13–20).

15.     As IDOC PREA Coordinator, Defendant Keane developed training on PREA requirements, spoke about PREA in monthly staff meetings, presented at wardens' meetings, and gave regional training across Illinois. (Ex. A (Keane dep.) at 109:10–16).

16.     Defendant Keane provided an eight-hour training to IDOC staff on PREA approximately 20 or 30 times. (Ex. A (Keane dep.) at 116:22–24, 118:8–12).

17.     Defendant Keane provided training on the rights of inmates and employees to be free from retaliation for reporting sexual abuse and harassment, including ensuring it was part of annual cycle training. (Ex. A (Keane dep.) at 109:17–22, 110:5–6, 113:23–114:19).

18.     The dynamics of sexual abuse and sexual harassment was discussed in annual cycle training, in training for security staff or correctional officers in training, also known as cadets, and in training for non-security staff. (Ex. A (Keane dep.) at 121:8–20, 128:19–129:3).

19.     Annual cycle training included training on the common reactions of sexual abuse and sexual harassment victims. (Ex. A (Keane dep.) at 142:17–20).

20.     Defendant Keane provided training in wardens' meetings on the rights of inmates and employees to be free from retaliation for reporting sexual abuse and harassment. (Ex. A (Keane dep.) at 138:21–139:5).

21.     Defendant Keane gave presentations in wardens' meetings that included training on the dynamics of sexual abuse and sexual harassment. (Ex. A (Keane dep.) at 137:12–16).

22.     To ensure IDOC staff were trained how to detect inappropriate relationships with inmates, Defendant Keane offered multiple training opportunities for employees to attend,

including annual cycling training for all employees, a class for cadets, and training for non-security staff. (Ex. A (Keane dep.) at 148:4–13).

23.     Defendant Keane never was involved in sending people to segregation. (Ex. A (Keane dep.) at 111:7–8).

24.     Defendant Keane played no role in the decision to make Logan Correctional Center a female facility. (Ex. A (Keane dep.) at 153:2–4).

25.     Defendant Keane was not at Logan Correctional Center giving training to its staff regarding dealing with female offenders. (Ex. A (Keane dep.) at 153:10–12).

26.     When he heard from Logan Correctional Center staff that they had not received any training about working with female prisoners, Defendant Keane notified the Warden and Defendant Keane's direct supervisor. (Ex. A (Keane dep.) at 155:15–24).

27.     Provocative verbal abuse by staff in the aftermath of the transition of Logan Correctional Center from a male to a female facility never was reported to Defendant Keane. (Ex. A (Keane dep.) at 161: 2–7, 18–22).

28.     Defendant Keane has no independent recollection of the Plaintiff. (Ex. A (Keane dep.) at 17:23–18:1).

29.     As IDOC PREA Coordinator, Defendant Keane would be notified of the results of a PREA investigation but would not receive the investigative report or summary. (Ex. A (Keane dep.) at 179:17–180:7).

30.     Defendant Keane notified the Chief of Intel, Mark Delia, that the standards from the PREA Coordinator's office needed to be met. (Ex. A (Keane dep.) at 182:18–20).

31.     During his tenure as IDOC PREA Coordinator, Defendant Keane did not know of frequent rumors about sexual interactions between members of the staff at Logan Correctional Center and the women who were housed there. (Ex. A (Keane dep.) at 252:6–19).

32.     Defendant Keane continually assessed facilities' compliance with the PREA standards. (Ex. A (Keane dep.) at 253:19–24).

33.     Defendant Keane does not know Defendant Kohlrus. (Ex. A (Keane dep.) at 264:6–7).

34.     In July 2013, while employed by IDOC as Program Compliance Officer, Defendant Keane was named the agency's PREA Coordinator. (Ex. B (Keane aff.) ¶ 2).

35.     Defendant Keane served as IDOC PREA Coordinator until November 13, 2015, when he voluntarily terminated his employment to accept a position with the Illinois Department of Juvenile Justice. (Ex. B (Keane aff.) ¶ 3).

36.     As part of his employment with IDOC, Defendant Keane traveled to and visited IDOC facilities, including Logan Correctional Center. (Ex. B (Keane aff.) ¶ 6).

37.     During his term as IDOC PREA Coordinator, Defendant Keane did not have an office assigned to him at IDOC headquarters in Springfield or at Logan Correctional Center, and he was not assigned to work out of Logan Correctional Center. (Ex. B (Keane aff.) ¶ 7).

38.     During his term as IDOC PREA Coordinator, Defendant Keane worked out of an office located at the Aurora Parole Office in Aurora, Illinois. (Ex. B (Keane aff.) ¶ 4).

39.     Prior to this lawsuit, Defendant Keane did not know who Plaintiff or Defendant Kohlrus were, and he does not recall ever meeting or interacting with either of them. (Ex. B (Keane aff.) ¶ 8).

40.     While employed at IDOC, Defendant Keane never knew or was aware of any threat that Defendant Kohlrus posed to sexually assault or sexually harass anyone at Logan Correctional Center, including Plaintiff, on or before December 28, 2015. (Ex. B (Keane aff.) ¶ 9).

41.     While employed at IDOC, Defendant Kohlrus never knew or was aware of any specific and substantial threat of sexual assault or sexual harassment posed to Plaintiff Farris, including by Defendant Kohlrus, on or before December 28, 2015. (Ex. B (Keane aff.) ¶ 10).

42.     Defendant Keane had no knowledge prior to the sexual encounter between Plaintiff and Defendant Kohlrus on December 28, 2015, at Logan Correctional Center that said sexual encounter was going to occur. (Ex. B (Keane aff.) ¶ 11).

43.     While employed at IDOC, Defendant Keane became acquainted with Defendants Christine Brannon, Clara Charron, Norine Ashley, Lisa Johnson, Mike Funk, Alan Pasley, and Angela Locke, who were fellow IDOC employees. (Ex. B (Keane aff.) ¶ 12).

44.     Defendant Keane is not and never has been acquainted with Defendants Kohlrus, Alex Adams, Laura Jackson, Jeff Gabor, or Trina Snyder. (Ex. B (Keane aff.) ¶ 13).

45.     Defendant Keane has never entered into an agreement with Defendants Kohlrus, Brannon, Charron, Ashley, Johnson, Funk, Pasley, Adams, Jackson, Gabor, Snyder, or Locke to deprive Plaintiff of her constitutional rights or to protect one another from liability for depriving Plaintiff of her constitutional rights. (Ex. B (Keane aff.) ¶ 14).

46.     At no time after the sexual encounter between Plaintiff and Defendant Kohlrus on December 28, 2015, at Logan Correctional Center was Defendant Keane aware of the existence of photographic or video evidence depicting Plaintiff at or about the time of the encounter. (Ex. B (Keane aff.) ¶ 15).

47.     At no time after the sexual encounter between Plaintiff Farris and Defendant Kohlrus on December 28, 2015, at Logan Correctional Center did Defendant Keane fail to preserve photographic or video evidence of which he was aware that depicted Plaintiff at or about the time of the encounter. (Ex. B (Keane aff.) ¶ 16).

48.     To his knowledge Defendant Funk never interacted with Plaintiff. (Ex. C (Funk dep.) at 14:23–25).

49.     Defendant Funk had no role in the investigation into Plaintiff's sexual assault at Logan Correctional Center in December 2015. (Ex. C (Funk dep.) at 15:1–4).

50.     In May 2015 Defendant Funk attended the National PREA Resource Center's week-long Audit Training Program, and he was officially certified as a certified PREA auditor in October 2015. (Funk dep at 24:16–19, 27:13–25).

51.     Defendant Patrick Keane previously attended the training. (Ex. C (Funk dep.) at 26:22–27:11).

52.     In approximately October 2015, Defendant Funk was approached to lead the PREA audit process for IDOC, with which he remained involved through May 2016. (Ex. C (Funk dep.) at 16:17–19).

53.     When asked to oversee the PREA audit, Defendant Funk also understood that he would replace Defendant Keane as Agency PREA Coordinator. (Ex. C (Funk dep.) at 29:8–12).

54.     Defendant Funk was asked or tasked to oversee the audit process coming to ensure IDOC was compliant with the national PREA standards. (Ex. C (Funk dep.) at 23:20–24).

