IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JACQUELINE FARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17 C 3279 |
| | ) | |
| ERIC KOHLRUS, et al., | ) | Hon. Sue E. Myerscough |
| | ) | |
| Defendants. | ) | Hon. Tom Schanzle-Haskins |

# **EXHIBIT 1**

**WENDY STILL, M.A.S.**
**4506 Hidden Court**
**Rocklin, CA 95661**

September 10, 2020

Sarah C. Grady
Loevy & Loevy
3112 N. May Street, Suite 100
Chicago, IL 60607

RE: Jacqueline Farris v. Kohlrus, et al., Civil Action 17:-C-3279

Dear Ms. Grady:

## I.     Basis for Expert Opinion, Qualifications and Methodology

### A.     Basis for and Scope of Expert Opinion

1.     I have been retained by Plaintiff's counsel in the *Jacqueline Farris v. Kohlrus, et al.,* Civil Action 17:-C-3279 as an expert witness regarding the sexual harassment, abuse and assault of Jacqueline Farris at the Logan Correctional Center (LCC) in Lincoln, Illinois by Correctional Officer Erik Kohlrus on December 28, 2015, as well as well as the actions of other Defendants who had a duty to protect Ms. Farris and whose actions led to the sexual assault and the events that occurred to Ms. Farris after the assault.  My opinions are based on all of the materials that I have reviewed, which are listed below.  My opinions are expressed to a reasonable degree of professional certainty.  I reserve the right to alter my opinions or form additional opinions in this case based on disclosure of further information and/or documents.

### B.     Expert Qualifications

2.     I am an expert corrections consultant.  My educational background includes a Bachelor of Science in Organizational Behavior from the University of San Francisco and a

1

Master's Degree in Criminology, Law, and Society from the University of California at
Irvine.

3.      My 35 years of correctional experience includes operating, managing, and
performing direct supervision and oversight for up to ten male and female prisons with
approximately 40,000 inmates and 15,000 staff for the California Department of Corrections
and Rehabilitation (CDCR), where I served as Southern Regional Prison Administrator,
Associate Director Female Offender Programs and Services, Deputy Director of Finance,
Chief of Regulation and Policy Management, and Prison Rape Elimination Act (PREA)
Executive Project Director.  I was also hired by the Federal Medical Receiver in the *Plata v.
Schwarzenegger* (now Plata v. Newsom) litigation related to prison healthcare to be the
Director of Rehabilitation Programs.  My responsibilities included creating the rehabilitation
programs for the new Healthcare Prison, and I worked embedded with architects for 18
months to create the model, define the physical space needs and create the rehabilitation
physical plant designs. I am also currently retained as a Special Consultant by the Federal
Medical Receiver to establish a Gender Responsive Women's Correctional Health Care
Program for the California Prison System.

4.      As the first Governor appointed Associate Director of Female Offender
Programs and Services, I was responsible for leadership, oversight and reform of CDCR's
women's prisons and mother-infant community corrections programs which housed
approximately 11,700 female inmates. Working with Assemblywoman Sally Lieber, I helped
draft a law, approved by the California legislature and now codified in California Penal Code
3430, which mandated the Department of Corrections and Rehabilitation to, among other
things,: a) create a Female Offender Reform Master Plan, and present this plan to the
Legislature by March 1, 2008; b) create policies and operational practices designed to ensure

a safe and productive institutional environment for female offenders; c) conduct a staffing analysis of all current job classifications assigned to each prison that houses only females and provide a plan to the Legislature by March 1, 2009, that incorporates those recommendations and details the changes that are needed to address any identified unmet needs of female inmates and develop programs and training for department staff in correctional facilities; d) create a gender responsive female classification system; e) create a gender responsive staffing pattern for female institutions and community-based offender beds; and f) create a needs-based case and risk management tool designed specifically for female offenders that includes an assessment upon intake, and annually thereafter, that gauges an inmate's educational and vocational needs, including mental health needs and trauma-treatment needs.

5.      In 2005 I drafted the language for an amendment to the California Code of Regulations Title 15 §3287 Cell, Property and Body Inspections, adding new subsections (b)(2)-(4), which were then enacted by the Secretary of CDCR. This regulatory change eliminated cross-gender clothed body searches of female inmates except in emergency situations, and mandated that male correctional employees shall not under any circumstances, perform non-emergency body searches of female inmates.  This regulation also defined emergency situations as requiring the immediate search of an inmate to avoid the threat of death, escape or great bodily injury. This regulatory change was promulgated based on gender responsive principals recognizing that female inmates have been disparately subjected to sexual trauma and abuse and male officers touching female bodies during a strip search is a trauma trigger of past sexual abuse and trauma.

6.      In 2006 I was Executive Project Director responsible for the development of the CDCR's Sexual Abuse in Detention and Prison Rape Elimination Act (PREA)

compliance program which includes departmental policy and regulations, staff training,

inmate education, and investigation and response protocols for 33 female and male prisons

that housed approximately 165,000 inmates. I was certified as a PREA Auditor by the

Department of Justice in lock-ups, jails, prisons and community corrections for the period of

July 2014- December 2017.

7.      I have also assisted the Department of Homeland Security, Office for Civil

Rights and Civil Liberties in the development of the Sexual Abuse and Assault Prevention

and Intervention audit protocols and tools for jails and detention centers housing male and

female detainees.

8.      I have provided expert reports and testimony for prison-related litigation in

the State of Hawaii, the State of Massachusetts, the State of Pennsylvania, the State of Ohio,

and the State of California, both for plaintiffs and for defendants, and testified in over 300

California Senate and Assembly legislative hearings related to prison, detention, probation

and community corrections issues.  I have also been a contract expert for the Department of

Justice to investigate and provide a report of my findings related to allegations of abuse,

harassment, and conditions of confinement complaints by female inmates housed in an

Arkansas prison.

9.      My past experience also includes teaching criminal justice related subject

matter at Stanford University, guest lecturing at University of California at Berkeley,

University of California, Hastings College of Law, and Sonoma State University on criminal

justice topics, and serving as an expert panelist for criminal justice research, sentencing,

gender, transgender, correctional operations, probation, and 2011 Public Safety Realignment

issues.  I testified before the U. S. Commission on Civil Rights on February 22, 2019 during

a public briefing held regarding Women in Prison: Seeking Justice Behind Bars.

10.      I was the Chief Adult Probation Officer for the City and County of San Francisco and a member of the California Rehabilitation Oversight Board (CROB) appointed by the California State Legislature from 2010 until I retired in 2015.  CROB provides oversight of the California Department of Corrections and Rehabilitation's inmate prison rehabilitation programs and reports to the State Legislature.  I was reappointed by the California State Legislature in August 2020 to the CROB and currently serve as a member.

11.      I have performed civil rights and conditions of confinement and sexual assault and abuse prevention investigations since 2011 to current for the Department of Homeland Security (DHS), Office for Civil Rights and Civil Liberties (CRCL) and provide expert advice on new policy development.  These investigations include jail facilities, seventy-two-hour hold facilities, family residential centers, and on coast guard cutters located throughout the United States that house female and male detainees and inmates.  I also serve as an expert for the DHS CRCL conducting a system review for the Department's Sexual Abuse and Assault Prevention and Intervention and Segregation Standards compliance.

12.      I have also performed investigations of sexual abuse of female inmates in prison on behalf of the Department of Justice (DOJ) and review and opine on proposed prison policies as a DOJ's gender responsive female prison operational expert and certified DOJ Prison Rape Elimination Act auditor from 2012-2017.

13.      I am also currently a member of the American Correctional Association, the American Probation and Parole Association, the American Society of Criminology, and a prior board member of the Association of Criminal Justice Researchers.  A copy of my Resume is attached as Exhibit A.  My Curriculum Vitae is attached as Exhibit B.

14.      The San Francisco Adult Probation Department under my leadership was awarded the American Probation and Parole Association 2013 President's Award for

outstanding contributions to the field of community corrections. In December 2014 I was the recipient of a Public Official of the Year Award by Governing Magazine for my successful efforts to reform San Francisco's Probation Department and criminal justice system.

15.     The Alameda County Probation Department under my leadership was awarded the Tyler Technology Innovation Award in 2019 for the Adult Probation Case Management System and the Tyler Technology Innovation Award in 2020 for the Pre-Trial System. I was awarded the Words to Deeds Award for over 40 years of correctional and mental health partnership contributions.

16.     I am currently the Chief Probation Officer for the County of Alameda. I have responsibility for the community supervision of approximately 8500 male and female probationers and prison community releases; oversight of a 300-bed juvenile female and male detention facility and camp; supervision of approximately of approximately 750 juvenile probationers; and making sentencing recommendations to the court in felony adult and juvenile court cases.

17.     I have extensive experience in prison as well as jail practices.
In the past over ten years, in my work for Homeland Security, I have personally visited approximately 50 county or local jails, detention centers, holding facilities, family residential centers and coast guard cutters located in California and throughout the United States to investigate complaints and observe various aspects of the handling and managing male and female detainees. In my role as Chief Probation Officer I frequently collaborated with the City and County of San Francisco's (SF) Sheriff and staff creating rehabilitative programs inside the jails. The SF Sheriff and I jointly released the Women's Community Justice Reform Blueprint: A Gender Responsive, Family Focused Approach to Integrating

Criminal and Community Justice. In the State Budget process for Fiscal Year 2013-14 I collaborated with Senator Loni Hancock, Chair of the Senate Public Safety Committee on the development of legislative language to create up to four pilot re-entry programs in San Francisco, Marin, San Diego and Los Angeles County Jails which was approved with funding during the current budget process. I have regularly provided expert testimony on legislation that impacts prisons, community corrections and jails to both the Assembly and Senate Public Safety Committees at the request of legislators. I am considered by the legislature to be an expert on female and male inmate issues and correctional practices. In addition, I regularly review reports or other materials regarding jail practices.