55.     In November 2015 Defendant Funk was appointed Agency PREA Coordinator for IDOC. (Ex. C (Funk dep.) at 28:24–29:3).

56.     One of Defendant Funk's roles was to oversee the external audit of IDOC's compliance with PREA and the PREA regulations. (Ex. C (Funk dep.) at 30:10–13).

57.     Defendant Funk was employed as a manager of IDOC's Employee Services Division in June 2016 until he retired in June 2017. (Ex. C (Funk dep.) at 16:20–17:8).

58.     Defendant Alan Pasley was Defendant Funk's backup Agency PREA Coordinator. (Ex. C (Funk dep.) at 33:12–16).

59.     Defendant Funk visited IDOC facilities to determine what practices existed and whether they were compliant with IDOC Administrative Directives or the PREA standards. (Ex. C (Funk dep.) at 32:13–21).

60.     Defendant Funk did not visit Logan Correctional Center personally, but Defendant Pasley did. (Ex. C (Funk dep.) at 34:23–35:8).

61.     Defendant Pasley worked at Logan Correctional Center at the time. (Ex. C (Funk dep.) at 35:11–12.

62.     As Superintendent of the Reception and Classification Unit at Logan Correctional Center, Defendant Pasley was responsible for ensuring that the unit was compliant with PREA and the Administrative Directives on sexual abuse. (Ex. C (Funk dep.) at 36:18–23).

63.     Defendant Funk relied upon accessing a database maintained by IDOC employee Jeff Smith to ensure that post-incident reviews and retaliation monitoring was occurring. (Ex. C (Funk dep.) at 46:23–15).

64.     Defendants Funk and Pasley worked as partners on PREA matters. (Ex. C (Funk dep.) at 48:25–49:13).

65.     Defendant Funk was not involved in the drafting of the Administrative Directive effective September 1, 2013, that was amended in early 2016. (Ex. C (Funk dep.) at 53:19–54:19).

66.     Training for PREA Compliance Managers and others was in place as of December 4, 2015. (Ex. C (Funk dep.) at 79:20–25).

67.     Defendant Ashley received training on PREA for sexual abuse on September 30, 2013, and December 4, 2013. (Ex. C (Funk dep.) at 81:23–82:8).

68.     Cycle training includes sexual abuse and sexual harassment training. (Ex. C (Funk dep.) at 91:12–15).

69.     Adding cameras at Logan was discussed on different occasions, and cameras were added at Logan. (Ex. C (Funk dep.) at 127:2–8).

70.     Cameras were added at Logan before Funk became involved. (Ex. C (Funk dep.) at 127:25–128:1).

71.     Cameras are not mandated under the PREA standards, but they are an enhancement to prevention and intervention. (Ex. C (Funk dep.) at 131:5–9).

72.     During his tenure as agency-wide PREA coordinator, Defendant Funk never was notified of conduct or treatment that was suggestive of retaliation. (Ex. C (Funk dep.) at 137:19–22).

**73.**     Defendant Funk took over as Agency PREA Coordinator from Patrick Keane. (Ex. C (Funk dep.) at 169:13–18).

74.     As soon as he learned from talking to an auditor where issues and discrepancies were, Defendant Funk worked to correct them. (Ex. C (Funk dep.) at 171:19–25).

75.     Defendant Funk had some reason to believe that, while no documentation supported that several PREA standards were being followed, the PREA standards nonetheless were being followed. (Ex. C (Funk dep.) at 172:15–24).

76.     An example was screening, where IDOC was using an old form and asking questions but it was not being documented and saved according to the standard. (Ex. C (Funk dep.) at 173:1–5).

77.     Only female offenders are at Logan Correctional Center. (Ex. C (Funk dep.) at 194:19–23).

78.     Logan Correctional Center switched from a male facility to a female facility in the early months of 2013. (Ex. C (Funk dep.) at 203:13–17).

79.     Defendant Funk served as IDOC PREA Coordinator in addition to his position as manager of the Jail and Detention Standards Unit. (Ex. C (Funk dep.) at 257:18–258:5).

80.     Defendant Pasley succeeded Defendant Funk as IDOC's PREA Coordinator. (Ex. C (Funk dep.) at 259:10–12).

81.     In November 2015, while employed by IDOC, Defendant Funk was named the agency's PREA Coordinator. He succeeded Patrick Keane in the position. (Ex. D (Funk aff.) ¶ 2).

82.     Defendant Funk served as the IDOC PREA Coordinator until May 2016, when he accepted a position of manager of IDOC's Employee Services Division in June 2016. (Ex. D (Funk aff.) ¶ 3).

83.     When Defendant Funk was IDOC PREA Coordinator, Defendant Pasley served as IDOC's backup PREA Coordinator. (Ex. D (Funk aff.) ¶ 4).

84.     As IDOC PREA Coordinator, Defendant Funk had an office at IDOC headquarters in Springfield, Illinois. (Ex. D (Funk aff.) ¶ 5).

85.     During his term as IDOC PREA Coordinator, Defendant Funk did not have an office assigned to him at Logan Correctional Center, and he was not assigned to work out of Logan Correctional Center. (Ex. D (Funk aff.) ¶ 7).

86.     Prior to this litigation, Defendant Funk did not know who Plaintiff or Defendant Kohlrus were. He does not recall ever meeting or interacting with either of them. (Ex. D (Funk aff.) ¶ 8).

87.     While employed at IDOC, Defendant Funk never knew or was aware of any threat that Defendant Kohlrus posed to sexually assault or sexually harass anyone at Logan Correctional Center, including Plaintiff, on or before December 28, 2015. (Ex. D (Funk aff.) ¶ 9).

88.     While employed at IDOC, Defendant Funk never knew or was aware of any specific and substantial threat of sexual assault or sexual harassment posed to Plaintiff Farris, including by Defendant Kohlrus, on or before December 28, 2015. (Ex. D (Funk aff.) ¶ 10).

89.     Defendant Funk had no knowledge prior to the sexual encounter between Plaintiff and Defendant Kohlrus on December 28, 2015, at Logan Correctional Center that said sexual encounter was going to occur. (Ex. D (Funk aff.) ¶ 11).

90.     While employed at IDOC, Defendant Funk became acquainted with Defendants Christine Brannon, Patrick Keane, Felipe Zavala, Alan Pasley, and Angela Locke, who were fellow IDOC employees. (Ex. D (Funk aff.) ¶ 12).

91.     Defendant Funk is not and has never been acquainted with Defendants Kohlrus, Alex Adams, Clara Charron, Norine Ashley, Lisa Johnson, Laura Jackson, Jeff Gabor, or Trina Snyder. (Ex. D (Funk aff.) ¶ 13).

92.     Defendant Funk has never entered into an agreement with Defendants Kohlrus, Brannon, Charron, Ashley, Johnson, Keane, Pasley, Adams, Jackson, Gabor, Snyder, or Locke to deprive Plaintiff of her constitutional rights or to protect one another from liability for depriving Plaintiff of her constitutional rights. (Ex. D (Funk aff.) ¶ 14).

93.     At no time after the sexual encounter between Plaintiff and Defendant Kohlrus on December 28, 2015, at Logan Correctional Center was Defendant Funk aware of the existence of photographic or video evidence depicting Plaintiff at or about the time of the encounter. (Ex. D (Funk aff.) ¶ 15).

94.     At no time after the sexual encounter between Plaintiff and Defendant Kohlrus on December 28, 2015, at Logan Correctional Center did Defendant Funk fail to preserve photographic or video evidence of which he was aware that depicted Plaintiff at or about the time of the encounter. (Ex. D (Funk aff.) ¶ 16).

95.     Defendant Pasley was IDOC PREA Coordinator or Compliance Manager in 2012 until July 2013. (Ex. E (Pasley dep.) at 135:16–21).

96.     Defendant Pasley served as backup IDOC PREA Compliance Manager in 2017, and as primary IDOC PREA Compliance Manager in 2017. (Ex. E (Pasley dep.) at 13:14–16, 15:23–16:1, 154:5–6).

97.     From 2013 through 2017, IDOC pushed heavily on educating both Logan Correctional Center staff and offenders by training employees to the PREA standards and educating inmates as to their rights as victims but also what would occur if they were perpetrators. (Ex. E (Pasley dep.) at 21:10–22:2).