18.     My compensation rate for providing gender responsive correctional expert services is as follows:

- Report Document Review/Writing: $275/hour

- Preparing a Written Report: $275/hour

- Preparing for Deposition and Trial: $275/hour

- Trial Testimony: $2400/day

- Travel Time: $200/hour

- Travel Costs and Per Diem: Actual cost

**C.     Methodology**

19.     This declaration is based on reviewing testimony, and documents related to *Jacqueline Farris v. Kohlrus, et al.,* Civil Action 17:-C-3279 for the sexual harassment, abuse, and assaults of the Plaintiff by Plaintiff Erik Kohlrus and failure of LCC and IDOC administrative staff to protect the plaintiff from sexual harassment, abuse, and assaults and retaliation, including:

- First Amended Complaint and Second Amended Complaint

- Investigation of the Jacqueline Farris Sexual Assault by Correctional Officer Erik Kohlrus, Case Number C-16-LOG-204, Socializing Conduct of an Individual, Impeding an Investigation, Custodial Sexual Misconduct, Official Misconduct, IDOC Subpoena 000001-54

- Illinois Department of Corrections Administrative Directive 04.01.301, Sexual Abuse and Harassment Prevention and Intervention Program, Dated September 01, 2013, IDOC Document No. 002035-2046

- Illinois Department of Corrections Administrative Directive 04.01.301, Sexual Abuse and Harassment Prevention and Intervention Program, Dated April 01, 2017, IDOC Document No. 002002-2014

- Logan Correctional Center Institutional Directive 04.01.301, Sexual Abuse and Harassment Prevention and Intervention Program, Dated January 11, 2016, IDOC Document No. 002015-2031

- Memorandum to Norine Ashley and Lisa Johnson from Warden Brannon, Dated November 19, 2015, PREA, PL 000393

- Memorandum to Executive Staff, et al., from Director S.A. Godinez, Dated July 1, 2013, Designation of Agency Wide PREA Coordinator and Backup, PL 000396

- Memorandum to Executive Staff, et al., from Acting Director Donald Stolworthy, Dated May 11, 2015, Designation of Agency Wide PREA Coordinator and Backup, PL 000397

- Memorandum to Executive Staff, et al., from Acting Director John Baldwin, Dated November 20, 2015, Designation of Agency Wide PREA Coordinator and Backup, PL 000398

- Access Database Documents, IDOC Document No. 379629, 390086-380087, and 380114-380116

- PREA File Checklist and Packet Compiled by LCC, IDOC for Farris, R92751, Sexual Assault Incident, IDOC Document No. 004529-4563

- Documents Related to Allegations of Sexual Misconduct by Women at Logan Between September 24, 2013 and December 31, 2015:

  o 2014-LOG-5016, IDOC Document No. 003227-3308
  o 2014-LOG-5021, IDOC Document No. 003309-3332
  o C13-LOG-180, IDOC Document No. 003369-3444
  o C14-LOG-088, IDOC Document No. 003633-3677
  o C14-LOG-089, IDOC Document No. 003678-3728
  o C14-LOG-138, IDOC Document No. 003729-3848
  o C14-LOG-188, IDOC Document No. 003849-3938
  o C15-LOG-047, IDOC Document No. 003939-4036
  o C15-LOG-054, IDOC Document No. 004037-4066
  o C15-LOG-101, IDOC Document No. 004067-4248
  o C15-LOG-201, IDOC Document No. 004249-4266
  o C16-LOG-022, IDOC Document No. 004267-4313
  o C16-LOG-099, IDOC Document No. 004314-4337
  o C16-LOG-120, IDOC Document No. 004338-4354
  o ███████████ IDOC Document No. 004401-4447
  o ███████████ IDOC Document No. 004448-4459
  o ██████ IDOC Document No. 004460-4467
  o ██████ IDOC Document No. 004468-4475
  o ████████ IDOC Document No. 004476-4482
  o ████████ IDOC Document No. 004483-4489
  o ████████ IDOC Document No. 004490-4499
  o ██████████ IDOC Document No. 004500-4508
  o ██████ IDOC Document No. 004509-4518
  o ██████ IDOC Document No. 004519-4528
  o ████████ IDOC Document No. 004564-4573
  o █████ IDOC Document No. 004574-4588
  o █████ IDOC Document No. 004589-4602
  o ████████ IDOC Document No. 004603-4613
  o ████████ IDOC Document No. 004614-4624

- o ████████████████ IDOC Document No. 004625-4635
- o ████████████████ IDOC Document No. 004636-4644
- o ████████████████ IDOC Document No. 004645-4655
- o ████████████ IDOC Document No. 004656-4665
- o ████████████ IDOC Document No. 004666-4676
- o ██████████ IDOC Document No. 004677-4684
- o ██████████████ IDOC Document No. 004685-4688
- o ████████ IDOC Document No. 004689-4694
- o ████████████████ IDOC Document No. 004695-4700
- o ████████████████ IDOC Document No. 004701-4709
- o Arnold, IDOC Document No. 004710-4717
- o Wheeler 12-13, IDOC Document No. 380117-380125
- o Tschida 6-2, IDOC Document No. 380126-380129
- o Stewart 8, IDOC Document No. 380130-380138
- o Pickett 9-12, IDOC Document No. 380139-380151
- o Rice 4-7, IDOC Document No. 380163-380169
- o Henderson 9-2, IDOC Document No. 380170-380178
- o Henderson 5-6, IDOC Document No. 380179-380183
- o Oatis.JoAnn 10-12, IDOC Document No. 380224-380237
- o Plair and Crook 12-18, IDOC Document No. 380255-380258
- o Talafhah 6-23, IDOC Document No. 380259-380280
- o Talafhah 9-28, IDOC Document No. 380281-380308
- o Talafhah, 10-7, IDOC Document No. 380309-380320
- o Adkinson 3-31, IDOC Document No. 380321-380338
- o Geist 11-11, IDOC Document No. 380339-380353

- PREA Audit Report Final, Adult Prisons & Jails, LCC, Dated May 06, 2016, Philip Bradshaw, The Nakamoto Group, IDOC Document No. 001944-1968

- Office of Inspector General (OIG), ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements, PL 002264-2297

- Gender Informed Practice Assessment (GIPA) Summary of Findings and Recommendations, Logan Correctional Center, Illinois Department of Corrections, November 2016, PL 000034-73

- 2014 IDOC PREA Report, IDOC Document No. 379437-379438

- 2015 IDOC PREA Report, IDOC Document No. 379439-379443

- 2016 IDOC PREA Report, IDOC Document No. 379444-379449

- 2015 LCC Annual PREA Compliance Report, IDOC Document No. 379556-379559

- 2016 LCC Annual PREA Compliance Report, IDOC Document No. 379560-379565

- Alan Pasley May 16, 2016 Memorandum to Margaret Burke, Warden LCC Subject: PREA Incident Reviews "Farris R87385," IDOC Document No. 004563

- Erik Kohlrus Resignation, Dated December 30, 2015, IDOC Document No. 000101-102

- Farris Housing Unit History Log, IDOC Document No. 001894

- IDOC Offender Disciplinary Report, Jacqueline Farris, R92751, Author Tina Synder, IDOC Document No. 000089-90

- Jacqueline Farris Mental Health Records, IDOC Document No. 000161-000195

- Tina Synder, Decatur Correctional Center (DCC), Internal Affairs Lieutenant Memorandum Dated February 5, 2016 to Shelith Hansbro, DCC Warden, Subject: Offender Jacqueline Farris, R92751, IDOC Document No. 000020

- DCC Incident Reports, March 4 and 13, 2016, Jacqueline Farris, IDOC Document No. 000021-000022

- DCC Adjustment Committee Final Summary Report (Discipline), Dated March 30, 2016, IDOC Document No. 000024

11

- IDOC Shift Roster, December 27, 2015, IDOC Document No. 001787-1834

- Photographs of LCC, IDOC Document No. 002047-2078

20.     I have reviewed the deposition of Jacqueline Farris, Plaintiff.

21.     I have reviewed the depositions of Defendants: Erik Kohlrus, Correctional Officer; Christine Brannon, Warden LCC; Norine Ashley, Mental Health Administrator and PREA Compliance Manager, LCC; Clara Charron, Assistant Warden LCC and PREA Compliance Manager, LCC; Patrick Keane, IDOC PREA Coordinator (prior to  November 2015); Mike Funk, IDOC PREA Coordinator (effective November 2015); Jeff Gabor, IDOC Investigator; Angela Locke, Prior LCC Acting Warden.

22.     In addition to evidence generated by the parties in discovery, the following findings are also based upon my over 35 years of correctional experience, a master's degree in criminology, Bureau of Justice Statistics Survey of Sexual Violence in Adult Correctional Facilities, 2009-11 Statistical Tables, accepted state and national correctional standards, including *Standards for Health Services in Correctional Institutions*, published by the American Public Health Association (APHA), *Standards for Adult Local Detention Facilities*, 3rd and 4th Editions, published by the American Correctional Association, and the Prison Rape Elimination Act Federal Regulations. All the information on which I have relied is of a type normally relied on by correctional administrators and experts.

## II.     Overview of LCC Location, Physical Plant, Population, Mission and Overview of the Prison Rape Elimination Act of 2003 Mandates

23.     LCC is located at 1906 135th Street in Lincoln, Illinois. In March 2013 LCC was converted to an all-female prison with a capacity of 2104 inmates.  The population fluctuates.  Logan's living units consist of seven E-style units, three C-style units, one X-

house, a segregation unit and a 15 bed-infirmary health care unit.  The facility encompasses 150 acres enclosed by fencing.  LCC serves a multi-security level population, consisting of reception and classification, segregation, protective custody and mental health units.

      24.    The Prison Rape Elimination Act (PREA) of 2003 or "PREA," 42 U.S.C. § 30301, was passed by Congress to Prevent, Detect, and Respond to Prison Rape.  The Statute directs the Attorney General to publish a final rule adopting national standards for the detection, prevention, reduction and punishment of prison rape.  The final PREA rule and defined standards were published by the Department of Justice on May 17, 2012.  Although the rule defining the standards was not published until May 2012, correctional agencies including prisons were put on notice in 2003 of the nationwide concern of prison rape and sexual abuse and assault that was occurring within correctional facilities across the country and prison administrators and the expectation for correctional systems to develop policies and procedures designed to protect inmates from sexual harassment, sexual violence, and retaliation.  PREA recognized that sexual assaults in prison endangered inmate safety as well as public safety and often went unreported.  PREA is mandatory for states receiving federal funding.  Nationally, as early as 2004 correctional agencies began developing strategies and forming task forces and committees looking at creating and revising policies to protect inmates from staff and inmate sexual harassment, sexual violence, and retaliation.  The PREA standards include mandates for correctional agencies to develop a zero tolerance policy, create safe reporting mechanisms for inmates, develop protections for inmates against discipline for reporting and suffering sexual harassment, abuse or assaults, conduct preventative retaliation reviews, provide training for staff, inmates and contractors regarding PREA protections against suffering sexual harassment, abuse or assaults and reporting; provide specialized training for investigators of allegations of sexual harassment and

violence, and conduct incident reviews to prevent future instances of sexual harassment and violence, and improve detection.

25.    The PREA standards set out a number of widely accepted measures that are critical to prevention and detection of sexual assault and harassment. In my expert opinion, ensuring that these measures are implemented in a prison that houses female inmates is particularly critical to protecting those inmates from the widely known risk of sexual assault and harassment that female inmates face from male correctional staff.