98.     Defendant Pasley was involved in revising IDOC policy on sexual harassment, sexual abuse, and sexual assault to bring it in line with the PREA definitions. (Ex. E (Pasley dep.) at 24:22–25:13).

99.     IDOC had training in place on July 1, 2015, concerning its zero-tolerance policy that comprised PREA Compliance Manager training and sexual assault and harassment prevention and intervention policy training. (Ex. E (Pasley dep.) at 32:11–33:3).

100.    The training IDOC provided to staff as of July 1, 2015, included training on the right of prisoners to be free from retaliation for reporting sexual abuse and harassment. (Ex. E (Pasley dep.) at 33:10–16).

101.    As of July 1, 2015, Logan Correctional Center provided training to staff on offenders' rights to be free from sexual abuse and harassment and free from retaliation as well as on common signs of sexually abusive or harassing behavior. (Ex. E (Pasley dep.) at 33:4–9, 17–23).

102.    By July 2013, the 40-hour training required to become an IDOC investigator included techniques for interviewing sexual abuse victims, and by 2016 IDOC had required existing investigators review the curriculum as well. (*See* Pasley dep. at 54:6–20, 55:4–19).

103.    Defendant Pasley does not know Defendant Adams. (Ex. E (Pasley dep.) at 145:16–17).

104.    Defendant Kohlrus has been criminally prosecuted for his sexual interaction with Plaintiff. (Ex. E (Pasley dep.) at 265:16–19).

105.    In 2011, while employed by IDOC, Defendant Pasley was named the agency's PREA Coordinator, a position in which he served until July 2013. (Ex. F (Pasley aff.) ¶ 2).

106.    From July 2013 to September 2016, Defendant Pasley worked as the Superintendent at Logan Correctional Center overseeing the reception and classification of offenders entering the prison. (Ex. F (Pasley aff.) ¶ 3).

107.    In late 2015 or early 2016 Defendant Pasley served as backup IDOC PREA Coordinator to Mike Funk while Pasley worked at Logan Correctional Center. (Ex. F (Pasley aff.) ¶ 4).

108.    As IDOC PREA Coordinator, Defendant Pasley had an office at IDOC headquarters in Springfield, Illinois. (Ex. F (Pasley aff.) ¶ 6).

109.    As part of his position as IDOC PREA Coordinator, Defendant Pasley traveled to and visited IDOC facilities, including Logan Correctional Center. (Ex. F (Pasley aff.) ¶ 7).

110.    During his term as IDOC PREA Coordinator, Defendant Pasley did not have an office assigned to him at Logan Correctional Center, and he was not assigned to work out of Logan Correctional Center. (Ex. F (Pasley aff.) ¶ 8).

111.    Prior to this litigation, Defendant Pasley only was aware of Plaintiff and Defendant Kohlrus by name; he was not acquainted with either one and does not recall interacting with either of them. (Ex. F (Pasley aff.) ¶ 9).

112.    While employed at IDOC, Defendant Pasley never knew or was aware of any threat that Defendant Kohlrus posed to sexually assault or sexually harass anyone at Logan Correctional Center, including Plaintiff, on or before December 28, 2015. (Ex. F (Pasley aff.) ¶ 10).

113.    While employed at IDOC, Defendant Pasley never knew or was aware of any specific and substantial threat of sexual assault or sexual harassment posed to Plaintiff, including by Defendant Kohlrus, on or before December 28, 2015. (Ex. F (Pasley aff.) ¶ 11).

114.    Defendant Pasley had no knowledge prior to the sexual encounter between Plaintiff and Defendant Kohlrus on December 28, 2015, at Logan Correctional Center that said sexual encounter was going to occur. (Ex. F (Pasley aff.) ¶ 12).

115.    While employed at IDOC, Defendant Pasley became acquainted with Defendants Christine Brannon, Clara Charron, Norine Ashley, Lisa Johnson, Patrick Keane, Mike Funk, Felipe Zavala, Trina Snyder, and Angela Locke, who were fellow IDOC employees. (Ex. F (Pasley aff.) ¶ 13).

116.    Defendant Pasley is not and has never been acquainted with Defendants Kohlrus, Alex Adams, Laura Jackson, or Jeff Gabor. (Ex. F (Pasley aff.) ¶ 14).

117.    Defendant Pasley has never entered into an agreement with Defendants Kohlrus, Brannon, Charron, Ashley, Johnson, Keane, Funk, Adams, Jackson, Gabor, Snyder, or Locke to deprive Plaintiff of her constitutional rights or to protect one another from liability for depriving Plaintiff of her constitutional rights. (Ex. F (Pasley aff.) ¶ 15).

118.    At no time after the sexual encounter between Plaintiff and Defendant Kohlrus on December 28, 2015, at Logan Correctional Center was Defendant Pasley aware of the existence of photographic or video evidence depicting Plaintiff at or about the time of the encounter. (Ex. F (Pasley aff.) ¶ 16).

119.    At no time after the sexual encounter between Plaintiff and Defendant Kohlrus on December 28, 2015, at Logan Correctional Center did Defendant Pasley fail to preserve photographic or video evidence of which he was aware that depicted Plaintiff at or about the time of the encounter. (Ex. F (Pasley aff.) ¶ 17).

120.    Defendant Kohlrus received instruction from IDOC that sexual contact with prisoners was against the rules. (Ex. G (Kohlrus dep.) at 28:18–21).

121.    Defendant Kohlrus was briefed on PREA and was aware he was not to have sexual contact with inmates. (Ex. G. (Kohlrus dep.) at 29:4–22).

122.    At the time of the sexual encounter with Plaintiff, Defendant Kohlrus understood that sexual contact with offenders was inappropriate and against IDOC policy and state and federal law. (Ex. G (Kohlrus dep.) at 233:5–17).

123. Defendant Kohlrus had no reason to believe that administration either at IDOC or Logan Correctional Center condoned officers having sexual relations with inmates. (Ex. G (Kohlrus dep.) at 236:5–20).

124. In the early morning hours of December 28, 2015, Defendant Kohlrus let Plaintiff out of her cell, then met her in the laundry room, where she performed oral sex on him. (Ex. G (Kohlrus dep.) at 86:10–87:2).

125. After she went back to her cell, Plaintiff told Defendant Kohlrus she wanted to "try again," so she returned to the laundry room, motioned him to follow, and they had sexual intercourse. (Ex. G (Kohlrus dep.) at 87:1–21).

126. Defendant Kohlrus was responsible for his own actions that evening. (Ex. G (Kohlrus dep.) at 92:19–20).

127. Defendant Kohlrus knew better and should not have had sexual contact with Plaintiff. (Ex. G (Kohlrus dep.) at 115:13–15).

128. Defendant Kohlrus initially lied to the investigator about having sexual contact with Plaintiff, then admitted he had. (Ex. G (Kohlrus dep.) at 110:19–111:7).

129. Defendant Kohlrus resigned from his position as a correctional officer at Logan Correctional Center on December 30, 2015, after it was discovered he had sexual contact with Plaintiff. (Ex. G (Kohlrus dep.) at 76:18–77:10).

130. Defendant Kohlrus pled guilty to custodial sexual misconduct based upon the prisoner's inability to consent under Illinois law. (Ex. G (Kohlrus dep.) at 30:12–17, 224:5–7).

### III.     ARGUMENT

### A.     STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides, in pertinent part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (West 2021).

The U.S. Court of Appeals for the Seventh Circuit has held that "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016) (internal quotation and citation omitted). While facts and reasonable inferences are construed in favor of the non-moving party, that favor does not extend to drawing inferences supported solely by speculation or conjecture. *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). "Plaintiffs must do more than raise some metaphysical doubt as to the material facts; Plaintiffs must come forward with specific facts showing that there is a genuine issue for trial." *Id.*

Summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing there is a genuine issue of material fact for trial. *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). Such an issue exists "when there is sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which it bears the burden of proof." *Id.* Summary judgment may only be denied when there is a genuine issue as to a material fact. *Madlock v. WEC Energy Group, Inc*., 885 F.3d 465, 470 (7th Cir. 2018). As such, a trial court is "not tasked with determining whether there is any evidence in the record to support

the non-movant, but rather 'whether reasonable jurors could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Id.*

**B.     SECTION 1983**

Of the three counts she brings against Defendants Funk, Keane, and Pasley, Plaintiff brings her two federal counts under 42 U.S.C. § 1983. *See* Count III (deliberate indifference); Count V (conspiracy).