26.    PREA was passed by Congress in 2003.  The regulations and standards took approximately nine years and thousands of hours of input by victims, correctional administrators, and advocates to develop the comprehensive standards.  The PREA standards address: 115.11, a zero tolerance of sexual abuse and sexual harassment and creation of an agencywide PREA Coordinator and a facility PREA Coordinator; 115.12, contracting with other entities for the confinement of inmates; 115.13, supervision and monitoring; 115.15, establishes limits to cross-gender viewing and searches; 115.16, inmates with disabilities and inmates who are limited English proficient; 115.17, hiring and promotion decisions; 115.18, upgrades to facilities and technology;  115.21, evidence protocol and forensic training; 115.31, employee training; 115.32, volunteer and contractor training; 115.33, inmate/resident education; 115.34, specialized investigation training; 115.41, screening for risk of victimization and abusiveness; 115.42, use of screening information; 115.51, inmate reporting; 115.53, inmate access to outside confidential support services; 115.71, criminal and administrative agency; and 115.82, access to emergency medical and mental health services.[1]  These comprehensive standards create a standardized system to prevent and detect sexual harassment and sexual abuse of inmates.  These standards also

---

[1] https://www.prearesourcecenter.org/StandardsinFocus

protect inmates who have suffered sexual harassment and abuse by staff from retaliation. For these standards to be effective a comprehensive policy must be developed by the correctional agency and the policy must be implemented and audited for compliance. Failure to follow these carefully crafted PREA standards and failure to audit for compliance totally obviates the purpose of the standards and puts inmates at great risk of sexual harassment and violence. Retaliation monitoring, effective incident reviews and follow-up corrective action, qualitative assessments, adequate investigations, and no punishment or retaliation for detainees for reporting harassment and sexual abuse are also key components of creating a culture within a facility that the inmates feel safe to report PREA complaints.

27.     The IDOC agency leadership, including the PREA Agency Coordinator, the Warden of LCC, and LCC's PREA Compliance Manager had the responsibility to develop PREA policies, procedures and training for staff working in IDOC prisons and at LCC as mandated by PREA when the final rule was adopted and Standards were issued on May 17, 2012. IDOC adopted Administrative Directive 04.01.301, Sexual Abuse and Harassment Prevention and Intervention Program on September 1, 2013. As an agency wide policy directive, LCC's leadership had an obligation to ensure LCC fully complied with Administrative Directive 04.01.301 when it was issued on September 1, 2013.

28.     Administrative Directive 04.01.301 laid out a number of responsibilities for the LCC Warden, the LCC PREA Compliance Manager, and the IDOC PREA Agency Coordinator. For example, the policy required the PREA Agency Coordinator to oversee the IDOC's sexual abuse and harassment prevention and intervention program, to review an annual evaluation of LCC's compliance with the policy, to report to the IDOC Director "perceived areas of concern" with recommendations to improve, and to assess the IDOC's

progress in addressing sexual abuse or harassment overall.[2] The policy required LCC's Warden to ensure that LCC was complying with the IDOC's policy on prevention and intervention of sexual abuse, ensure that staff and inmates are provided with appropriate training on sexual assault prevention and intervention, ensure that incident reviews of all allegations of sexual assault and harassment were being appropriately conducted, and conduct an annual review of each incident of sexual abuse along with recommendations for necessary training or procedural changes.[3] The policy required LCC's PREA Compliance Manager to provide annual training to staff, develop a program for evaluating and treating victims of sexual abuse, ensure that incident reviews of all allegations of sexual assault and harassment were being appropriately conducted, monitor all inmates who have reported sexual abuse or harassment for suggestions of retaliation for at least 90 days, and conduct an annual review of each incident of sexual abuse along with recommendations for necessary training or procedural changes.[4] When an inmate is transferred to another facility, the PREA Compliance Manager at the transferring facility is also required to notify the PREA Compliance Manager at the receiving facility.[5]

29.     The IDOC's policy recognizes that its purpose is to instruct staff in the "prevention and intervention of offender sexual abuse and harassment."[6]

### III.     Staff Roles Related to Plaintiff's Complaint

30.     Christine Brannon was the Warden of LCC from August of 2015 until February of 2016.[7] Warden Brannon as the facility head is the principal official of LCC and

---

[2] Bates 002037 and 002045-2046
[3] Bates 002039-2040 and 002043-2045
[4] Bates 002039-2040 and 002043-2045
[5] Bates 002042
[6] Bates 002035
[7] C. Brannon Deposition, page 13

had overall responsibility for the compliance with Administrative Directive 04.01.301, Sexual

Abuse and Harassment Prevention and Intervention Program, and the applicable PREA

Standards during her tenure at LCC.  Warden Brannon received PREA Compliance Manager

training during a previous IDOC assignment that she held.[8]

31.     Angela Locke was the Acting Warden of LCC until June 2015.[9] She was the

Warden in 2013 when LCC became a women's prison.[10] Like Warden Brannon, Acting

Warden Locke was primarily responsible for LCC's compliance with Administrative

Directive 04.01.301, and the applicable PREA Standards during her tenure at LCC. Warden

Locke also received training on how to handle each PREA allegation in compliance with the

Administrative Director and PREA Standards.[11]

32.     Patrick Keane was appointed IDOC Agency PREA Coordinator in July 2013

through November 2015.[12]  Mike Funk replaced Mr. Keane, and was appointed IDOC

Agency PREA Coordinator in November 2015 through May 2016.  Mr. Keane and Mr.

Funk attended PREA Auditor certification training.  Mr. Funk was certified as a PREA

Auditor in October of 2015 and Mr. Keane was certified in mid-2014.[13]  PREA §115.11(b)

mandates that "an agency shall employ or designate an upper-level, agency-wide PREA

coordinator with sufficient time and authority to develop, implement and oversee agency

efforts to comply with sufficient time and authority to develop, implement, and oversee

agency efforts to comply with the PREA standards in all of its facilities." The memoranda

---

[8] C. Brannon Deposition, page 20
[9] A. Locke Deposition, page 83
[10] A. Locke Deposition, page 82
[11] A. Locke Deposition, page 73
[12] PL 000396 and P. Keane Deposition, page 28
[13] M. Funk Deposition, pages 7-9 and P. Keane Deposition, page 88

appointing Mr. Keane and Mr. Funk as PREA Coordinators noted that they were "responsible for coordinating the Department's statewide compliance with PREA."[14]

33.    Clara Charron, Assistant Warden Programs (AWP) was the LCC PREA Compliance Manager at the time LCC became a female facility until Norine Ashley, Mental Health Administrator was appointed as LCC's PREA Compliance Coordinator in November 2015.[15] The IDOC's policy notes that a facility's PREA compliance manager is responsible to "ensure facility compliance" with the policy at the facility.[16] PREA §115.11(c) mandates that where an agency operates more than one facility, each facility shall designate a PREA compliance manager with sufficient time and authority to coordinate's the facility's efforts to comply with the PREA standards. Norine Ashley during her deposition testified that "the responsibilities that I have as a mental health authority with the Rasho lawsuit, that my time is filled with the monitoring of mental health staff and that lawsuit, and that I did not feel that I had adequate time to fully look after the PREA coordinator [Compliance Manager] position."[17]  N. Ashley expressed her concern to AWP Charron, her supervisor.  N. Ashley testified "prison rape reform is a serious situation that should not be looked at loosely. I believe it should be more than just an accounting process, which is what I was doing, making sure that we could pass the audit.  I think it should entail a lot more than just the administrative function."[18] The audit conducted by Nakamoto Group, however, reported that N. Ashley said that she did have sufficient time to perform her duties as PREA Compliance Manager, one of the findings necessary to determine that LCC met PREA

---

[14] PL 00396-398
[15] A. Locke Deposition, pages 64-65
[16] Bates 002036
[17] N. Ashley Deposition, page 61
[18] N. Ashley Deposition, page 61

standards.[19] N. Ashley never received any formal training as the PREA Compliance Manager.

34.     Erik Kohlrus was employed as a Correctional Officer at LCC.  Officer Kohlrus testified that he joined the IDOC in 2011 or 12.  Office Kohlrus was employed at the LCC until his resignation on December 30, 2015.  Officer Kohlrus resigned[20] after participating in an investigatory interview during which he admitted to having sexual intercourse and had oral sex performed on him by Jacqueline Farris, an inmate at LCC.[21] He was not disciplined by Warden Brannon or anyone else at IDOC as a result of the sexual acts. He has since pled guilty to custodial sexual misconduct.[22]

## IV.     Findings and Opinions

### A.     Overview of the National Resource Center on Justice Involved Women (NRCJIW) Gender Informed Practice Assessment (GIPA) and the LCC Prison Rape Elimination Act (PREA) Audit Report

35.     In November 2016, the National Resource Center on Justice Involved Women issued the Gender Informed Practice Assessment (GIPA) Summary of Findings and Recommendations Report.  The GIPA report was based on the findings of an 18-person team that conducted an onsite four-day evaluation of the IDOC's LCC in October 2015. The GIPA team included current and former IDOC wardens and personnel including social service providers, community-based prison reform and reentry advocates, academics, and a woman with lived experience in the IDOC system.  Throughout the process current IDOC employees (or former employees with more than 20 years of experience) worked alongside community stakeholders to collect and analyze data.[23]  This experienced team produced a

---

[19] Bates 001948
[20] Bates 000101-102
[21] IDOC Subpoena 000001-54
[22] E. Kohlrus Deposition, page 224
[23] GIPA, PL000035-000037

comprehensive 71-page report with credible findings and recommendations. This project was supported by a Bureau of Justice grant. The GIPA tool used to conduct the evaluations was developed by the National Institute of Corrections. The GIPA report is germane to my expert report and this litigation based on the extensive onsite policy review, staff interviews from line staff to leadership, inmate interviews, and the fact that it reflects practices that were in place in October 2015, before the sexual assault in this case occurred. The team was onsite at LCC for four days. This GIPA report had findings that did not comport to the findings of the PREA audit that was conducted by Philip Bradshaw, The Nakamoto Group PREA Auditor.