In an action under Section 1983, the plaintiff must establish individual liability. *Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019. "The plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Carmody v. Bd. of Trustees of Univ. of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018). Vicarious liability does not exist in a Section 1983 suit, *Lennon v. City of Carmel*, 865 F.3d 503, 507-08 (7th Cir. 2017), nor does respondeat superior liability. *Carmody* at 403.

In a Section 1983 suit, the plaintiff must establish the state of mind required to prove the underlying violation. *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 405 (1997). Section 1983 claims cannot be founded on negligence. *E.g.*, *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). Under Section 1983, a prison official's negligence or even gross negligence is insufficient for liability. *Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

**C.     PRISON RAPE ELIMINATION ACT**

In her Second Amended Complaint, Plaintiff cites heavily to the Prison Rape Elimination Act, 34 U.S.C. § 30301 *et seq.*, citing it by name twice and by its acronym, PREA, forty-two (42) times.

PREA is a federal statute enacted in 2003 to deter the sexual assault of prisoners. *J.K.J. v. Polk County*, 960 F.3d 367, 373–74 (7th Cir. 2020). The Act provides for the development and

implementation of national standards for the detection, prevention, reduction, and punishment of prison rape. *E.g.*, 34 U.S.C. § 30302(3). Those standards are set forth at 28 C.F.R. § 115 *et seq. Fontano v. Godinez*, 2013 WL 3712406, at *2 (C.D. Ill. 2013).

Significantly, however, PREA does not provide for a private right of action. *E.g.*, *Mackel v. Hou*, 2020 WL 2544400, at *2 (C.D. Ill. 2020); *Ramirez v. Godinez*, 2013 WL 5876715, at *1 (C.D. Ill. 2013). "While the PREA was intended in part to 'increase the accountability of prison officials' and to 'protect the Eighth Amendment rights of Federal, State, and local prisoners' (42 U.S.C. § 15602), nothing in the language of the statute establishes a private right of action." *Ross v. Gossett*, 2016 WL 335991, at *4 (S.D. Ill. 2016). No court considering the issue has found a private right of action existing under PREA. *Jordan v. Lashbrook*, 2019 WL 1282327, at *4 (S.D. Ill. 2019); *Bolden v. Lieutenant Law*, 2016 WL 11647039, at *2 (C.D. Ill. 2016). Consequently, "PREA does not give prisoners a personal right to sue for an official's failure to comply with the Act's requirements." *Summers v. Waggoner*, 2020 WL 6321488, at *3 (S.D. Ill. 2020); *Davis v. Thompson*, 2019 WL 3928899, at *4 (S.D. Ill. 2019).

### D.   ELEVENTH AMENDMENT SOVEREIGN IMMUNITY

Plaintiff's Second Amended Complaint expressly names Defendants Adams, Ashley, Brannon, Charron, Gabor, Jackson, Johnson, Kohlrus, Locke, and Snyder as being sued in their official capacities. (Doc. 170 ¶¶ 7, 10, 12, 14, 21–22, 26). However, Plaintiff's Second Amended Complaint is silent as to which capacity Defendants Funk, Keane, and Pasley are being sued.

Eleventh Amendment immunity prohibits both a state and its agencies from being subject to a federal suit without consent, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984), and suit against a state official in his or her official capacity is no different from suit against the state itself. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989); *Nelson v. La Crosse*

*County Dist. Att'y*, 301 F.3d 820, 827 n.7 (7th Cir. 2002) ("The Eleventh Amendment extends to state agencies and departments and, subject to the *Ex Parte Young* doctrine, to state employees acting in their official capacities."). Further, nothing in PREA suggests Congress intended to override state's Eleventh Amendment immunity. *Ramirez v. Godinez*, 2013 WL 5876715, at *1 (C.D. Ill. 2013) (quoting *Rivera v. Drake*, 2010 WL 1172602 (E.D. Wis. 2010)).

To the extent Plaintiff has sued them for monetary damages in their official capacities as officials and employees of the Illinois Department of Corrections, a department of the State of Illinois, 730 ILCS 5/3-1-1 *et seq.,* Defendants Keane, Funk, and Pasley are entitled to Eleventh Amendment sovereign immunity. (Doc. 171 at 35 ¶ 3).

### E.   BECAUSE DEFENDANTS DID NOT KNOW OF OR DISREGARD A SPECIFIC AND SUBSTANTIAL THREAT TO PLAINTIFF, HER DELIBERATE INDIFFERENCE CLAIM FAILS, AND DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW.

In Count III of her Second Amended Complaint, Plaintiff alleges Defendants Funk, Keane, and Pasley were deliberately indifferent to Defendant Kohlrus' misconduct in having sexual relations with her at Logan Correctional Center ("Logan CC"). (*See* Doc. 170 Ct. III ¶ 58). Plaintiff contends in this Section 1983 count that her sexual activity with Defendant Kohlrus was not an isolated incident, and that these Defendants were "on notice of the customs, policies, and practices at Logan CC" permitting such misconduct. (*Id.*)

Plaintiff alleges Defendants Keane and Funk, as Agency PREA Coordinators, and Defendant Pasley, as back-up Agency PREA Coordinators, knew in December 2015 of a practice of guard-on-inmate sexual assaults at Logan CC. (Doc. 170 Ct. III ¶¶ 60–61.) Plaintiff contends these sexual assaults constituted a practice "so well-settled as to constitute a de facto policy" of PREA Defendants and that they failed to take reasonable measures to remedy the problem "thus directly encouraging future abuses such as those affecting Plaintiff." (Doc. 170 Ct. III ¶¶ 62–63).

Plaintiff's allegations that Defendants were "on notice of the customs, policies, and practices at Logan CC" permitting sexual misconduct, that they knew about guard-on-inmate assaults, and that the assaults constituted a practice "so well-settled as to constitute a de facto policy" so as to hold Defendants liable for Plaintiff's sexual encounter with Defendant Kohlrus indicate Plaintiff's efforts to impose *Monell*-type liability upon the Defendants in this action. However, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), does not apply to state defendants such as those in the instant action. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989).

A prison official's "deliberate indifference" to a substantial risk of harm to an inmate violates the Eighth Amendment's prohibition against cruel and unusual punishments. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). However, the U.S. Supreme Court has rejected an objective test for deliberate indifference, instead holding that a prison official cannot be liable unless the official knows of and disregards an excessive risk to inmate health or safety. *Id.* at 837. "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Consequently, deliberate indifference requires more than negligence or even gross negligence; it requires criminal recklessness. *Id.* at 839–840; *Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018). The deliberate indifference standard "impos[es] a high hurdle on plaintiffs because it requires a showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (internal quotations omitted).

Where an inmate's claims for failure to protect against the risk of sexual assault have survived summary judgment, the record contained the prison official's knowledge of a specific and substantial threat. *Cole v. Tredway*, 2016 WL 7118946, at *5 (S.D. Ill. 2016). "An opportunity

in which abuse may be committed does not establish deliberate indifference. At most it establishes negligence, which will not suffice to establish § 1983 liability." *J.K.J. v. Polk County*, 960 F.3d 367, 403 (7th Cir. 2020) (internal quotations omitted).

Although negligence is insufficient to establish liability under Section 1983, *id.*, and PREA provides no private right of action, *e.g.*, *Mackel*, *Ramirez*, *supra*, Plaintiff clearly attempts to use PREA as a standard of care in this Section 1983 action and with Defendants Keane, Funk, and Pasley in particular based upon their roles administering PREA within IDOC. (*See* 2nd Am. Compl. ¶¶ 16–19, 60). However, all three worked to ensure compliance with PREA, and none was deliberately indifferent to a specific and substantial threat to Plaintiff.