36.     The GIPA report contained many findings and recommendations. I will highlight findings that I think are important to this expert report. "In 2013 the Illinois Department of Corrections consolidated the populations of the state's two largest women's prisons into Logan Correctional Center. The John Howard Association of Illinois (JHA) reported that the Logan conversion was "under resourced and ill-conceived." "The transition took place with limited planning, staff training, and efforts to take into account the unique nature of the needs of such a large, complex women's prison population levels compared with those of the medium-security male population that had been housed there for such a long period of time. The full Logan conversion that occurred in 2013 created numerous challenges resulting from the lack of gender responsive policies and practices. Many of these challenges have persisted and intensified over time."[24]

37.     The GIPA report identified a high risk, divisive facility culture that was created due to the chaotic transition of Women to Logan that had persisted through the GIPA October 2015 onsite and issuance of the November 2016 GIPA report. "Ultimately

---

[24] GIPA, PL000047

the way in which the Logan conversion was handled created numerous barriers to the development and implementation of gender responsive policies and practices with women, which in turn, created significant risks to safety and security."[25]

38.     The GIPA report also identified that a "broken grievance process prevents management from knowing about and correcting problems." The GIPA team also identified that "while a clear grievance process existed for women to protect their rights and safety, numerous reports indicated that it was not being followed." "Grievances are not being properly tracked, logged and returned back to the grievance officer or the warden in a timely manner and according to departmental policy."[26]  Staff and inmates told GIPA team members that grievance slips were not regularly available in the housing units.  It was also reported that women were told by staff if they file a grievance about staff they would not be believed. Women also reported concerns of retaliation for filing a grievance.[27]

39.     In contrast to the GIPA report, Philip Bradshaw, PREA Auditor-The Nakamoto Group, did not find any deficiencies in his final PREA report dated May 06, 2016.  In fact "the Auditor concluded through interviews, the examination of policy and documentation and interviews with staff, contractors and volunteers, that all were knowledgeable concerning their responsibilities involving PREA." and "the facility was found to be found full compliant with PREA."[28] I found direct conflicts in the PREA Auditor's report and staff depositions.  One example is Standard 115.11, Zero tolerance of sexual abuse and harassment was marked at meets standard. Philip Bradshaw, PREA Auditor, documents in his report "Both the agency PREA Coordinator and facility PREA

---

[25] GIPA, PL 000049
[26] GIPA, PL 000050-000051
[27] GIPA, PL 000051
[28] Bates 001945-1947

Compliance Manager indicated they have sufficient time and authority to coordinate efforts to comply with PREA standards.  Staff interviews confirm compliance to this standard."[29] PREA Compliance Manager Norine Ashley's deposition testimony regarding the lack of adequate time to perform the duties of LCC's PREA Compliance Manager directly and significantly conflicts with the Auditor's report to the contrary.  The Nakamoto Group has been publicly criticized by the Department of Homeland Security, Office of the Inspector General in their report, OIG-18-67 *"ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance,"*[30] The OIG found during their audits " Nakamoto's inspection practices are not consistently thorough, its inspections do not fully examine actual conditions or identify all compliance deficiencies."  The extensive GIPA 18-person evaluation also contained numerous findings that similarly conflicted with the Nakamoto PREA Audit.

      **B.**      **Prior Allegations and Incidents Related to Sexual Abuse, Assault and Harassment Were Early Warning Indicators to Facility Management and Agency PREA Coordinators**

      40.      Defendants were failing to comply with PREA standards and IDOC's Administrative Directive 04.01.301, Sexual Abuse and Harassment Prevention and Intervention Program, even though the PREA standards were in force and effect in May 2012 (more than 3 years before the events in this case occurred) and IDOC's Administrative Directive 04.01.301 was effective in September 1, 2013.  LCC's leadership, including Brannon, Ashley, Locke, and Charron, and IDOC's PREA Agency Coordinators Keane and Funk had a responsibility to ensure compliance to protect the female inmates at LCC from sexual harassment and sexual violence.

---

[29] Bates 001948
[30] https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18

41.     I conducted a thorough review of allegations of sexual misconduct at LCC. Specifically, I reviewed 45 allegations of sexual misconduct made between September 2013 and December 2015. I saw no evidence of retaliation monitoring performed by anyone in IDOC, as required by PREA § 115.67(c) and Administrative Directive 04.01.301.[31]

42.     The documents for five of the allegations show that prisoners were disciplined in connection to a PREA complaint that they reported and/or that alleged they had sexual contact or an intimate relationship with a correctional officer.[32]

43.     For one example, the documents show that a woman at Logan Correctional Center experienced repeated sexual assault at the hands of a correctional officer, yet was subject to severe discipline. She alleged that the correctional officer would threaten her with segregation or planting contraband on her unless she engaged in sexual acts with him.[33] In response, she was disciplined for "Sexual Misconduct" and "Contraband/Unauthorized Property" with the resulting punishment of 6 months of segregation, C grade, and revocation of GCC, plus 1 month C grade.[34]

44.     PREA and Administrative Directive 04.01.301 further require that victims and abusers be separated by the first security staff member to respond to an allegation (PREA § 115.64(a)(1)).[35] In the documents I reviewed, I saw no evidence of compliance with this policy.

45.     PREA § 115.21(c) requires an agency to attempt to make available to the victim a victim advocate from a rape crisis center, or if unavailable, a qualified staff-member from a community-based organization or a qualified agency staff member. Agencies must

---

[31] Bates 002045
[32] Bates 003684-3685, 004450, 004605, 004638, and 004650
[33] Bates 003732
[34] Bates 004638
[35] Bates 002041

document their efforts to secure services from a rape crisis center. In response to all the PREA allegations made in September 2013 through December 2015, the documents show no evidence of a victim being told that they are entitled to a victim advocate, of a victim advocate being provided, or of any efforts to contact a rape crisis center.

46.     PREA and Administrative Directive 04.01.301 also require that a facility conduct a sexual abuse incident review at the conclusion of every sexual abuse investigation, whether or not the allegation was substantiated (although not when an allegation is unfounded) (PREA § 115.86(a)).[36] Of the dozens of substantiated and unsubstantiated PREA allegations that fit this description between September 2013 and December 2015, documents showed only six PREA incident reviews.[37] Moreover, no more than four of these six reviews (and potentially as few as two of them) reflect actual compliance with the policy, including consideration of what enabled and/or contributed to the incident and recommendations to prevent similar incidents going forward.[38] And there is no indication that the recommendations were implemented in any meaningful way.

47.     In addition to the examples described above, LCC leadership did not consistently or properly conduct the annual evaluations of its compliance with the PREA standards or Administrative Directive 04.01.301, as required by IDOC policy.[39]

48.     LCC Wardens Locke and Brannon, LCC PREA Compliance Managers Charron and Ashley, and PREA Agency Coordinators Keane and Funk were responsible for taking action to ensure that the actions taken in response to a report of sexual misconduct complied with the PREA Standards and Administrative Directive 04.01.301. These

---

[36] Bates 002044-2045
[37] Bates 004578, 004563, 004612-4613, 004640-4641, 380236-380237
[38] Bates 004578, 004640-4641, 380236-380237
[39] Bates 379437-379449 and 379556-379565

individuals were aware of their responsibilities but took no action to remedy any of the above-described violations.

49.    The LCC Warden and LCC PREA Compliance Manager, for example, had direct responsibility to conduct and review the responses taken after a report of sexual misconduct by inmates. Yet there is no indication that LCC Wardens Locke or Brannon, or LCC PREA Compliance Managers Charron or Ashley, conducted or attempted to conduct retaliation reviews, took action to ensure incident reviews were meaningfully conducted, or took any steps regarding the other violations of PREA and Administrative Directive 04.01.301.

50.    PREA Agency Coordinators Keane and Funk learned through the Access Database specifically maintained by them to satisfy their responsibilities for ensuring compliance with PREA and Administrative Directive 04.01.301 that many of the above violations were occurring. Yet neither Keane nor Funk took action to remedy these violations.[40]

### C.    Plaintiff Sexual Assault Incident

51.    On December 28, 2015, at around 3:30 a.m., Correctional Officer Erik Kohlrus ordered Jacqueline Farris to engage in oral and vaginal sex with him in the laundry room in Housing Unit 15, B Wing.[41] Officer Kohlrus had previously told Ms. Farris it was his last day as the B-Wing officer for Housing Unit 15. On that morning, Officer Kohlrus called Ms. Farris and her cellmate out of their cell to serve meal trays.[42] Ms. Farris had never been assigned the task of serving meal trays before the morning of December 28.[43]

---

[40] Bates 379629, 380086-380087, and 380114-380116
[41] J. Farris Deposition, pages 39-42 and 47-51
[42] J. Farris Deposition, page 39, and E. Kohlrus Deposition, page 86
[43] J. Farris Deposition, page 26

52.     After Ms. Farris and her cellmate had finished serving meal trays, Officer Kohlrus ordered Ms. Farris's cellmate to return to her cell, and told Ms. Farris to stay behind for additional work.[44] Officer Kohlrus then directed Ms. Farris back to the laundry room, where he ordered her to get on her knees and exposed his penis.[45]

53.     Ms. Farris began to perform oral sex on Officer Kohlrus. Ms. Farris began shaking uncontrollably, and got up and ran out of the laundry room.[46] Ms. Farris returned to her cell and Officer Kohlrus followed after her.[47] Ms. Farris and Officer Kohlrus had a conversation at Ms. Farris's cell, and afterward, Officer Kohlrus directed Ms. Farris to return to the laundry room.[48] Officer Kohlrus pulled Ms. Farris's pants down, turned her around, and penetrated her vaginally. Ms. Farris told Officer Kohlrus to hurry up, and shortly afterward, Officer Kohlrus removed his penis and directed Ms. Farris to open her mouth, where he ejaculated.[49] Officer Kohlrus threatened Ms. Farris that she would not be permitted to go to "boot camp" if she reported the assault.[50] Ms. Farris testified that she knew at the time that Officer Kohlrus had the power to issue her a disciplinary ticket, which would have resulted in revocation of her boot camp.[51]

54.     Prior to December 28, 2015, Officer Kohlrus had ordered Ms. Farris to remove her clothing and spin around for him.[52] Officer Kohlrus had also previously made sexual comments to Ms. Farris, commenting on her appearance and flirting with her.[53] Ms. Farris testified that she did not report Officer Kohlrus's misconduct because she was afraid

---

[44] J. Farris Deposition, page 39, and E. Kohlrus Deposition, page 105
[45] J. Farris Deposition, pages 39-42
[46] J. Farris Deposition, page 41
[47] J. Farris Deposition, pages 45-47, and E. Kohlrus Deposition, page 87
[48] J. Farris Deposition, pages 45-46, and E. Kohlrus Deposition, page 87
[49] J. Farris Deposition, pages 49-51
[50] J. Farris Deposition, page 63
[51] J. Farris Deposition, page 122, and IDOC Subpoena 000011
[52] J. Farris Deposition, pages 30-33
[53] J. Farris Deposition, page 34-37

3:17-cv-03279-SEM-EIL     # 229-1     Filed: 04/26/21     Page 28 of 50

of making him angry and receiving a disciplinary ticket that would have resulted in a loss of her boot camp status.[54]

55.    Ms. Farris reported the sexual assault later in the morning of December 28, 2015. A rape kit was performed and Ms. Farris was interviewed by Investigator Jeffrey Gabor that same day.[55] Investigator Gabor did not tell Ms. Farris that she was permitted to have a victim's advocate present with her during the interview.[56] Investigator Gabor used interrogation techniques on Ms. Farris while interviewing her and threatened her that if she was lying, she could be prosecuted.[57] Investigator Gabor asked Ms. Farris: "Was it consensual or was force used?"[58] Investigator Gabor did not note that he asked this question when he wrote that Ms. Farris reported that the sex was "consensual."[59]

56.    Investigator Gabor interviewed Officer Kohlrus two days later, on December 30, 2015. In the days before his interview, Officer Kohlrus was assigned to work in the control unit of Housing Unit 15, where he learned that Ms. Farris had been moved, and suspected that his sexual assault was likely to be discovered.[60] During his interview, Investigator Gabor asked Officer Kohlrus the same question about whether the sex was consensual or whether force was used.[61]