Defendant Keane served as IDOC PREA Coordinator during a portion of the time Plaintiff was incarcerated at Logan Correctional Center. (Doc. 171 (Answer) at 7; Keane dep. at 16:24–17:2). While employed by IDOC as Program Compliance Officer, Defendant Keane was named to the position of agency PREA Coordinator in July 2013. (Ex. A (Keane dep.) at 28:17–20, 63:22–24, 64:11–14, 73:22–74:1; Keane aff. ¶ 2). After becoming IDOC PREA Coordinator, Defendant Keane attended PREA training from the U.S. Department of Justice in 2013 and became a certified PREA auditor in 2014. (*See* Keane dep. at 88:7–21, 90:10–14, 253:16–18). Defendant Keane remained IDOC PREA Coordinator until November 13, 2015, when he took a position with the Illinois Department of Juvenile Justice. (Ex. A (Keane dep.) at 28:21–23; Keane aff. ¶ 3). Thus, Defendant Keane was not even an IDOC employee at the time of Plaintiff's incarceration by IDOC in December 2015. (*Id.*; Doc. 171 (Answer) at 3).

As IDOC PREA Coordinator, Defendant Keane developed training on PREA requirements, spoke about PREA in monthly staff meetings, presented at wardens' meetings, and gave regional training across Illinois. (Ex. A (Keane dep.) at 109:10–16). He instituted a

notification program to inmates on their PREA rights through an orientation video and orientation manuals, orientation classes explaining the manual, postings in facilities including in medical and mental health areas, and an IDOC website informing family and friends of inmates' PREA rights. (Ex. A (Keane dep.) at 104:7–106:20; 107:4–13; also 122:10–14). Defendant Keane provided an eight-hour training to IDOC staff on PREA approximately 20 or 30 times. (Ex. A (Keane dep.) at 116:22–24, 118:8–12). To ensure IDOC staff were trained how to detect inappropriate relationships with inmates, Defendant Keane offered multiple training opportunities for employees to attend, including annual cycling training for all employees, a class for cadets, and training for non-security staff. (Ex. A (Keane dep.) at 148:4–13). He provided training in wardens' meetings on the rights of inmates and employees to be free from retaliation for reporting sexual abuse and harassment and on the dynamics of sexual abuse and sexual harassment. (Ex. A (Keane dep.) at 137:12–16, 138:21–139:5). Defendant Keane also ensured that such training was part of annual cycle training for security and non-security IDOC staff alike, covering the dynamics of sexual abuse and harassment and common reactions of victims. (Ex. A (Keane dep.) at 109:17–22, 110:5–6, 113:23–114:19, 121:8–20, 128:19–129:3, 142:17–20).

Defendant Keane continually assessed facilities' compliance with the PREA standards. (Ex. A (Keane dep.) at 253:19–24). As IDOC PREA Coordinator, he would be notified of the results of a PREA investigation but would not receive the investigative report or summary. (Ex. A (Keane dep.) at 179:17–180:7). Defendant Keane notified the Chief of Intel, Mark Delia, that the standards from the PREA Coordinator's office needed to be met. (Ex. A (Keane dep.) at 182:18–20).

Defendant Keane played no role in the decision to make Logan Correctional Center a female facility. (Ex. A (Keane dep.) at 153:2–4). He was not at Logan Correctional Center giving

training to its staff regarding dealing with female offenders. (Ex. A (Keane dep.) at 153:10–12). However, when he heard from Logan Correctional Center staff that they had not received any training about working with female prisoners, Defendant Keane notified the Warden and Defendant Keane's direct supervisor. (Ex. A (Keane dep.) at 155:15–24). Provocative verbal abuse by staff in the aftermath of the transition of Logan Correctional Center from a male to a female facility never was reported to him. (Ex. A (Keane dep.) at 161: 2–7, 18–22). During his tenure as IDOC PREA Coordinator, Defendant Keane did not know of frequent rumors about sexual interactions between members of the staff at Logan Correctional Center and the women who were housed there. (Ex. A (Keane dep.) at 252:6–19). Defendant Keane also never was involved in sending people to segregation. (Ex. A (Keane dep.) at 111:7–8).

Defendant Keane's successor as IDOC PREA Coordinator, Defendant Funk, attended the National PREA Resource Center's week-long Audit Training Program in May 2015, and he was officially certified as a certified PREA auditor in October 2015. (Funk dep at 24:16–19, 27:13–25). Defendant Keane previously attended the training. (Ex. C (Funk dep.) at 26:22–27:11).

In approximately October 2015, Defendant Funk was approached to lead the PREA audit process for IDOC, with which he remained involved through May 2016. (Ex. C (Funk dep.) at 16:17–19). He was tasked to oversee the audit process coming to ensure IDOC was compliant with the national PREA standards. (Ex. C (Funk dep.) at 23:20–24). When asked to oversee the PREA audit, Defendant Funk also understood that he would replace Defendant Keane as Agency PREA Coordinator. (Ex. C (Funk dep.) at 29:8–12). Defendant Funk took over as agency PREA Coordinator from Defendant Keane. (Ex. C (Funk dep.) at 169:13–18; Funk aff. ¶ 2).

In November 2015 Defendant Funk was appointed Agency PREA Coordinator for IDOC. (Ex. C (Funk dep.) at 28:24–29:3; Funk aff. ¶ 2). Thus, Defendant Funk only began working as

IDOC PREA Coordinator in the month prior to Plaintiff's incarceration. (*Id.*; Doc. 171 (Answer) at 3). Defendant Funk served as IDOC PREA Coordinator in addition to his position as manager of the Jail and Detention Standards Unit. (Ex. C (Funk dep.) at 257:18–258:5). One of Defendant Funk's roles was to oversee the external audit of IDOC's compliance with PREA and the PREA regulations. (Ex. C (Funk dep.) at 30:10–13). As soon as he learned from talking to an auditor where issues and discrepancies were, Defendant Funk worked to correct them. (Ex. C (Funk dep.) at 171:19–25). For example, Defendant Funk had some reason to believe that, while no documentation supported that several PREA standards were being followed, the PREA standards nonetheless were being followed. (Ex. C (Funk dep.) at 172:15–24). An example was screening, where IDOC was using an old form and asking questions but it was not being documented and saved according to the standard. (Ex. C (Funk dep.) at 173:1–5). Defendant Funk, however, was not involved in the drafting of the Administrative Directive effective September 1, 2013, that was amended in early 2016. (Ex. C (Funk dep.) at 53:19–54:19).

Defendant Funk visited IDOC facilities to determine what practices existed and whether they were compliant with IDOC Administrative Directives or the PREA standards. (Ex. C (Funk dep.) at 32:13–21). Training for PREA Compliance Managers and others was in place as of December 4, 2015. (Ex. C (Funk dep.) at 79:20–25). Cycle training includes sexual abuse and sexual harassment training. (Ex. C (Funk dep.) at 91:12–15). Defendant Ashley, for example, received training on PREA for sexual abuse on September 30, 2013, and December 4, 2013. (Ex. C (Funk dep.) at 81:23–82:8).

Defendant Funk relied upon accessing a database maintained by IDOC employee Jeff Smith to ensure that post-incident reviews and retaliation monitoring was occurring. (Ex. C (Funk dep.) at 46:23–15). During his tenure as IDOC PREA coordinator, Defendant Funk never was

notified of conduct or treatment that was suggestive of retaliation. (Ex. C (Funk dep.) at 137:19–22).

Logan Correctional Center switched from a male facility to a female facility in the early months of 2013. (Ex. C (Funk dep.) at 203:13–17). Only female offenders are at Logan. (Ex. C (Funk dep.) at 194:19–23).

Defendant Funk did not visit Logan personally, but Defendant Pasley did. (Ex. C (Funk dep.) at 34:23–35:8). Defendant Pasley worked at Logan at the time. (Ex. C (Funk dep.) at 35:11–12; Pasley aff. ¶ 4). Defendant Pasley was Defendant Funk's backup Agency PREA Coordinator. (Ex. C (Funk dep.) at 33:12–16; Funk aff. ¶ 4; Pasley aff. ¶ 4). Defendants Funk and Pasley worked as partners on PREA matters. (Ex. C (Funk dep.) at 48:25–49:13). As Superintendent of the Reception and Classification Unit at Logan from July 2013 to September 2016, Defendant Pasley was responsible for ensuring that the unit was compliant with PREA and the Administrative Directives on sexual abuse. (Ex. C (Funk dep.) at 36:18–23; *see* Pasley aff. ¶ 3). Defendant Funk served as the IDOC PREA Coordinator until May 2016, when he accepted a position of manager of IDOC's Employee Services Division in June 2016. (Ex. C (Funk dep.) at 16:20–17:8; Funk aff. ¶ 3).