57.    Investigator Gabor did not take any steps to preserve any of the video footage from Housing Unit 15 or to investigate whether any physical barriers enabled the sexual assault, as required by PREA and Administrative Directive 04.01.301.[62]

---

[54] J. Farris Deposition, pages 146-147
[55] IDOC Subpoena 000009 and 000027-30
[56] J. Gabor Deposition, page 178
[57] J. Gabor Deposition, pages 179 and 184-186
[58] J. Gabor Deposition, pages 199-200
[59] IDOC Subpoena 000029
[60] E. Kohlrus Deposition, pages 178-187
[61] J. Gabor Deposition, page 235
[62] J. Gabor Deposition, pages 208-210 and 267-268

58.     After admitting to the sexual encounter, Officer Kohlrus was permitted to resign by LCC Warden Brennan. He received no discipline.[63]

59.     At the time of the sexual assault, Ms. Farris had been approved by mental health staff for boot camp. That program would have permitted Ms. Farris the opportunity to complete a boot camp program that was approximately 120 days, and complete the remainder of her sentence on supervised release. Had she successfully completed the program, Ms. Farris would have been able to regain custody of her son.[64]

60.     On December 31, 2015, after the sexual assault, Ms. Farris reported feeling significant anxiety and difficult sleeping.[65] Mental health staff prescribed Ms. Farris Buspar and Vistaril for her anxiety and Trazodone for her insomnia.[66] On January 5, 2016, Ms. Farris was deemed ineligible for boot camp as a result of her medication.[67] There was no review as to whether this was an instance of retaliation as required by the PREA standards and Administrative Directive 04.01.301. Correctional Officer Kohlrus's threat of Ms. Farris losing her boot camp had become a reality.  Ms. Farris' loss of boot camp sent a strong message to the female population, if you report sexual violence there will be severe ramifications as a result of the reporting.

61.     On January 21, 2016, Ms. Farris was transferred from LCC to another prison, Decatur Correctional Center. On March 24, 2016, Internal Affairs Lt. Trina Snyder issued a disciplinary report to Ms. Farris for mentioning or discussing her sexual assault with staff and inmates at DCC.[68] As a result of Lt. Snyder's disciplinary report, Ms. Farris spent time in

---

[63] Bates 000101-102
[64] J. Farris Deposition, page 17
[65] Bates 000180-181
[66] Bates 000183
[67] Bates 000190
[68] Bates 000089-90

segregation and was placed on 3 months of "C Grade" and one month of phone

restriction.[69] There was no review as to whether this was an instance of retaliation as

required by the PREA standards and Administrative Directive 04.01.301.

62.    I have identified numerous concerns and violations of the PREA standards

in LCC's response to Ms. Farris's reporting of the sexual assault by Correctional Officer

Kohlrus.  Jeff Gabor was the investigator assigned to investigate Ms. Farris' complaint.[70]

Investigator Gabor did not attend the specialized training for investigating sexual abuse in

correctional settings as mandated by PREA standard 115.(3)34.[71]  The specialized training

for investigating sexual abuse in correctional settings curriculum is designed to increase the

investigators success in sexual abuse investigations in correctional settings.  The training

typically includes modules on: 1) Explaining the legal liabilities relating to investigation of

sexual abuse in confinement settings; 2) Understanding the PREA standard requirements

and best practice in first response, evidence collection procedures and investigation

processes; 3) Explaining the impact of culture on investigations of sexual abuse and sexual

harassment; 4) Describing the processes involved in forensic medical exams, and the role of

the victim advocate; 5) Defining appropriate trauma-informed and gender-informed

interviewing techniques; and 6) Identifying key concepts and PREA standard requirements

in report writing.[72] The lack of training jeopardized the investigation outcome as well as

subjected Ms. Farris to traumatizing investigative techniques and the investigator's failure to

offer Ms. Farris a victim advocate during the investigatory interview.

---

[69] Bates 000024
[70] IDOC Subpoena 000003
[71] J. Gabor Deposition, pages 263-269, and M. Funk Deposition, pages 51-54
[72] https://www.prearesourcecenter.org/sites/default/files/content/
investigations_curriculum_introduction_instructors_guide.pdf

63.    If LCC conducted timely and effective post PREA incident reviews, and followed up on deficiencies that were identified in post incidents reviews related to sexual violence of other female inmates, and acted to remove the barriers, installed cameras, monitor camera's in real time, conducted thorough investigations, provided victim advocates, and conducted the mandatory monitoring for retaliation, these corrective actions would have improved the sexual safety of female inmates at LCC and sent a strong message to staff based on actions that sexual violence of female inmates will not be tolerated.  All these failures contributed to creating the environment in which Ms. Farris could be sexually assaulted by Correctional Officer Kohlrus and the mishandling of the associated investigation of the sexual assault.

**D.    LCC Leadership and PREA Agency Coordinators Would Have Known That the Inadequate Policies in Place at LCC Put Inmates Like Ms. Farris at Risk of Sexual Assault by Male Officers**

64.    Defendants' failure to comply with the PREA standards and IDOC's policies, including inadequate staff training, lack of leadership, lack of clarity of the PREA Compliance Manager role and insufficient time to perform the associated duties, inadequate staff supervision, inadequate camera monitoring and failure to protect Jacqueline Farris from retaliation violates generally accepted standard correctional practices and norms, the American Correctional Association's Performance Based Standard for Local Adult Detention Facilities, fourth edition, and PREA Standards.

65.    LCC Wardens Locke and Brannon, PREA Agency Coordinators Keane and Funk, and LCC PREA Compliance Managers Charron and Ashley knew their responsibilities under the PREA standards and the IDOC's policies regarding sexual abuse prevention and

intervention.[73] Any minimally competent correctional administrator with responsibilities under PREA would know the risk of harm posed to female inmates like Jacqueline Farris from their failure to comply with the PREA standards or the IDOC's policies. Certainly, correctional administrators with the training provided to Brannon, Locke, Keane, Funk, Charron, and Ashley would have been aware of such dangers. This is particularly so given the multiple instances that LCC leadership and the PREA Agency Coordinators were made aware that IDOC policies were not being followed, as described above.

66.     The failure to comply with each of the PREA standards that I have outlined above made it more likely that a prisoner like Jacqueline Farris would be assaulted by a male officer like Officer Kohlrus.

67.     PREA prohibits retaliation against prisoners for reporting sexual contact with staff for the commonsense reason that fear of retaliation deters prisoners from reporting sexual assaults that implicate staff, which results in under-reporting of such assaults, which results in belief among staff that they are unlikely to be caught if they have sexual relations with inmates, which makes it more likely that sexual assault will occur.

68.     For such a policy to be effective, moreover, it is not enough to adopt a prohibition on retaliation.  Rather, as PREA prescribes, retaliation must be carefully monitored to ensure that prison staff do not retaliate against prisoners for reporting sexual assault.  Such monitoring is critical for ensuring prison employees cannot surreptitiously abuse a prison's rules and regulations to retaliate against a prisoner who reports sexual abuse by another employee.

---

[73] C. Brannon Deposition, pages 20-21, A. Locke Deposition, pages 66-68, M. Funk Deposition, page 24, P. Keane Deposition, pages 88-89, C. Charron Deposition, pages 91-94, and N. Ashley Deposition, page 72

69.     That is additionally why, except in the specific circumstance in which a prisoner engages in sexual contact with an unwilling correctional employee, PREA prohibits prisoners from being disciplined for sexual conduct with employees.  Were it otherwise, not only could retaliation occur under the guise of "discipline," correctional employees could subject prisoners to sexual conduct and know that a prisoner would be reluctant to report it, for fear of being disciplined.  Indeed an officer would be specifically empowered to threaten the prisoner with retaliation, in the guise of discipline, if the prisoner reported the incident.

70.     As set forth above, these prohibitions against retaliation were largely absent from LCC.  There was no PREA monitoring for retaliation, and in fact multiple prisoners who reported abuse faced discipline or retaliation for doing so.  Such failures are likely to have emboldened a correctional officer like Officer Kohlrus to believe that he could have his way with Ms. Farris without being caught.  Indeed Officer Kohlrus specifically threatened Ms. Farris with retaliation—the loss of boot camp and thus early release—if she reported his sexual contact with him.  Given the nonexistent retaliation monitoring at LCC, and indeed the discipline of other prisoners who reported sex assault, there is every reason to believe that Officer Kohlrus believed Ms. Farris would be retaliated against for reporting his sexual assault, that she would be too fearful of retaliation to report the sexual assault, and that he was emboldened to carry out the sexual assault because he thought she would not report it.

71.     In companion with the measures against retaliation, PREA is designed to prevent sexual assault in another way:  it requires the facility to incident reviews of sexual assault allegations, even if a particular allegation of sexual assault cannot be substantiated. This requirement exists for another commonsense reason:  while it is often hard to substantiate a particular allegation of sexual assault, incident reviews allow investigators to "connect the dots" and identify potentially predatory employees, for example a single

employee whom multiple prisoners had identified as an assailant. Such incident reviews ensure that guards cannot engage in careers of sexual abuse over time, which otherwise might go undetected. *Without* such incident reviews, however, guards and other prison employees can feel emboldened to commit sexual assault, knowing that most sexual assault claims, in isolation, will come down to a prisoner's word against theirs.

72.     My review of the LCC sexual assault investigation files in this case indicates that the facility rarely conducted incident reviews that would have connected sexual assault claims by multiple prisoners against particular employees. For example, the record shows that multiple female prisoners lodged sexual assault allegations against a correctional officer (Durbin) and food service supervisor (Wood), but investigators examined each case in isolation and never connected them.

73.     The widespread failure to conduct such reviews would have emboldened employees like Kohlrus to believe that they could engage in sexual misconduct over the course of their prison careers with little repercussion, because even if multiple women reported being assaulted, there was little chance that any of them, in isolation, could prove their claims against him.

74.     The commonsense PREA measures that I have outlined in this section are designed not only to uncover specific incidents of abuse, but also to be prophylactic: they are designed to create an atmosphere within correctional facilities in which it is universally understood that correctional officers and other employees hold no power over inmates when it comes to sexual misconduct, and in which it is understood that correctional officers and other employees who engage in sexual conduct with a captive population will be found out.

75. The IDOC's failure to take up these commonsense measures would have created obvious avenues and incentives for abuse, and the failures appear to have resulted in an atmosphere in which sexual contact between employees and inmates was a known and accepted phenomenon. It is thus that Officer Kohlrus testified at his deposition that he heard "rumors"—from his instructors at the IDOC's academy and from other staff at LCC—that prison employees had sexual contact with female prisoners at LCC. And rumors about employee-inmate sexual contact were not uncommon at LCC, representing either conduct that was common or allegations of misconduct that nobody believed.[74] That sort of atmosphere can be expected in a situation where inmates are intimidated from filing formal complaints for fear of retaliation, and where employees know that allegations by inmates of sexual abuse will not be investigated or examined effectively. It is an atmosphere, moreover, in which a prison employee like Officer Kohlrus could expect to engage in sexual acts with employees and perhaps face "rumors," but not real consequences. This atmosphere is likely to have emboldened Officer Kohlrus to commit the sexual assault on Ms. Farris.