Defendant Pasley succeeded Defendant Funk as IDOC's PREA Coordinator. (Ex. C (Funk dep.) at 259:10–12). Defendant Pasley previously served as IDOC PREA Coordinator in 2012 until July 2013, before Defendant Keane held the position. (Ex. E (Pasley dep.) at 135:16–21; *e.g.*, Keane aff. ¶ 2; Pasley aff. ¶ 2). Defendant Pasley was involved in revising IDOC policy on sexual harassment, sexual abuse, and sexual assault to bring it in line with the PREA definitions. (Ex. E (Pasley dep.) at 24:22–25:13). From 2013 through 2017, IDOC pushed heavily on educating both Logan Correctional Center staff and offenders by training employees to the PREA standards and

educating inmates as to their rights as victims but also what would occur if they were perpetrators. (Ex. E (Pasley dep.) at 21:10–22:2). By July 2013, the 40-hour training required to become an IDOC investigator included techniques for interviewing sexual abuse victims, and by 2016 IDOC had required existing investigators review the curriculum as well. (See Pasley dep. at 54:6–20, 55:4–19). IDOC had training in place on July 1, 2015, concerning its zero-tolerance policy that comprised PREA Compliance Manager training and sexual assault and harassment prevention and intervention policy training. (Ex. E (Pasley dep.) at 32:11–33:3). The training IDOC provided to staff as of July 1, 2015, included training on the right of prisoners to be free from retaliation for reporting sexual abuse and harassment. (Ex. E (Pasley dep.) at 33:10–16). As of July 1, 2015, Logan Correctional Center provided training to staff on offenders' rights to be free from sexual abuse and harassment and free from retaliation as well as on common signs of sexually abusive or harassing behavior. (Ex. E (Pasley dep.) at 33:4–9, 17–23). Defendant Pasley later served as backup IDOC PREA Compliance Manager in 2017, and as primary IDOC PREA Compliance Manager in 2017. (Ex. E (Pasley dep.) at 13:14–16, 15:23–16:1, 154:5–6).

The above recitation of their positions and activities underscores that Defendants Keane, Funk, and Pasley all have had substantial experience administering PREA, including as IDOC's PREA Coordinator. What these Defendants did not have, however, was any knowledge of an excessive risk to Plaintiff's health or safety from Defendant Kohlrus prior to her sexual encounter with him, and they certainly did not disregard any such knowledge.

When they each served as IDOC PREA Coordinator, Defendants Funk and Pasley had an office at IDOC headquarters in Springfield. (Ex. D (Funk aff.) ¶ 5; Pasley aff. ¶ 6). When Defendant Keane served as IDOC PREA coordinator, however, he did not have an office assigned to him at IDOC headquarters. (Ex. B (Keane aff.) ¶ 7). Instead, Defendant Keane worked out of

an office located at the Aurora Parole Office in Aurora, Illinois. (Ex. B (Keane aff.) ¶ 4). Defendant Keane traveled to and visited IDOC facilities, including Logan Correctional Center. (Ex. B (Keane aff.) ¶ 6).

Thus, when they served as IDOC PREA Coordinator, Defendants Keane, Funk, and Pasley's offices were not in Logan Correctional Center. In fact, during their service as IDOC PREA Coordinator, none of them had an office at Logan or were assigned to work out of Logan. (Ex. B (Keane aff.) ¶ 7; Funk aff. ¶ 7; Pasley aff. ¶ 8). Yet despite not even working out of the prison where Plaintiff and Defendant Kohlrus' sexual encounter occurred while they each served as IDOC PREA Coordinator, Plaintiff attempts to hold them liable for it.

Defendant Pasley is the only one of these three Defendants who worked out of Logan and did so at the time of Plaintiff's incarceration there. He was not IDOC PREA Coordinator at the time but did serve as backup IDOC PREA Coordinator while working as Logan's Superintendent overseeing the reception and classification of incoming prisoners. (Ex. F (Pasley aff.) ¶¶ 3–4).

Nonetheless, prior to this litigation Defendant Pasley only was aware of Plaintiff and Defendant Kohlrus by name; he was not acquainted with either one and does not recall interacting with either of them. (Ex. F (Pasley aff.) ¶ 9). Defendants Keane and Funk did not know who Plaintiff or Defendant Kohlrus were prior to this lawsuit, and neither recalls ever meeting or interacting with them. (Ex. A (Keane dep.) at 17:23–18:1, 264:6–7; Keane aff. ¶ 8; Funk dep. at 14:23–25; Funk aff. ¶ 8).

Efforts to educate IDOC staff about PREA reached Defendant Kohlrus, who was briefed on PREA and aware he was not to have sexual contact with inmates. (Ex. G. (Kohlrus dep.) at 29:4–22). He received instruction from IDOC that sexual contact with prisoners was against the rules. (Ex. G (Kohlrus dep.) at 28:18–21). Defendant Kohlrus had no reason to believe IDOC or

Logan Correctional Center condoned officers having sexual relations with inmates. (Ex. G (Kohlrus dep.) at 236:5–20). Even at the time of the sexual encounter with Plaintiff, Defendant Kohlrus understood sexual contact with offenders was inappropriate and against IDOC policy and state and federal law. (Ex. G (Kohlrus dep.) at 233:5–17).

Despite this knowledge, on December 28, 2015, Defendant Kohlrus let Plaintiff out of her cell, then met her in the laundry room, where she performed oral sex on him. (Ex. G (Kohlrus dep.) at 86:10–87:2). After she went back to her cell, Plaintiff told Defendant Kohlrus she wanted to "try again," so she returned to the laundry room, motioned him to follow, and they had sexual intercourse. (Ex. G (Kohlrus dep.) at 87:1–21).

Defendant Kohlrus was responsible for his own actions that evening. (Ex. G (Kohlrus dep.) at 92:19–20). He knew better and should not have had sexual contact with Plaintiff. (Ex. G (Kohlrus dep.) at 115:13–15). Defendant Kohlrus initially lied to the investigator about having sexual contact with Plaintiff, then admitted he had. (Ex. G (Kohlrus dep.) at 110:19–111:7). He resigned from his position as a correctional officer at Logan Correctional Center on December 30, 2015. (Ex. G (Kohlrus dep.) at 76:18–77:10). Defendant Kohlrus pled guilty to custodial sexual misconduct. (Ex. G (Kohlrus dep.) at 30:12–17, 224:5–7; Ex. E (Pasley dep.) at 265:16–19).

Just as was the case with Defendants Keane and Funk, Defendant Pasley never knew or was aware of any threat that Defendant Kohlrus posed to sexually assault or sexually harass anyone at Logan Correctional Center, including Plaintiff, on or before December 28, 2015. (Ex. B (Keane aff.) ¶ 9; Funk aff. ¶ 9; Pasley aff. ¶ 10). Defendants Keane, Funk, and Pasley also never knew or were aware of any specific and substantial threat of sexual assault or sexual harassment posed to Plaintiff, including by Defendant Kohlrus, on or before December 28, 2015. (Ex. B (Keane aff.) ¶ 10; Funk aff. ¶ 10; Pasley aff. ¶ 11). Further, Defendants Keane, Funk, and Pasley had no

knowledge prior to the sexual encounter between Plaintiff and Defendant Kohlrus on December 28, 2015, at Logan that their sexual encounter was going to occur. (Ex. B (Keane aff.) ¶ 11; Funk aff. ¶ 11; Pasley aff. ¶ 12). Although he served as IDOC PREA Coordinator at the time of the incident, Defendant Funk had no role in the investigation into Plaintiff's sexual assault at Logan in December 2015. (Ex. C (Funk dep.) at 15:1–4).

Under established U.S. Supreme Court precedent, Defendants Keane, Funk, and Pasley cannot be held liable for deliberate indifference unless they both knew of and disregarded an excessive risk to Plaintiff's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The Plaintiff must show that these Defendants both were aware of the fact that a substantial risk of serious harm to her existed and that they also drew that inference. *Id.* While Defendants deny any negligence, it would not be sufficient to prove Plaintiff's case if she could prove it, as not even gross negligence is enough for deliberate indifference; it requires criminal recklessness, a standard "approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Huber*, *Rosario*, *supra*.