## V.    Trauma and Female Inmates

76. Significant research has been conducted regarding trauma and female inmates. In June 2003, the National Institute of Corrections released *Gender Responsive Strategies: Research, Practice and Guiding Principles for Women Offenders*, written by Drs. Owen, Bloom and Covington. This research was the first of many publications focused on providing gender responsive practices and services in correctional environments and included the pathways to crime for women and identified the prevalence of prior abuse that women offenders have experienced. Before 2013, when LCC was converted to use for female inmates, this information and research was widely known among correctional

---

[74] E. Kohlrus Deposition, pages 41-44 pages 54-59, pages 70-76, and pages 209-212

practitioners responsible for managing correctional facilities with female inmates. Women who have experienced prior abuse are especially vulnerable for future victimization and abuse. A Bureau of Justice Statistics study conducted in 2004 found that 42 percent of female State prisoners and 28 percent of female Federal prisoners reported that they had been sexually abused before their current sentence, as compared to 6 percent of male State prisoners and 2 percent of male Federal prisoners. A BJS survey of jail inmates, conducted in 2002, found that 36 percent of female inmates reported sexual abuse prior to incarceration, compared to 4 percent of male inmates.[75]   A BJS Special Report on Mental Health Problems of Prison and Jail Inmates found 75% of females in local jails had mental health problems.[76]

## VI.    Conclusions & Opinions

77.    In addition to the opinions discussed above, it is my expert opinion to a reasonable degree of certainty based on my experience:

78.    LCC has an entirely female jail population. The top leadership of the LCC was aware that female inmates at LCC had been sexually harassed, abused, assaulted, and subjected to retaliation and their safety continued to be at risk prior to the sexual assault and rape of Jacqueline Farris by Correctional Officer Erik Kohlrus on December 28, 2015.

79.    Failure by the LCC Administrators and PREA Agency Coordinators to implement PREA and Administrative Directive 04.01.301, comply with PREA Standards and IDOC policies, and audit to ensure the PREA Standards are being complied after the release of the PREA Standards in May 2012 and the IDOC Administrative Directive 04.01.301, Sexual Abuse and Harassment Prevention and Intervention Program, contributed

---

[75] Department of Justice, 28 CFR Part 115 Docket No. OAG-131; AG Order No.
RIN 1105-AB 34, National Standards to Prevent, Detect, and Respond to Prison Rape, p.52
[76] Bureau of Justice Statistics, Special Report September 2006, page 1

to and resulted in the sexual assault and rape of Jacqueline Farris by Correctional Officer

Erik Kohlrus on December 28, 2015.

80.    Defendants' deliberate indifference to complying with the Prison Rape

Elimination Act and IDOC's policies resulted in the unsafe conditions for female inmates

housed at LCC and created the conditions in which acts of sexual violence against Jacqueline

Farris could be perpetrated by Correctional Officer Erik Kohlrus.

81.    Regardless of what system efforts, and policies are put in place to protect

prisoners from sexual assault and abuse, if staff does not follow the policies, leadership,

administrators and supervisors are not aware of the requirements of critical position

responsibilities and also do not enforce the policies, and hold staff accountable to follow and

adhere to the policies, then audit to ensure PREA requirements are in place, and monitor

their PREA statistics for trend analysis and system improvements, then the results can be

catastrophic.

82.    The conduct of all Defendants caused serious psychological and physical

harm to Ms. Farris.  In my opinion, Defendants failed to protect Ms. Farris causing her

serious harm.

83.    Based on the material I have reviewed, my training and experience, the

Defendants would have been aware of a substantial risk of harm posed by male correctional

officers to female inmates.  If the LCC administrators and PREA Agency Coordinators had

adequately complied with PREA Standards and the IDOC's IDOC Administrative Directive

04.01.301, Sexual Abuse and Harassment Prevention and Intervention Program,

Correctional Officer Kohlrus would not have been able to be undetected when he removed

Jacqueline Farris from her cell during early morning hours under the guise of assisting with

feeding trays.  In these ways and others, the Defendants failed to act and consciously

disregarded their responsibility to protect female inmates like Ms. Farris by failing to conduct

effective sexual harassment and sexual assault incident reviews and failing to take

appropriate corrective measures to eliminate the risk of sexual violence for female inmates

housed at LCC.

84.    I reserve the right to revise or supplement my report after further

investigation and analysis and after consideration of any additional information that may

become available.


I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


Executed on 09/10/2020 at Oakland, California.


 /s/ Wendy Still
Wendy Still, MAS
Correctional Expert

**WENDY STILL, M.A.S.**
4506 Hidden Court
Rocklin, California 95677
(916) 532-7390


EXHIBIT A

## QUALIFICATIONS SUMMARY

- Criminologist and Peace Officer.
- Prison, Jail, Juvenile Detention and Community Corrections Operations and Program Expert-30 years experience.
- Recognized for developing a program vision and successfully planning and implementing the vision.
- Readily establish positive, professional rapport among Executive State and local Criminal Justice Leadership, Courts, Department of Finance, legislative officials, Attorney General's Office, control agencies, union representatives, co-workers, staff, the public, the media, statewide inmate family council and inmates.
- Ability to make sound decisions independently and under pressure of deadlines. Highly self-directed.

## EDUCATION

**University of California, Irvine,** Masters of Advanced Studies, Criminology, Law & Society – GPA: 4.0
**University of San Francisco,** Bachelor of Science Degree in Organizational Behavior - GPA: 4.0.

## EMPLOYMENT

**Alameda County**                                                                                                     **8-16– Present**
**Chief Probation Officer,**
**Alameda County Probation Department, Alameda County**
- Provide leadership, direction, and training for Alameda County Probation Department including supervision of 10,000 adult and juvenile probationers, Juvenile Hall and Camp residents, 675 employees and direct resources for $135 million budget. Chairperson of the Community Correctional Partnership-Executive Committee and the Joint Safety Table.

**Special Consultant, California Federal Prison Health Care Services**                                     **8-15–7-16**
**Appointed by J. Clark Kelso, Federal Prison Receiver**
- Develop and implement a statewide strategy to create gender responsive correctional health care services for female inmates consistent with community standards of care. Design and establish a Women's Correctional Health Care Services Advisory Committee comprised of internal and external national experts and stakeholders.

**Expert Consultant, Department of Justice, Civil Rights Division**                                          **7-15-Present**
- Conduct civil rights and condition of confinement investigation including sexual abuse and assault in prison settings, prepare expert report of findings and recommendations. Review and prepare prison policy analysis with recommendations.

**City/County of San Francisco**                                                                                     **3-10– 3-15**
**Chief Adult Probation Officer**
**San Francisco Adult Probation Department, San Francisco**
- Provide leadership, direction, and training for San Francisco County and City Adult Probation Department
- Appointed by the State Senate as Board Member to the California Rehabilitation Oversight Board representing Chief Probations Officers' statewide interests
- California Attorney General Harris Smart Team Member-Rehabilitation, Reentry, and Female Offender Expert
- Chair, Executive Community Correctional Partnership. Creator of AB 109 State mandated SF City and County Public Safety Realignment Plan
- San Francisco Sentencing Commission Member
- San Francisco Reentry Council-Co-Chairperson
- Reformed San Francisco Adult Probation Department and lead county-wide criminal justice reform efforts which resulted in:
  - o  Increased Successful Probation completion rate to over 80%
  - o  Reduced Probation failures to State Prison by 80%
  - o  Reduced Probation caseload by 43%
  - o  Criminal Justice reform projects reduced jail population by 41%

**Certified Department of Justice PREA Auditor**                                                                 **7-14-12-17**

**Expert Consultant, Department of Homeland Security, Office for Civil Rights and Civil Liberties**    **8-11-Present**
- Conduct detainee civil rights and condition of confinement investigations and sexual assaults in jails, contracted correctional facilities, family residential centers, and lockups. Prepare expert reports of findings and recommendations.

**Wendy Still**                                                                                                    **Page 2**

**Expert Corrections Consultant and Criminologist**                                          **11-10-Present**
- Provide corrections and criminology consulting in litigation cases and for various federal agencies

**California Federal Prison Health Care Services**                                             **9-08 - 2-10**
    **Appointed by J. Clark Kelso, Federal Prison Receiver**

    <u>Director, Activation Management and Rehabilitation Program</u>
    **Corrections Services, Sacramento**
- Appointed by the Federal Prison Receiver, accountable for the oversight of all activation activities involved in the management support and infrastructure for each of the California Prison Health Care Services (CPHCS) new and renovated health care prison facilities.
- Responsible for the development, design and oversight of all rehabilitative services including the physical space in new and renovated health care facilities including: vocational and academic education, libraries, religious services, recreation, counseling services, addiction programs, visitation, daily activities and re-entry programs.
- Embedded with a multi-disciplinary corrections, medical, mental health, architect, and plaintiff's expert team to create a Healthcare prison design and program that met constitutional standards.
- Responsible for creating and managing an activation organizational structure with new policies and protocols to carry out the related Federal Receiver's objectives as described in the Federal Receiver's Turnaround Plan of Action for Achieving a Constitutional Level of Medical Care in California Prisons.
- Create and implement program staffing, deliverables, and coordinates the delivery of activation and rehabilitative services with other custody and medical services.
- Represent CPHCS before the legislature and the administration, the Department of Finance, the Legislative Analyst's Office, constituent groups, the media and state and federal agencies, including the courts.
- Designed and managed a mental health inmate research project to produce evidence on inmates and parolees for the design of the new consolidated correctional care center programs to improve behavior and reduce recidivism.
- Designed and lead the statewide prison medical population assessment project to produce population projections needed to master plan the capacity and components of the statewide correctional medical bed system.