Significantly, Plaintiff's deliberate indifference claim against Defendants Keane, Funk, and Pasley for failing to protect her requires not just an opportunity for her abuse but their knowledge of a specific and substantial threat. *Cole*, *J.K.J.*, *supra.* Plaintiff cannot prove that in this case, as these Defendants never knew or were aware of any specific and substantial threat that Defendant Kohlrus posed to sexually assault or harass anyone at Logan, including Plaintiff, or of any specific and substantial threat posed to Plaintiff, including by Defendant Kohlrus, of sexual assault or harassment, prior to their sexual encounter on December 28, 2015. These Defendants had no knowledge prior to that encounter that it was going to occur. Because they did not have any such knowledge, let alone disregard it, Plaintiff cannot prove that they acted with the requisite

criminal recklessness. Therefore, Plaintiff's Section 1983 deliberate indifference claim fails, and

Defendants Keane, Funk, and Pasley are entitled to summary judgment as a matter of law on Count

III of Plaintiff's Second Amended Complaint.

> **F.    AS SHE HAS FAILED TO PROVE DEFENDANTS DEPRIVED
> PLAINTIFF OF HER CONSTITUTIONAL RIGHTS AND AS SHE LACKS
> EVIDENCE OF AN AGREEMENT AMONG DEFENDANTS TO DO SO,
> DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
> PLAINTIFF'S SECTION 1983 CONSPIRACY CLAIM.**

In Count V of her Second Amended Complaint, Plaintiff asserts a Section 1983 claim

alleging Defendants Funk, Keane, and Pasley conspired along with Defendants Adams, Ashley,

Brannon, Charron, Jackson, Johnson, Kohlrus, and Locke by agreeing "to deprive Plaintiff and

other prisoners facing a substantial risk of sexual assault of their constitutional rights and to protect

one another from liability for depriving Plaintiff and prisoners like her of their rights" and by

committing overt acts. (Doc. 170 Ct. V ¶¶ 75-76).[1]

A civil conspiracy is a combination of two or more persons acting in concert to commit an

unlawful act or to commit a lawful act by unlawful means. *Beaman v. Freesmeyer*, 776 F.3d 500,

510 (7th Cir. 2015).

A Section 1983 conspiracy claim requires both (1) an underlying constitutional violation

and (2) an agreement among the defendants to inflict the unconstitutional harm. *Green v. Howser*,

942 F.3d 772, 778 (7th Cir. 2019). "To prevail on a conspiracy claim, the plaintiff must show that

(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt

acts in furtherance actually deprived him of those rights." *Daugherty v. Page*, 906 F.3d 606, 612

(7th Cir. 2018) (internal quotations omitted). To survive summary judgment, a plaintiff needs to

---

[1] Plaintiff's suit is not a class action, and Plaintiff is the only named plaintiff; there are no others, including any "prisoners like her."

show evidence of an agreement among the conspirators to violate her rights. *Owens v. Evans*, 878 F.3d 559, 565 (7th Cir. 2017). While circumstantial evidence may be used to establish a conspiracy, such evidence cannot be speculative. *Daugherty*.

Section 1983 conspiracy claims are derivative and cannot stand alone. *Campos v. Cook County*, 932 F.3d 972, 975 (7th Cir. 2019). Consequently, Section 1983 does not reach a conspiracy to deny a right in the absence of an actual denial of such a right. *Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017). "Without a viable federal constitutional claim, the conspiracy claim under § 1983 necessarily fails; there is no independent cause of action for § 1983 conspiracy." *Katz-Crank v. Haskett*, 843 F.3d 641, 650 (7th Cir. 2016).

Because Plaintiff fails to establish Defendants' deliberate indifference to prove Count III of her Second Amended Complaint, *see* Section E, *supra*, no constitutional violation exists to support her Section 1983 conspiracy claim in Count V, either. *See*, *e.g.*, *Green*, *supra.* However, Plaintiff's conspiracy claim also fails because no agreement exists for Defendants to inflict constitutional harm against her.

As is the case with most conspiracy theories, Plaintiff's conspiracy claim rests upon speculation. While Defendants Keane, Funk, and Pasley are acquainted with each other and with some of the other Defendants, they also are not acquainted with others. (Ex. B (Keane aff.) ¶¶ 12–13; Funk aff. ¶¶ 12–13; Pasley aff. ¶¶ 13–14). Defendant Keane, for example, is not and never has been acquainted with Defendants Kohlrus, Adams, Jackson, Gabor, or Snyder. (Ex. B (Keane aff.) ¶ 13). Defendant Funk is not and never has been acquainted with Defendants Kohlrus, Adams, Charron, Ashley, Johnson, Jackson, Gabor, or Snyder. (Ex. D (Funk aff.) ¶ 13). Defendant Pasley is not and never has been acquainted with Defendants Kohlrus, Adams, Jackson, or Gabor. (Ex. E

(Pasley dep.) at 145:16–17; Pasley aff. ¶ 14). Nonetheless, Plaintiff alleges that Defendants Keane, Funk, and Pasley conspired with these people they do not even know.

Plaintiff's allegations fail to go beyond speculation, though, as Defendants Keane, Funk, and Pasley never entered into an agreement with other Defendants to deprive Plaintiff of her constitutional rights or to protect one another from liability for depriving Plaintiff of her constitutional rights. (Ex. B (Keane aff.) ¶ 14; Funk aff. ¶ 14; Pasley aff. ¶ 15).

Because Plaintiff's underlying deliberate indifference claim against Defendants Keane, Funk, and Pasley fails, and because they never entered into an agreement to deprive Plaintiff of her constitutional rights, Plaintiff's Section 1983 conspiracy claim fails, and Defendants Keane, Funk, and Pasley are entitled to summary judgment as a matter of law on Count V of Plaintiff's Second Amended Complaint.

### G. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S SPOLIATION CLAIM, AS PLAINTIFF CANNOT PROVE THAT DEFENDANTS OWED A DUTY TO PRESERVE OR THAT THE LOSS OR DESTRUCTION OF SUCH EVIDENCE RESULTED IN HER INABILITY TO PROVE HER UNDERLYING CLAIMS.

In Count XIII of her Second Amended Complaint, Plaintiff alleges the Illinois state law claim of negligent spoliation of evidence, contending Defendants Funk, Keane, and Pasley knew of photographic and/or video evidence depicting Plaintiff on the morning of her sexual activity with Defendant Kohlrus and failed to preserve that evidence.

Spoliation of evidence is treated as a negligence action under Illinois law. *Duran v. Town of Cicero, Ill*., 653 F.3d 632, 644 (7th Cir. 2011). As a species of negligence and not a new tort, a spoliation claim requires the plaintiff to prove the four traditional elements of negligence: (1) a duty to preserve the evidence; (2) breach of that duty by loss or destruction of the evidence; (3) that the loss or destruction proximately caused the plaintiff's inability to prove her underlying

claim; and (4) actual damages as a result. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 608 (7th Cir. 2016). "If a plaintiff cannot prevail in the underlying suit even with the allegedly lost or destroyed evidence, then a claim for spoliation will fail because the plaintiff cannot prove damages." *Borsellino v. Goldman Sachs Group, Inc*., 477 F.3d 502, 510 (7th Cir. 2007). Further, no evidentiary presumption exists that negligently lost or destroyed evidence was favorable to the plaintiff. *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 611 (7th Cir. 2016).

Under Illinois law, no general duty exists to preserve evidence. *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 609 (7th Cir. 2016); *Martin v. Keeley & Sons, Inc*., 2012 IL 113270, ¶ 27. However, a duty arises if two conditions are satisfied. *Id.* Under the first—a "relationship" condition—a plaintiff must show that an agreement, contract, statute, special circumstance, or voluntary undertaking has given rise to the duty. *Id.* Under the second—a "foreseeability" condition—the plaintiff must show the duty extends to the specific evidence at issue by demonstrating that a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action. *Id.* If the plaintiff fails to prove either condition, the defendant has no duty to preserve the evidence at issue. *Id.*

Illinois courts have not defined precisely what constitutes a "special circumstance," but mere possession and control of the evidence are not sufficient nor is being a potential litigant. *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 609 (7th Cir. 2016). However, a plaintiff's request to preserve the evidence or a defendant's segregation of the evidence for the plaintiff have been recognized as special circumstances. *Id.*

Under Illinois law, the limitation period for the underlying action applies to a plaintiff's spoliation action. *Skridla v. Gen. Motors Co*., 2015 IL App (2d) 141168, ¶ 16. The statute of

limitations for Section 1983 claims in Illinois is two years. *E.g.*, *Janus v. AFSCME Council 31*, 942 F.3d 352, 361 (7th Cir. 2019).