**California State Department of Corrections and Rehabilitation**                        **1985 - 2008**

    <u>Associate Director-Female Offender Programs & Services, Division of Adult Institutions</u>    **10-05 – 9-08**
    **Div. of Adult Institutions Sacramento (Governor's Appointment/Confirmed by State Senate Rules Committee)**
- Developed a strategic master plan for 11,700 California female felon offenders.
- Provided leadership direction, training, evaluation, coordination and institutional oversight for three female prisons, Civil Addict Programs, three conservation camps, six Family Foundation Programs and Community Mother Prisoner Programs, Women and Children Services Unit, the Female Rehabilitative Community Correctional Center, and the Female Residential Multi Service Center Program with budgets exceeding $387 million dollars.
- Designed, developed and managed female offender institutions and programs utilizing performance measurement tools. Created the accountability performance metrics for all female programs.
- Oversight of all inmate casework, appeals, disciplinary and re-entry functions for community female programs.
- Developed an extensive, active community group network.
- Researched, reviewed and recommended policy standardization and regulatory proposals, provided leadership on statewide issues related to female offenders.
- Secured $150 million in funding and implemented female offender program reforms aligned with departmental strategic objectives. Improved rehabilitative programming opportunities, including community re-entry.
- Gender Responsive Strategies Commission Chairperson.
- Conducted onsite visits, audits and performed immediate review of major emergency incidents.
- Designed and managed two transgender correctional safety research projects which produced evidence needed to update statewide departmental transgender case management and housing policies.
- Departmental transgender expert on policy and testified in Federal Court as a departmental expert.
- Prison Rape Elimination Act (**PREA**) Executive Project Director. Developed and implemented California's Correctional Statewide **PREA** Compliance Program for 170,000 inmates housed in 33 prisons.
- Oversight of security issues, such as policies and procedures on the use of force, shooting policies and training, primary and secondary response, and post orders; housing policies, procedures and practices; effectiveness of overall operations to ensure a safe and secure operation that was aligned with the strategic objectives of the Department.
- Ensure Segregataion/lock-ups operated within regulations..
- Oversight of female institution and community correction program audit compliance and issue resolution. Ensured effective audit corrective action plans were written and complied with.

    <u>Associate Director-Reception Center Mission</u>
    <u>Southern Regional Administrator (A), Institutions Division</u>                              **11-04 - 9-05**

**Division of Adult Institutions, Sacramento**
- Provided administrative direction, oversight and counsel to Wardens on matters related to all facets of institutional operations for 10 male and female prisons and approximately 40,000 inmates and 13,000 staff with budgets exceeding $1 billion.
- Ensured classification casework met set performance standards.
- Ensured Segregation/lock-ups operated within regulations.
- Chaired the Reception Center Operational Streamlining workgroup with a mission to increase operational efficiency.
- Conducted site visits, audits and investigation related to institutional security, policies, procedures and practices for 10 prisons.

- Oversight of security issues, such as policies and procedures on the use of force, shooting policies and training, primary and secondary response, and post orders; housing policies, procedures and practices; effectiveness of overall operations to ensure a safe and secure operation that was aligned with the strategic objectives of the Department.
- Oversight of institution audit compliance and issue resolution.  Ensured effective audit corrective action plans were written and complied with.

**Deputy Director/Chief Financial Officer, Financial Services Division**                  **12-99 – 11-04**
**Office of the Chief Deputy Director, Support Services, Sacramento**
- Provided financial leadership, direction and management of a $5.7 billion budget and 50,000 authorized positions.
- Developed and implemented statewide fiscal management policies and a fiscal training program.
- Established statewide standards for all financial services, including budgeting and accounting.
- Testified at Legislative Budget Hearings.
- Primary departmental financial affairs contact for the Department of Finance, Legislature, Legislative Analyst's Office and the Bureau of State Audits.
- Secured $70 million to implement an automated statewide Business Information System.

**Special Assistant to the Chief Deputy Director**                                              **9-98 - 12-99**
**(Correctional Administrator)**
**Office of the Chief Deputy Director, Support Services, Sacramento**
- Headquarters Operational Assessment $140 million Budget Reduction Team member.
- Prepared policy analysis and recommendations.
- Team Leader for Staff Development Center/Basic Correctional Officer Academy Split Project.
- Researched issues, facilitated problem resolution and completed special projects.

**Correctional Administrator**
**Chief, Correctional Planning and Research Branch**                                          **2-97 - 8-98**
**Chief, Regulation and Policy Management**
**Evaluation, Compliance and Information Systems Division, Sacramento**
- Organized and directed transfer of Three Strikes Planning Office to Planning and Construction Division.
- Managed large scale, multi-disciplinary projects involving investigation of best practices, use of stakeholder work groups, input and benchmarking of techniques.
- Managed the Department's strategic planning activity.
- Networked nationally among federal and state agencies, as well as private industry, to develop innovative strategies for department application.
- Managed the development, composition and quality control of the Department's Operations Manual.
- Directed preparation and promulgation of changes to California Code of Regulations driven by policy modifications related to staff, inmates and administration.
- Testified before legislative committees and at legal depositions related to regulations and policy.

**Acting Chief Deputy Warden**                                                                   **6-90 - 10-96**
**Correctional Administrator  (Associate Warden-Business Services)**
**California State Prisons - Solano, Folsom and Wasco**
**Held various high level institution operations and business positions with duties including:**
- Chief Institutional Operations Officer, responsible for overall institutional safety and security.
- Planned and directed correctional programs, including: inmate casework, work-training incentive, classification, education, medical, litigation management, appeals, labor relations and business management.
- Chaired the Warden's Institutional Classification Committee (highest level of prison classification review), which is responsible    for the most complex inmate housing, safety, security, and case management decisions.
- Managed plant operations, hazardous materials, budgeting, accounting, food services, procurement, canteen, clothing, warehousing, personnel assignments, return-to-work and personnel activity for 1,150 staff and 4,800 inmates.
- Administrated $71 million annual operating budget.  Oversight of the preparation of budget concept statements, overcrowding, staffing activation and deactivation packages.  Prepared deficiency budget cut packages.  Resolved operating deficiencies.
- Negotiated with union representatives on staffing and business matters.

- Met with Inmate Advisory Committee to resolve inmate issues.
- As EEO Coordinator, responded to Department of Fair Employment and Housing and CDC internal, informal and formal discrimination and sexual harassment complaints on behalf of the Warden.
- Special Assignments:  Master Trainer Sexual Harassment Prevention Training, EEO Counselor, Employee Assistance Program (EAP) Coordinator, Joint Venture Coordinator, Management Performance Appraisal System (MPAS) Coordinator, Management By Objective (MBO) Coordinator, Departmental Women's Liaison Council (DWLC) Executive Chair 1991 - 1993 and Member, Director's Female Custody Uniform Task Force Review Committee,  Female SERT Recruitment Task Force Member, and Discrimination Complaint Investigator.

## HONORS

- Words to Deeds Award for over 40 years of correctional and mental health partnership contributions-Nov. 2019
- No More Tears supporting Prisoner Reentry-October 2019
- Wendy Still Day in San Francisco by Mayor Ed Lee, Over 30 decades of Dedicated Public Service-March 23, 2015
- Chief Probation Officer's of California Commendation for Distinguished Community Corrections Service-March 2015
- SF Woman of the Year 2015, SF District Attorney George Gascon-March 2015
- SF Public Health Hero Award, SF Public Health Department-March 2015
- SF District Attorney's Office Certificate of Honor for Dedicated Public Service-March 2015
- SF Public Defender's Office Recognition Award for Improving the Quality of Justice in SF-March 2015
- SF Police Department's Certificate of Appreciation for Dedicated Public Service-March 2015
- SF Deputy Probation Officer's Association Service Award-March 2015
- SF Adult Probation Distinguished Service Award-March 2015
- SF Juvenile Probation Department Certification of Appreciation for Innovative and Cutting Edge Community Corrections-March 23, 2015
- Certificate of Recognition for Outstanding SF Public Service Contributions, Senator Mark Leno-March 2015
- Certificate of Special Congressional Recognition, Women's History Month 2015 Honoree, Congresswoman Nancy Pelosi-March 2015
- Certificate of Recognition for Dedicated Service to Community of SF, Assemblymember David Chiu-March 2015
- Commendation for SF Women's History Month Honoree, SF Commission On Status of Women-March 2015
- Governing Magazine Public Official of the Year- December 2014
- National Council on Crime and Delinquency Correctional Service Award-December 2014
- American Probation and Parole Association President's Award to SF Adult Probation-July 2013
- Healthright360°, San Francisco Community Partner Award--September 2012
- Capstone Award, University of California Irvine – June 2008
- Letter of Appreciation from CDCR Director, Division of Adult Institutions – June 2008
- Letter of Appreciation for participation in the Strategic Action Plan, Goal 5, "Crime Prevention And Safety" from CDCR Chief Deputy Director, Field Operations – June 2005
- Certificate of Appreciation–Participation in Fiscal Workgroup Executive from Agency Secretary - November 2004
- Letter of Commendation from Attorney General's Office - June 1998
- Letter of Commendation for outstanding performance from A. C. Newland, Warden - February 1997
- Management Training Program Instructor Award - 1997
- Leadership Institute Graduate - 1995
- Management Training Instructor Appreciation Award - 1994
- Departmental Women's Liaison Council Appreciation Award - 1993
- Director's Appreciation Award - 1993
- Employee of the Month - February 1991
- Supervisor of the Year Award – 1990
- Governor's Merit Award – 1980

## CIVIC POSITIONS

Vice Chairperson, Roseville Homeless Commission, 1998


## PROFESSIONAL ASSOCIATIONS

American Probation and Parole Association
American Correctional Association
Association of Criminal Justice Researchers
Chief Probation Officers of California

Exhibit B

## CURRICULUM VITAE OF WENDY STILL

| DATE | TITLE |
|------|-------|
| February 1997 – August 2008 | Policy, Fiscal and Operational Expert for the California Department of Corrections and Rehabilitation. Provided Expert Testimony in over 200 Legislative, Oversight and Fiscal Hearings on behalf of the Department. |
| November 14, 2006 | United States Department of Justice Prison Rape Elimination Act Standards Panel Testimony for California Prisons |
| December 27, 2006 | Maegan Black et al v. State of California, et al Expert Witness Declaration as Gender Prison Program Expert for State of California, Attorney General's Office |
| July 2007 | Giraldo v. California Department of Corrections and Rehabilitation- Attorney General's Transgender Prison Policy and Operations Attorney General Expert Witness |
| March 11, 2008 | United States Department of Justice Hearing on Rape and Staff Sexual Misconduct in U. S. Prisons – California Prison System Expert Witness |
| May 2008 | California Department of Corrections and Rehabilitation "Master Plan for Female Offenders: A Blueprint for Gender Responsive Rehabilitation". Author of Penal Code Mandated Plan to the Legislature |
| April 09, 2010 | Senate Hearing: Inmates Alternative Custody Program – Testified as Senate's Expert Witness to support new legislation |
| April 23, 2010 | Gender and Incarceration in California – Consortium for Women and Research, University California at Davis, - Expert Panel Member |
| May 05, 2010 | San Francisco County Board of Supervisors Accept and Expend Hearing on Evidenced Based Probation Supervision Grant (SB 678) Speaker |
| June 24, 2010 | San Francisco County Budget and Finance Committee Adult Probation Budget Hearing Speaker |
| August 04, 2010 | Justice and Courage Oversight Panel Speaker |
| August 27, 2010 | KALW Public Radio Interview |
| September 2010 | University California at Berkeley – Guest Lecturer – Coleman Prison Mental Health Class Litigation and Corrections Response |
| September 27, 2010 | Sonoma State Corrections Class Guest Lecturer |