As Defendant Funk testified, cameras are not mandated under the PREA standards, but they are an enhancement to prevention and intervention. (Ex. C (Funk dep.) at 131:5–9). Adding cameras at Logan was discussed on different occasions, and cameras were added at Logan. (Ex. C (Funk dep.) at 127:2–8). In fact, cameras were added at Logan before Funk became involved. (Ex. C (Funk dep.) at 127:25–128:1).

Of course, having a camera and having a recording made by a camera are two different things. While Plaintiff contends surveillance cameras "captured" Plaintiff and Defendant Kohlrus in the early hours of December 28, 2015, including their walk to and from the laundry room where they had their sexual encounter, even the Plaintiff's Second Amended Complaint does not squarely allege that any such camera actually recorded what it allegedly viewed. (2nd Am. Compl. ¶ 37).

Further, if such a recording existed, Defendants Keane, Funk, and Pasley only could be held liable for negligent spoliation of it if a duty existed for them to preserve the evidence, as no such general duty exists under Illinois law. *See Schaefer*, *Martin*, *supra.* A duty only arises if both a "relationship" and a "foreseeability" condition are satisfied, and Plaintiff cannot satisfy either. *Id.* No contract, statute, or voluntary undertaking gives rise to the duty in the instant case, nor does any special circumstance, such as a request from Plaintiff to Defendants Keane, Funk, or Pasley to preserve the evidence or their segregation of it. In fact, even though mere possession and control of evidence are not sufficient nor is being a potential litigation to constitute a "special circumstance," *Schaefer*, *supra*, Plaintiff does not even level such allegations against these Defendants in her Second Amended Complaint, let alone have evidence of their possession and control. Thus, Plaintiff cannot satisfy the "relationship" condition required for a duty.

Significantly, Plaintiff also cannot satisfy the "foreseeability" condition. At no time after the sexual encounter between Plaintiff and Defendant Kohlrus on December 28, 2015, at Logan were Defendants Keane, Funk, or Pasley aware of the existence of photographic or video evidence depicting Plaintiff at or about the time of the encounter. (Ex. B (Keane aff.) ¶ 15; Funk aff. ¶ 15; Pasley aff. ¶ 16). As such, they did not fail to preserve any such photographic or video evidence. (Ex. B (Keane aff.) ¶ 16; Funk aff. ¶ 16; Pasley aff. ¶ 17). Because Defendants were not even aware of purported existence of the alleged photographic or video evidence, no reasonable person in their position should have foreseen that the evidence was material to a potential civil action, as such a reasonable person would not foresee preserving evidence he or she did not know existed in the first place. *See Schaefer*, *Martin*, *supra.* Having failed to prove either the "relationship" or the "foreseeability" condition, Plaintiff cannot establish Defendants had a duty to preserve the evidence at issue.

Finally, even if she could establish both the "relationship" and "foreseeability" conditions necessary for the duty to preserve to arise, Plaintiff also must prove that the loss or destruction of the evidence proximately caused her inability to prove her underlying claim. *See Schaefer, Borsellino*, *supra.* However, Plaintiff cannot prove that in the case at bar because there is no dispute that Plaintiff and Defendant Kohlrus had a sexual encounter on December 28, 2015, at Logan Correctional Center, and therefore the lack of any such alleged recording could not cause her inability to prove her deliberate indifference or even conspiracy claims against Defendants Keane, Funk, and Pasley. (Doc. 171 (Answer) at 1).

Because Plaintiff can neither establish that they had a duty to preserve the alleged photographic or video evidence and cannot show that the lack or destruction of that evidence

makes her unable to prove her underlying claims, Defendant Keane, Funk, and Pasley are entitled to summary judgment as a matter of law on Count XIII of the Second Amended Complaint.

### H. BECAUSE THE FACTS OF THIS CASE FAIL TO ESTABLISH A VIOLATION OF PLAINTIFF'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS, DEFENDANTS KEANE, FUNK, AND PASLEY REMAIN SHIELDED BY QUALIFIED IMMUNITY.

To the extent Plaintiff has sued them in their individual capacities, Defendants Keane, Funk, and Pasley are entitled to qualified immunity to Plaintiff's Section 1983 deliberate indifference and conspiracy claims against them in Counts III and V.

The U.S. Supreme Court has held that "[t]he doctrine of qualified immunity shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotations omitted). A government official cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate. *City & County of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1774 (2015). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Id.*

Significantly, "[a]lthough qualified immunity is an affirmative defense, once the defense is raised, it becomes the plaintiff's burden to defeat it." *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (citations omitted). A plaintiff may defeat qualified immunity by pointing to a clearly analogous case establishing a right to be free from the specific conduct at issue or by showing that the conduct at issue is so egregious that no reasonable person could have believed it would not violate clearly established rights. *Id.*

Defendants Funk, Keane, and Pasley asserted qualified immunity among their affirmative defenses when answering Plaintiff's Second Amended Complaint. (Doc. 171 at 34 ¶ 1). Thereafter, Plaintiff has had the burden to defeat it. *Wheeler*, *supra*. However, because the facts of this case fail to establish violations of clearly established constitutional rights by Defendants Keane, Funk, and Pasley, they remain shielded by qualified immunity and are entitled to summary judgment as a matter of law on Counts III and V of Plaintiff's Second Amended Complaint.

## IV.    CONCLUSION

WHEREFORE, Defendants PATRICK KEANE, MIKE FUNK, and ALAN PASLEY move this honorable Court to enter summary judgment in their favor and against Plaintiff.

DATED: March 18, 2021

Respectfully submitted,

PATRICK KEANE, MIKE FUNK,
and ALAN PASLEY,

Defendants,

KWAME RAOUL, Attorney General,
State of Illinois,

Attorney for Defendants,

Scott B. Sievers ARDC No. #6275924
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62701
(217) 782-9015 (telephone)
Email: ssievers@atg.state.il.us
      & gls@atg.state.il.us

By:    s/ Scott Sievers
       Scott Sievers
       Assistant Attorney General

## <u>CERTIFICATION OF COMPLIANCE WITH CDIL-LR 7.1(D)(5)</u>

Pursuant to CDIL-LR 7.1(D)(5) (incorporating the page and character limits set forth in CDIL-LR 7.1(B)(4)), the undersigned hereby certifies the Argument section of this memorandum does not contain more than 7,000 words or 45,000 characters. In making this certification, I relied upon the word- and character-counting function of Microsoft Word that indicated the Argument section contains 6,946 words and 42,761 characters with spaces. These totals include all headings and footnotes.

Respectfully submitted,

By:     <u>s/Scott B. Sievers</u>
        Scott B. Sievers #6275924
        Assistant Attorney General

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| JACQUELINE FARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-03279-SEM-TSH |
| | ) | |
| ERIC KOHLRUS *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 18, 2021, the foregoing document, **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS KEANE, FUNK, AND PASLEY'S MOTION FOR SUMMARY JUDGMENT**, was electronically filed with the Clerk of the Court using the CM/ECF system, which will send electronic notice of same to the following:

> Julie Marie Goodwin *at* julie@loevy.com
> Jonathan I. Loevy *at* jon@loevy.com
> Megan Colleen Pierce *at* megan@loevy.com
> Stephen H. Weil *at* weil@loevy.com
> Sarah C. Grady *at* sarah@loevy.com
> Carla G. Tolbert *at* ctolbert@atg.state.il.us
> William L. Vig *at* bill@vig-law.com
> Sara M. Vig *at* sara@vig-law.com

and I hereby certify that on the same date, I caused a copy of the foregoing described document to be mailed by United States Postal Service, in an envelope properly addressed and fully prepaid, to the following non-registered participant:

> None.

Respectfully submitted,

By: <u>s/ Scott Sievers</u>
Scott Sievers #6275924
Assistant Attorney General
500 South Second Street
Springfield, IL 62701
(217) 782-9015 (telephone)
Email: ssievers@atg.state.il.us
  & gls@atg.state.il.us