# CURRICULUM VITAE OF WENDY STILL

| | |
|---|---|
| October 21, 2010 | Select Committee on Women and Children in the Criminal Justice System – Expert Senate Witness "Models of Innovation for Female Offenders" |
| October 27, 2010 | San Francisco County Board of Supervisors Budget and Finance Committee Re-entry Grant Ordinance Speaker |
| November 18, 2010 | Little Hoover Commission Corrections Oversight Hearing-Speaker: "Correctional Structure Reform and Options for Expanding Community Corrections" |
| November 28, 2010 | *Botelho, et al. v. State of Hawaii- Expert, Jail Overcrowding and Conditions of Confinement* |
| January 20, 2011 | California Attorney General Harris Transition Smart Team Member-Expert Rehabilitation, Reentry and Female Offenders |
| January 25, 2011 | *Doe v. USA Civil No. 08-00517-Expert Report, Prison Rape Elimination Act* |
| February 2011 | Appointed Co-Chair, City & County of San Francisco Reentry Council |
| March 31, 2011 – May 19, 2011 | Instructor Stanford University, Continuing Studies, Social 36: "Criminal Justice: Incarceration and its Impact" |
| May 10, 2011 | American Constitution Society-Panel Member AB 109 California Criminal Justice Realignment |
| June 14, 2011 | Keynote Speaker "Friends Care" 37th Annual Dinner, Rehabilitation Inside Corrections and AB 109 Impact |
| July 25, 2011 | American Probation and Parole Association Panelist, Innovations in California Probation |
| August 24, 2011 | Bay Area Regional Public Safety Realignment Panelist, Innovative Reentry Strategies and Criminal Justice Reform Collaborations |
| September 1, 2011 | Instructor, Department of Homeland Security, Office of Civil Rights and Civil Liberties, Department of Justice, and ICE, "Vulnerable Detainee Populations" Training |
| September 1, 2011 | Instructor, Department of Homeland Security, Office of Civil Rights and Civil Liberties, "Effective Investigation Techniques" Training |
| September 15, 2011 | Performance Incentive Funding Panel Member, Implementing State/County Evidenced Based Criminal Justice Legislation |

2

## CURRICULUM VITAE OF WENDY STILL

| | |
|---|---|
| September 18, 2011 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation |
| September 19, 2011 | California Cities and Gang Prevention Network Expert Panel Member ; AB 109 Criminal Justice Impact with Senator Hancock and Matthew Cate, Secretary, California Department of Corrections and Rehabilitation |
| September 22, 2011 | Expert Training for all San Francisco District Attorneys, "AB 109, California Criminal Justice Realignment" |
| October 11, 2011 | University California at Davis, Crime and Punishment Revisited Panel Member, "Terms of Realignment and California Sentencing Since 2008". |
| October 11, 2011 | University California at Davis, Crime and Punishment Revisited Panel Member "Sentencing Reform for 2012". |
| October 20, 2011 | Association of Criminal Justice Researchers Winter Conference Expert Panel Member, "Implementing AB 109 Criminal Justice Realignment in the City and County of San Francisco". |
| November 22, 2012 | National Reentry Resource Center Webinar Speaker with Commissioner Schiraldi "Critical Criminal Justice Reforms in Difficult Times, Engaging Families". |
| December 5, 2011 | Criminal Dismissals and Realignment Roundtable Expert Panel Member |
| January 23, 2012 | Drug Court Graduation Speaker |
| February 2, 2012 | NAACP and the California Department of Corrections and Rehabilitation "Pathways, Reaching the Overlooked" Expert Panel Member on "Realignment". |
| February 21, 2012 | Microsoft Public Safety Institute, Expert Panel Member "Corrections Realignment, AB 109 Implications and Risk Management". |
| March 14, 2012 | Academy of Architecture for Justice Bay Area: "The Future of Corrections and Detention in California", Expert Speaker |
| March 15, 2012 | Senate Public Safety Budget Committee, testified as Senate's Expert Witness: "Female Offender Master Plan and Alternate Custody Program Criteria Expansion" |

# CURRICULUM VITAE OF WENDY STILL

| | |
|---|---|
| March 16, 2012 | University of California, Berkeley, Boalt School of Law, Caleb Foote Symposium, "Past and Future of the California Justice System," Expert Panel Member |
| March 21, 2012 | University of California, Berkeley, Radio Interview: "Criminal Justice Reform in California, A Conversation with Wendy Still and David Onek" |
| April 15, 2012 | Isadore Gartrell v.Federal Bureau of Prisons, et al, Expert Religious Freedom |
| April 15, 2012 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| April 29, 2012 | *Expert Report In re: Prison Overcrowding Cases, Civil Action No. 11-3711 and All Member Cases* |
| June 10, 2012 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| July 23, 2012 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| September 6, 2012 | Keynote Speaker:Healthright360°Graduation and recipient of Healthright360°Community Partner Award |
| September 12, 2012 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| September 30, 2012 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| October 3, 2012 | Panelist: San Francisco AB 109 Criminal Justice Realignment Collaborations-Child Welfare Director's Association Annual Conference |
| October 18, 2012 | Panel Moderator: *Realignment Year One- How Does it Measure Up?* State Perspectives |
| October 18, 2012 | Panel Member: *Realignment Year One-How Does it Measure Up?* Local Perspectives |

# CURRICULUM VITAE OF WENDY STILL

| | |
|---|---|
| February 8, 2013 | Panelist: American Society of Criminologist, President's Panel-The Future of Feminist Correctional Theory |
| February 18, 2013 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| February 24, 2013 | *Expert Report, In re: Baggett v. Ashe, Civil Rights Class Action Case, Civil Action No. 11-cv-30223-MAP* |
| April 2013 | Author – Article:  *Realigning California Corrections,* Volume 24, Issue No. 4, *Federal Sentencing Reporter* |
| May 5, 2013 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| May 26, 2013 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| June 26, 2013 | Harvard John F. Kennedy School of Government and National Institute of Justice  - Executive Sessions on Community Corrections Team Member |
| July 8, 2013 | *Expert Report, In re: Amador v. Baca, Civil Rights Class Action Case, Civil Action No. 10-cv-01649-SVW* |
| July 25, 2013 | Awarded American Probation and Parole Association 2013 President's Award |
| September 10, 2013 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| October 2, 2013 | Panelist, "Curbing Corrections Cost", Governing California Leadership Forum |
| October 3, 2012 | Panelist, "Reentry and Realignment Forum", Senate Public Safety Committee, |
| October 30, 2013 | Panelist, "Women and Realignment", Women's Foundation |
| December 4, 2013 | Expert Testimony, Assembly Public Safety Hearing – "Alternatives to Incarceration" |
| December 19, 2013 | Keynote Speaker, Brother's for Change Scholarship |

# CURRICULUM VITAE OF WENDY STILL

| | |
|---|---|
| December 20, 2013 | *Expert Report, In re: Baggett, v. Ashe, Civil Rights Class Action Case, Civil Action No. 11-cv-30223-MAP* |
| March 5, 2014 | Senate Public Safety Budget Committee, testified as Senate's Expert Witness: "Female Offender Master Plan and Alternate Custody Program Criteria Expansion" |
| March 6, 2014 | Senate Public Safety Budget Committee, testified as Senate's Expert Witness: "Female Offender Master Plan and Female Offender Criminal Justice System Reform" |
| June 15, 2014 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| August 24, 2014 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| October 17, 2014 | Author – Article: *Realignment in Action – Alternative to Incarceration: Effective Community Supervision and Reentry in San Francisco* |
| October 17, 2014 | Presenter: "Understanding the Effects of Plata and Realignment on California's Criminal Justice System Panel," Realigning California Corrections: Legacies of the Past, the Great Experiment and Trajectories for the Future, UC Irvine Symposium |
| October 19, 2014 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| November 17, 2014 | Panelist, The Long Overdue Reform of Corrections Sentencing Practice and Policy, San Francisco's Programs Reducing Recidivism, McGeorge School of Law |
| December 2014 | Governing Magazine Public Official of the Year 2014 Award |
| January 8, 2015 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| March 26, 2015 | Panel Moderator, Criminal Justice in a Community Perspective," Association of Criminal Justice Researchers |
| January 22, 2015 | Retained Expert, Hernandez v. Monterey County, Civil Action Case No.: 5:13-cv-2354- |

6

## CURRICULUM VITAE OF WENDY STILL

| | |
|---|---|
| | PSG, US District Court, Northern District of California, San Jose Division (settled) |
| September 30. 2015 | Expert Report, In re: *Throgmorton v. Reynolds, et al., Civil Action No. 3:12-cv-3087* |
| February 26, 2016 | Expert Report, *In re: Amador v. Baca, Civil Rights Class Action Case, Civil Action No. 10-cv-01649-SVW* |
| December 2016 | Co-Author – Article:  *Building Trust and Legitimacy in Community Corrections*, Harvard Kennedy School/National Institute of Justice, Issue No. 3 |
| December 2016 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Resident Conditions of Confinement |
| January 2017 | Co-Author – Article:  *Shackled to Debt: Criminal Justice Financial Obligations and the Barriers They Create*, Harvard Kennedy School/National Institute of Justice, Issue No. 4 |
| January 2017 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| January 2017 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Resident Conditions of Confinement |
| August 2017 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| October 2017 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Resident Conditions of Confinement |
| December 2017 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Resident Conditions of Confinement |
| January 2018 | Expert Report, Department of Justice, McPherson Unit, Newport Arkansas, Prison Conditions of Confinement Investigation |
| April 2018 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| July 2018 | Expert Report, Department of Homeland |

7

# CURRICULUM VITAE OF WENDY STILL

|  |  |
|---|---|
|  | Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| August 2018 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| November 2018 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Customs & Border Patrol UAC & Conditions of Confinement |
| February 1, 2019 | Expert Testimony: The United States Commission on Civil Rights, Women in Prison: Disparate Treatment, Disparate Impact, and the Duty of Care |
| June 23, 2019 | Expert Report, In re: *Angelina Sandifor, Brenda Blandon, Jamie Utterback v. County of Los Angeles et al, Civil Action No. 2:18-cv-07650-DMG-PLA* |
| July 2019 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, United States Coast Guard Detainee Conditions of Confinement |
| August 2019 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Customs & Border Patrol UAC & Conditions of Confinement |
| November 2019 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement-ST Family Residential Center |
| June 2020 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| July 2020 | Expert Testimony, Senate Public Safety Hearing AB 1950 |
| August 2020 | Panelist, American Probation and Parole Training Institute, Racial Justice Town Hall |
| August 2020 | Expert Report, Department of Homeland Security, Office of Civil Rights and Civil Liberties Investigation, Detainee Conditions of Confinement |
| August 2020 | *Expert Report, In re: Irie Reyes, v. County of Los Angeles, et al, Civil Action No. 2:20-cv-00471-GW-KSx* |