# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JACQUELINE FARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3279 |
| | ) | |
| ERIK KOHLRUS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. District Judge.**

Plaintiff Jacqueline Farris is a former resident of the Logan Correctional Center, a facility operated by the Illinois Department of Corrections (IDOC). Less than three weeks after arriving at Logan, Ms. Farris was sexually assaulted by Defendant Erik Kohlrus, a correctional officer assigned to Ms. Farris's housing unit.

After completing her sentence, Ms. Farris sued IDOC and nineteen of its employees pursuant to 42 U.S.C. § 1983. She alleges that these Defendants violated the First, Eighth, and Fourteenth Amendments by, among other things, failing to protect her from a known, serious risk of custodial sexual abuse at Logan.

This matter comes before the Court on three motions for summary judgment, each filed by a group of current or former IDOC employees.  <u>See</u> Defs.' Mot. Summ. J., d/e 215; Defs.' Mot. Summ. J., d/e 217; Defs.' Mot. Summ. J., d/e 219.

## I. BACKGROUND

### A.    Parties

Plaintiff Jacqueline Farris is a former resident of Logan Correctional Center and Decatur Correctional Center.  Ms. Farris entered Logan in December 2015 and remained there until January 2016, when she was transferred to Decatur.  She completed her term of incarceration in September 2018.

Defendant Angela Locke was a correctional officer at Decatur and Logan at all relevant times.  Major Locke served as Logan's acting warden, or chief administrative officer, from October 2013 to June 2015.  In that capacity, Major Locke was responsible for overseeing day-to-day operations at Logan, including compliance with the Prison Rape Elimination Act (PREA); for promulgating rules, regulations, policies, and procedures to ensure the safety of the women housed at Logan; and for supervising, training, assigning, and disciplining Logan's counselors, correctional officers,

internal-affairs investigators, and other staff.  After completing her temporary assignment at Logan, Major Locke resumed her service as a shift supervisor at Decatur.

Defendant Christine Brannon served as Logan's warden from August 2015 until February 2016.  Warden Brannon was responsible for overseeing day-to-day operations at Logan, including compliance with PREA; for promulgating rules, regulations, policies, and procedures to ensure the safety of the women housed at Logan; and for supervising, training, assigning, and disciplining Logan's correctional officers, internal-affairs investigators, and other staff.

Defendant Clara Charron was Logan's Assistant Warden of Programs at all relevant times.  Ms. Charron implemented and oversaw certain policies and practices at Logan, including Logan's mental-health, educational, and religious programming.  Ms. Charron also served as Logan's PREA compliance manager from the fall of 2013 until November 2015, when she was succeeded by Defendant Norine Ashley.  In that capacity, Ms. Charron was responsible for ensuring compliance with PREA regulations and standards and for developing, planning, and overseeing efforts to address the problem of custodial sexual assault at Logan.

Defendant Norine Ashley was a staff psychologist at Logan at all relevant times.  Dr. Ashley served as Logan's PREA compliance manager beginning in November 2015.  Like Ms. Charron, Dr. Ashley was responsible for Logan's compliance with PREA regulations and standards and for developing, planning, and overseeing programs to address the problem of custodial sexual assault at Logan.  Defendant Lisa Johnson, the head of Logan's health-care unit, served as Dr. Ashley and Ms. Charron's backup PREA compliance manager through the relevant period.

Defendant Alex Adams was a correctional officer at Logan at all relevant times.  Officer Adams was assigned to the nightshift in Ms. Farris's housing unit and was in the unit's control room when Ms. Farris was assaulted.

Defendant Trina Snyder was a correctional officer at Decatur, with the rank of lieutenant, at all relevant times.  As head of Decatur's internal-affairs office, Lt. Snyder bore principal responsibility for investigating allegations of staff and prisoner misconduct at Decatur.

Defendant Jeff Gabor was an external investigator employed by IDOC at all relevant times.  In that capacity, Investigator Gabor

was responsible for investigating allegations of staff and prisoner misconduct throughout the Department of Corrections.

Defendant Patrick Keane served as IDOC's systemwide PREA coordinator between July 2013 and November 2015, when he was succeeded by Defendant Michael Funk. Among other duties, Mr. Keane and Mr. Funk were tasked with ensuring IDOC facilities' compliance with PREA, facilitating PREA-related staff trainings and overseeing IDOC's federally mandated PREA audit.

Defendant Alan Pasley served as Superintendent of Logan's Reception & Classification Center ("R&C") from 2013 to 2017. Mr. Pasley also served as Mr. Funk's backup PREA coordinator until May 2016, when Mr. Pasley replaced Mr. Funk as agency PREA coordinator.

**B.   Facts**

The Court draws these facts from the parties' statements of undisputed facts and the evidence they submitted. The Court deems admitted those facts not in dispute or disputed without an evidentiary basis. See L.R. 7.1(D)(2)(b)(2).

**1. Logan Correctional Center.**

Logan Correctional Center is a mixed-security women's prison located in Lincoln, Illinois. Logan opened in 1978 as a men's facility. By the early 1990s, IDOC had converted Logan into a mixed-gender facility. Logan reverted to housing only men just a few years later.

In early 2013, IDOC consolidated "the populations of the state's two largest women's prisons" into Logan. See Pl.'s Resp. ex. 32, d/e 235-32, at 15 ("GIPA Report"). Before the transition, Logan held around 1,500 medium-security male prisoners. Afterward, Logan was charged with "manag[ing] a population of 2,000 (or more) women across all security classifications," in addition to serving as the statewide reception and classification center for each of the 2,500 or so women incarcerated in Illinois every year. Id. As the John Howard Association of Illinois, a nonprofit prison-monitoring organization, would later report, the Logan conversion was "under[-]resourced and ill-conceived." Id. An IDOC-led study similarly found that the transition "took place with limited planning, staff training[,] and efforts to take into account the unique nature and needs of such a large, complex women's prison population." Id.

In March 2015, IDOC commissioned a gender-informed practice assessment (GIPA) at Logan.  See id. at 7.  Over a four-day period in November 2015, the GIPA team surveyed nearly 1,000 Logan prisoners, staff members, and external stakeholders.  The team sought to evaluate Logan's ability to respond to the needs of its unique population and to devise and propose "evidence-based" and "trauma-informed" improvements.

The GIPA team found that Logan's "divisive facility culture" had engendered an "unstable environment that undermines the safety of both the women [prisoners] and staff."  Id. at 18.  For example, although women of color predominated in Logan's custodial population, the facility was managed "by a predominantly white and male staff" with "little, if any, training on cultural responsivity."  Id. at 21.  Staff members, too, "voiced concerns about being unprepared to work with the Logan population, where 770 women are identified as SMI [seriously mentally ill], 60% are estimated to be suffering from PTSD, and 75% have been the victims of sexual abuse."  Id. at 20.  Of the 800 prisoners surveyed, 84.4% indicated that Logan staff failed to treat the women in their custody with respect.

The study also identified systemic deficiencies in Logan's handling of grievances—written requests or complaints submitted by prisoners.  The GIPA team concluded that Logan's grievance process "[p]revent[ed] management from [k]nowing about and [c]orrecting [p]roblems."  Id. at 18.  The team's findings revealed that grievances were "not being properly tracked, logged, and returned back to the grievance officer or the warden in a timely manner and according to departmental policy."  Id. at 18–19.  The team further found that some Logan staff members "intimidate women and throw grievances out or dismiss them prematurely."  Id. at 19.  Women at Logan reported "losing their job assignments, being arbitrarily moved, [and otherwise] being mistreated by staff" for complaining about staff misconduct.  Id.  And other staff and supervisors deterred prisoners from filing grievances simply by telling them that their complaints or allegations would "not be believed."  Id.

### 2. Jacqueline Farris's Incarceration Before December 28, 2015.

On November 30, 2015, Plaintiff Jacqueline Farris pled guilty in Illinois state court to possessing between one and fifteen grams

of cocaine, a Class 4 felony.  People v. Farris, No. 2015-CF-1602 (Cir. Ct. Champaign Cnty.).  The circuit court then sentenced Ms. Farris to six years in IDOC custody.  See Def.'s Mem. ex. B, d/e 214-2, at 2.  In issuing its "Impact Incarceration Sentencing Order," the circuit court found that Ms. Farris's offense "was committed as the result of the use of . . . or addiction to . . . a controlled substance."  Id.  The circuit court further found that Ms. Farris met "the eligibility requirements for possible placement in the Impact Incarceration Program."  Id.

The Impact Incarceration Program, or "boot camp," provides individuals under Illinois felony sentence with "an alternative to prison styled after the familiar military basic training program." United States v. Gajdik, 292 F.3d 555, 556 (7th Cir. 2002).  A prisoner who completes boot camp is entitled to a reduction in his sentence to time served.  730 ILCS 5/5–8–1.1(a).  If the prisoner "is not accepted for placement" or "does not successfully complete the program, his term of imprisonment shall be as set forth by the court in its sentencing order."  Id.

Participation in boot camp ordinarily follows from a sentencing judge's recommendation.  See id.; see also 20 Ill. Admin. Code §

460.20.  However, a judicial recommendation satisfies only one of eight statutory eligibility requirements, and the sentencing judge's word is neither sufficient nor necessary.  Cf. 730 ILCS 5/5–8–1.1(*l*) (enabling IDOC to "identify candidates for participation in the program that were not previously recommended and formally submit the names to" the committing state's attorney); see also Solorzano-Patlan v. INS, 207 F.3d 869, 871 n.4 (7th Cir. 2000) (noting that IDOC previously had rejected prisoners recommended by sentencing judge).  To enroll, a prisoner also must:

> 1) Be between 17 and 35 years of age;
> 2) Never have participated in the program before or served more than one prior sentence of imprisonment for a felony offense;
> 3) Not have been convicted of certain serious felonies such as murder, rape, kidnapping, and arson;
> 4) Have been sentenced to a term of imprisonment of eight years or less;
> 5) Be physically able to participate in the program;
> 6) Not have any mental disorder or disability that would prevent participation; and
> 7) Consent in writing.

See 730 ILCS 5/5–8–1.1(b)(1–7).  However, even if a prisoner satisfies all the statutory eligibility criteria, IDOC still "may consider, among other matters, . . . whether [the offender's] participation in the impact program may pose a risk to the safety or

security of any person." Id. The program's enabling statute therefore leaves to IDOC's discretion the decision whether to admit a particular candidate.

Certain categories of prisoners are definitionally ineligible for boot camp, including prisoners who require psychotropic medication for mental or emotional illness. Before a prisoner may be admitted to boot camp, he must undergo a mental-health evaluation "that focuses on 'current and previous mental health issues that could compromise the offender's ability to successfully complete the rigorous physical requirements or adhere to strict disciplinary requirements of the program." Def.'s Mem., d/e 214, at 5 ¶ 30. If IDOC finds "no evidence of current mental disorder that would compromise [a prisoner's] participation in the program," IDOC categorizes the offender as "Priority #1," which means that the offender does "[n]ot have any mental disorder or disability that would prevent participation." Id. at 3 ¶ 12. If the offender reports a "history" of psychological diagnoses or treatment, IDOC categorizes the offender as "Priority #2" and performs further screening to determine whether the "chronic or episodic mental health problem . . . may influence [the offender's] ability to complete the program."

Id. ¶ 13.  And if the offender's "mental health needs require[]
psychotropic medications," IDOC classifies the offender as "Priority
#3" and deems him ineligible for boot camp.  Id. at 5 ¶ 28.  IDOC's
internal directives and policies do not contemplate an exception to
this rule.  Instead, IDOC expressly "prohibits . . . deeming a
prisoner on psychotropic medication eligible for the Impact
Incarceration Program."  Id. at 6 ¶ 36.

Ms. Farris was admitted to Logan's Reception & Classification
Center ("R&C") for processing and placement on December 4, 2015.
When Ms. Farris began her sentence, she was 31 years old, a first-
time felony offender, a first-time prisoner, and under a six-year
sentence.  Cf. 730 ILCS 5/5–8–1.1(b)(1–4).  Upon arrival, Ms. Farris
received a grey uniform screen-printed with the words "boot camp."
She also received a one-page memorandum instructing her not to
"loan [her] IIP [Impact Incarceration Program] clothing to other IIP
inmate [sic]."  See Pl.'s Mot. Summ. J. ex. 9, d/e 223-9, at 1.  Ms.
Farris then signed two forms: a release identifying her as "the
undersigned participant in the Impact Incarceration Program," and
another release bearing the title "Impact Incarceration Form
Consent to Participate."  Id. ex. 10, d/e 223-10, at 1–3; cf. 730 ILCS

5/5–8–1.1(b)(7) (requiring that boot-camp participants "consent in writing").  Ms. Farris also was furnished with a copy of Logan's orientation handbook.  In relevant part, the handbook advised its newly incarcerated readers that:

> **Sexual abuse and custodial sexual misconduct are against the law.**
>
> The Department is committed to your safety and the safety of staff.  Sexual abuse compromises everyone's safety.
>
> The Department has ZERO TOLERANCE of sexual abuse.  That means we are committed to investigating EVERY allegation, getting services to EVERY victim, and punishing EVERY perpetrator.  That includes involving law enforcement and prosecutors.

Pl.'s Resp. ex. 10, d/e 235-10, at 6 (IDOC handbook).

Ms. Farris underwent a first-level mental health screening later that day.  The screening consisted of a brief interview with Amy Rude, a licensed clinical social worker and IDOC contractor.  Ms. Rude memorialized the screening by checking two boxes on Logan's "Mental Health Impact Incarceration" form.  One check designated Ms. Farris as "Priority #1," indicating that Ms. Rude had found "no evidence of current mental disorder . . . that may compromise the offender's participation."  See Pl.'s Mot. Summ. J.

ex. 11, d/e 223-11, at 1.  The other check affirmed that, "[b]ased on the medical screening above," Ms. Farris was "[a]pproved to participate in the Impact Incarceration program."  Id.; cf. 730 ILCS 5/5–8–1.1(b)(6) (requiring that boot-camp participants "not have any mental disorder or disability that would prevent participation").

Ms. Farris also underwent a medical screening.  Robert Allison, a physician's assistant and IDOC contractor, conducted Ms. Farris's examination.  Like Ms. Rude, Mr. Allison found that Ms. Farris satisfied IDOC's physical-health qualifications and was "[a]pproved to participate in the Impact Incarceration Program." See Pl.'s Mot. Summ. J. ex. 13, d/e 223-13, at 1; see also 730 ILCS 5/5–8–1.1(b)(5) (requiring that boot-camp participants "be physically able to participate in physical activities").

On December 21, Logan submitted Ms. Farris's "Offender Classification Form" to IDOC's transfer coordinator.  See Pl.'s Mot. Summ. J. ex. 14, d/e 223-14, at 1.  The form indicated that Logan's superintendent had approved Ms. Farris for admission to boot camp.  Id. at 4.  At Logan's recommendation, Ms. Farris was to be placed at "VIENNA: DIXON SPRINGS BOOT."  Id.  As of December

27, Ms. Farris remained approved and eligible for boot camp.  <u>See</u>
Def.'s Resp. to Pl.'s Second Interrogs., d/e 223-15, at ¶ 2.

### 3. Ms. Farris's Assault; Aftermath.

Ms. Farris awaited boot camp in the B-Wing of Housing Unit
15, which houses Logan's Reception & Classification Center.  By
day, Ms. Farris "had some freedom of movement within B Wing."
Defs.' Reply, d/e 249, at 90.  By night, Ms. Farris was confined to
her cell, where she remained until breakfast.  A correctional officer
monitored the housing unit's electronic security systems for any
signs of unauthorized nighttime movement.

Ms. Farris lived under the watchful eye of housing-unit
correctional officers.  One of these officers was Defendant Erik
Kohlrus.  Officer Kohlrus began working at Logan in 2012, when it
still was a men's facility.  When Ms. Farris arrived, Officer Kohlrus
had just begun a 90-day rotation as the B-Wing's overnight wing
officer.  From 11:00 p.m. to 7:00 a.m., Officer Kohlrus walked up
and down the B-Wing, looking for signs of improper activity.

Ms. Farris first met Officer Kohlrus when, about a week after
moving into the B-Wing, Officer Kohlrus "approached her cell and
asked her why she was there."  <u>Id.</u>  For the next several weeks, he

"would approach Plaintiff's locked cell multiple times during each shift." Id.  If Ms. Farris "was sleeping, Kohlrus would sometimes wake her up." Id.  Officer Kohlrus eventually began passing an increasingly sexually charged series of notes through the slot in Ms. Farris's cell door.  One evening, just a few days before Christmas, Officer Kohlrus approached Ms. Kohlrus's cell and instructed her to disrobe and "spin in a circle." Id.  Ms. Kohlrus "complied, doing what she was told." Id.

Officer Kohlrus worked the last scheduled nightshift of his 90-day rotation on December 27.  At around 3:30 a.m., he awoke Ms. Farris and her cellmate and instructed them to distribute breakfast trays.  After the two had finished, Officer Kohlrus ordered Ms. Farris's cellmate back into her room and directed Ms. Farris "to stay behind for extra detail work." Id. at 92.  He then took Ms. Farris into the B-Wing laundry room, told her to get on her knees, and pushed her head toward his penis.  "While she was performing oral sex" on Officer Kohlrus, Ms. Farris "began to shake uncontrollably" and ran out of the laundry room back to her cell. Id. at 93–94.

All of this transpired in full view of the B-Wing's control room—known as the "bubble"—in which several officers, including

Defendant Alex Adams, were monitoring the halls and cells for improper movement.  And while "the lights were off in the laundry room," there still was "a ray of light that shone directly . . . where Plaintiff and Kohlrus were located."  Id. at 93.  Officer Kohlrus later returned to Ms. Farris's cell and told her that he would "direct her to return to the laundry room" once it was clear.  Id. at 94.  He left Ms. Farris's cell door unlocked.

Once the laundry room was available, Officer Kohlrus "motioned for Plaintiff to return."  Id.  Ms. Farris again followed Officer Kohlrus into the laundry room, where he pulled Ms. Farris's pants down and began to engage in sexual intercourse.  Officer Kohlrus soon "removed his penis, turned Plaintiff around and to her knees, pulled Plaintiff's head forward, and directed Plaintiff to open her mouth before ejaculating."  Id. at 95.   He then ordered Ms. Farris "to open her mouth again, kissed her, and told her that she was a 'good girl.'"  Id.  Before Ms. Farris left the laundry room, Officer Kohlrus warned her "that if she told anyone, she would not go to boot camp and would get in trouble."  Id.  All of this transpired

in full view of the control room.[1]  Ms. Farris "returned to her cell, where she lay on the floor crying."  Id. at 95–96.

Around 9:30 that morning, Ms. Farris told Robert Allison, a mental-health staffer and IDOC contractor, that a correctional officer—whom she identified as "Mr. K"—had engaged in several sex acts with her during his overnight shift.  Ms. Farris reported feeling "anxious" and asked to speak with a psychiatrist.  Ms. Farris also shared that she had "minimized" her history of psychiatric treatment "because of rumors she'd heard about the advisability of denying symptoms to get cleared for boot camp."  Def.'s Mem., d/e 214, at 4.  Mr. Allison then memorialized Ms. Farris's account in an IDOC incident report, see Pl.'s Resp. ex. 62, d/e 235-62, at 2, and contacted Defendant Lisa Johnson, his supervisor.

_____

[1] The parties agree that Ms. Farris and Officer Kohlrus had sex and that Ms. Farris promptly reported it.  The parties dispute only whether the sex was consensual.  As this Court previously has found, however, IDOC "prisoners cannot consent to sex with prison staff under any circumstances. . . . That constitutes staff sexual misconduct which is against IDOC policy and against the law."  Doe v. Macleod, No. 18-3191, 2023 WL 2698672, at *11 (C.D. Ill. Mar. 29, 2023) (citing 720 ILCS 5/11-9.2(e) ("A person is deemed incapable of consent, for purposes of this Section, when he or she is a probationer, parolee, releasee, inmate in custody of a penal system or person detained or civilly committed under the Sexually Violent Persons Commitment Act, or a person in the custody of a law enforcement agency or employee.")).

Warden Christine Brannon quickly reported the suspected assault to IDOC's Investigations Unit, which assigned the matter to Defendant Jeff Gabor, an IDOC external investigator. Investigator Gabor interviewed Ms. Farris that afternoon and provided her with a rape kit. He warned Ms. Farris that false reporting carried heavy consequences, including the possibility of spending "way more time" in prison. Defs.' Reply, d/e 249, at 98. Once the interview ended, Investigator Gabor placed Ms. Farris on "investigative status" and assigned her to Logan's health-care unit.

Investigator Gabor interviewed Officer Kohlrus on December 30, more than 36 hours after the assault allegedly had transpired. Officer Kohlrus promptly admitted to "engaging in sexual activity" with Ms. Farris. Id. at 104. He then resigned.

On December 31, Ms. Farris was evaluated by Dr. Jose Mathews, a psychiatrist and IDOC contractor. According to Dr. Mathews, Ms. Farris reported that she had been diagnosed with and treated for an anxiety disorder before her incarceration. Dr. Mathews noted that Ms. Farris previously had been prescribed at least fifteen different psychotropic medications, including the antidepressants Prozac and Wellbutrin and the anti-anxiety

medications Ativan and Xanax.  Dr. Mathews diagnosed Ms. Farris with generalized anxiety disorder and prescribed Ms. Farris low doses of three psychotropic medications: the sleeping aid trazadone and the anti-anxiety medications hydroxyzine and buspirone.

On January 5, 2016, Ms. Rude completed a second "Mental Health Impact Incarceration" form on behalf of Ms. Farris.  The form classified Ms. Farris "as a Priority #3, deemed ineligible to participate in the Impact Incarceration Program because her mental health needs required psychotropic medications."  Def.'s Mem., d/e 214, at 5 ¶ 28.  As a result, Ms. Farris automatically was "denied acceptance to the Impact Incarceration program because of her prescription for psychotropic medications."  Id. at 7 ¶ 28.  She was transferred to the Decatur Correctional Center three weeks later.

Ms. Farris discussed the circumstances of her transfer with several other prisoners and staff members during her first few weeks at Decatur.  At least one of these individuals passed Ms. Farris' reports along to Defendant Trina Snyder, Decatur's lead internal-affairs officer.  On February 5, Lt. Snyder instructed Ms. Farris to sign a memorandum acknowledging that she would refrain (with limited exceptions) from talking about her assault.  Lt. Snyder

told Ms. Farris that this arrangement was necessary to preserve the integrity of IDOC's ongoing investigation into Officer Kohlrus.

On March 24, Lt. Snyder sent Defendant Angela Locke a disciplinary report alleging that Ms. Farris had violated a "direct order during an interview conducted with her on 3/7/16 not to be discussing the current investigation." Pl.'s Resp. ex. 99, d/e 235-99, at 2. Major Locke then "sign[ed] off on the ticket." A. Locke Dep., d/e 235-3, at 171:7–16. Ms. Farris received three months' relegation to C-grade status—thereby losing all but a few of her institutional privileges—and a monthlong restriction on telephone use. See Pl.'s Resp. ex. 100, d/e 235-100, at 2.

Ms. Farris was released from custody in September 2018.

## C.   Procedural History

After completing her sentence, Ms. Farris brought this suit pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq. She twice amended her complaint. Am. Compl., d/e 14; Second Am. Compl., d/e 170.

In addition to the motions now before the Court, IDOC and Ms. Farris also sought summary judgment on Ms. Farris's ADA and

Rehabilitation Act claims.  Def.'s Mot. Summ. J. d/e 213; Pl.'s Mot. Summ. J., d/e 223.  On February 13, 2023, this Court granted partial summary judgment to Ms. Farris on liability and reserved the question of damages for trial.  Op. & Ord., d/e 128.

## II. JURISDICTION AND VENUE

Ms. Farris brought this civil-rights action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 12132 et seq., and 29 U.S.C. § 794 et seq.  This Court, therefore, has federal-question jurisdiction over her claims.  28 U.S.C. § 1331.  The Court also has supplemental jurisdiction over Ms. Farris's state-law claims, which share a common nucleus of operative fact with her federal claims.  See 28 U.S.C. § 1367 (district courts have jurisdiction "over all other claims that are so related to claims . . . within such original jurisdiction that they form part of the same case or controversy").  Venue is proper because a substantial part of the events giving rise to Ms. Farris's claims occurred within this District.  28 U.S.C. § 1391(b).

## III. LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party.  Carroll v. Lynch, 698 F.3d 561, 564 (7th Cir. 2012).  This Court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  Woodruff v. Mason, 542 F.3d 545, 550 (7th Cir. 2008).

## IV. DISCUSSION

Defendants move for summary judgment on six of Ms. Farris's thirteen claims.

### A. Count III – Failure to Protect

Count III of Ms. Farris's Second Amended Complaint alleges that eight of the named Defendants are liable for failing to protect her from a known, substantial risk of custodial sexual abuse.

In prohibiting "cruel and unusual punishment," the Eighth Amendment further requires that prison officials "take reasonable measures to guarantee the safety" of the prisoners in their care.

Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)).  Therefore, to survive summary judgment on Count III, Ms. Farris must offer evidence from which a reasonable factfinder could conclude that Defendants were deliberately indifferent to "an excessive risk to inmate health or safety."  Gevas v. McLaughlin, 798 F.3d 475, 480 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837).

A claim of deliberate indifference comprises two elements. First, "the harm to which the prisoner was exposed must be an objectively serious one."  Gevas, 798 F.3d at 480.  Second, considered subjectively, the official must have had "actual, and not merely constructive, knowledge of the risk" of harm and disregarded that risk all the same.  Id.  On this element, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.  But while "this inquiry focuses on an official's subjective knowledge, a prisoner need not present direct evidence of the official's state of mind."  Gevas, 897 F.3d at 480.  Rather, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to

demonstration in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842.

A general risk of harm is not enough to establish the existence of a "substantial risk." See Shields v. Dart, 664 F.3d 178, 181 (7th Cir. 2011). Still, if a plaintiff presents evidence that a risk of attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it," then an inference of actual knowledge of a substantial risk of harm may be permissible. Farmer, 511 U.S. at 843. As the Seventh Circuit has noted, an official's actual knowledge of a substantial risk "can be inferred by the trier of fact from the obviousness of the risk." Haley v. Gross, 86 F.3d 630, 641 (7th Cir. 1996) (citing Farmer, 511 U.S. at 842).

Individual liability under section 1983 requires personal involvement in the constitutional deprivation. Gonzalez v. McHenry Cnty., 40 F.4th 824, 828 (7th Cir. 2022). To establish personal liability under section 1983, a plaintiff must show that the official "caused the constitutional deprivation at issue or acquiesced in

some demonstrable way in the alleged constitutional violation." Id.

"Each case must be examined individually, with particular focus on

what the officer knew and how he responded." Dale v. Poston, 548

F.3d 563, 569 (7th Cir. 2008).  As the Seventh Circuit has

explained:

> [I]n order to hold an individual defendant liable under § 1983 for a violation of an inmate's constitutional rights, the inmate must show that the defendant was personally responsible for that violation.  A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent.  While the defendant need not have participated directly in the deprivation of the plaintiff's constitutional right to be held liable, he or she must nonetheless have known about the conduct, facilitated it, approved it, condoned it, or turned a blind eye for fear of what they might see.

Rasho v. Elyea, 856 F.3d 469, 478 (7th Cir. 2017) (cleaned up).

Liability under section 1983 "is direct rather than vicarious."

Horshaw v. Casper, 910 F.3d 1027, 1029 (7th Cir. 2018) (citations

omitted).  High-ranking officials and supervisors "are responsible

for their own acts but not for those of subordinates, or for failing to

ensure that subordinates carry out their tasks correctly." Id.  But

an official "responsible for setting prison policy" still may "be held liable for a constitutional violation if they are aware of a systematic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy." Sinn v. Lemmon, 911 F.3d 412, 423 (7th Cir. 2018) (citing Steidl v. Gramley, 151 F.3d 739, 741 (7th Cir. 1998)) (cleaned up). "[I]f a plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding and pervasive or noted by prison officials in the past, and a defendant has been exposed to information regarding the risk, then the evidence could be sufficient to permit a trier of fact to find that the official in fact had actual knowledge." Mayoral v. Sheahan, 245 F.3d 934, 938–39 (7th Cir. 2001).

Defendants do not dispute that sexual assault constitutes an "objectively serious" harm. See J.K.J. v. Polk Cnty., 960 F.3d 367, 376 (7th Cir. 2020) ("To say that sexual assaults [that a guard] committed against [the plaintiffs] objectively imposed a serious risk to their safety would be an understatement."). And Defendants concede taking no action to prevent Ms. Farris's assault. To defeat summary judgment, Ms. Farris must present "enough evidence for a reasonable jury to conclude that" Defendants actually knew that

she "faced an ongoing, substantial risk of serious harm."  Balsewicz
v. Pawlyk, 963 F.3d 650, 658 (7th Cir. 2020).

### 1. Defendants are not entitled to qualified immunity from Count III.

Defendants all raise the affirmative defense of qualified
immunity on Count III.  Qualified immunity insulates public
employees from liability for money damages if "their conduct does
not violate clearly established statutory or constitutional rights of
which a reasonable person would have known."  Van den Bosch v.
Raemisch, 658 F.3d 778, 786 (7th Cir. 2011) (citing Pearson v.
Callahan, 555 U.S 223,  231 (2009)).  In evaluating a qualified-
immunity defense, this Court asks two questions: whether "the
facts that a plaintiff has alleged make out a violation of a
constitutional right," and, if so, "whether the right at issue was
clearly established at the time of defendant's alleged misconduct."
See id. (cleaned up).  A clearly established right is one that "is
sufficiently clear that any reasonable official would understand that
his or her actions violate that right, meaning that existing precedent
must have placed the statutory or constitutional question beyond

debate." Zimmerman v. Doran, 807 F.3d 178, 182 (7th Cir. 2015) (citing Mullenix v. Luna, 577 U.S. 7, 12 (2015)).

This Court must "approach the qualified-immunity inquiry by treating as true the evidence-supported facts and inferences favoring" Ms. Farris. Balsewicz, 963 F.3d at 657 (citing Orlowski v. Milwaukee Cnty., 872 F.3d 417, 421–22 (7th Cir. 2017)). Ms. Farris charges that Defendants knew that she and other women at Logan faced an acute risk of custodial sexual abuse but failed to take reasonable steps to mitigate it. Defendants contend that these allegations fall outside the clearly established scope of the Eighth Amendment. E.g., Defs.' Mem., d/e 216, at 23 (arguing, without citation or elaboration, that "the facts here do not give rise to a constitutional violation"). The Court disagrees.

In Farmer, the Supreme Court "made clear that being violently assaulted . . . in prison is a serious harm." Balsewicz, 963 F.3d at 657 (citing Farmer, 511 U.S. at 834). The Farmer Court "also made clear what a prison official must do when he learns that an inmate faces an excessive danger of such a harm: take reasonable measures to abate the danger." Id. (citing Farmer, 511 U.S. at 832–33). "There can be no debate," moreover, that prisoners have a

clearly established right "to be free from deliberate indifference to rape and assault." Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005); see also Schwenk v. Hartford, 204 F.3d 1187, 1197 (9th Cir. 2000) ("In the simplest and most absolute of terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault [in the mid-1990s], and no reasonable prison guard could possibly have believed otherwise."). This right obtains even when "the specific identity of the ultimate assailant is not known in advance." Brown v. Budz, 398 F.3d 904, 915 (7th Cir. 2005) (citing Farmer, 511 U.S. at 843). It does not matter whether the official knew that the prisoner-plaintiff "was especially likely to be assaulted by the [individual] who eventually committed the assault." Farmer, 511 U.S. at 843. Nor does it matter "whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Id. Defendants are not entitled to qualified immunity from Count III.

## 2. Defendant Locke is not entitled to summary judgment on Count III.

Defendant Angela Locke served as Logan's acting warden from March 2013, when the facility transitioned into a women's prison, until June 2015, just a few months before Ms. Farris's arrival.  Ms. Farris claims that Major Locke abdicated "her responsibilities to implement the IDOC's sexual abuse prevention and intervention program, even in the face of rampant violations and an environment where sexual contact between prisoners and staff was a known and accepted phenomenon," thereby incarcerating Ms. Farris and others in a sexually dangerous environment.  Pl.'s Resp., d/e 239, at 67.

Major Locke now moves for summary judgment.  She argues that Ms. Farris "is attempting to . . . allege a <u>Monell</u> claim against [her], and that must fail," and that in any event her stint at Logan was too attenuated from Ms. Farris's to be causally related.  Defs.' Mem., d/e 216, at 16–17.  Yet a factfinder could reach the opposite conclusion.  Construing the record in Ms. Farris's favor, a reasonable jury could find that Major Locke personally fostered a sexually dangerous, constitutionally infirm culture at Logan.  Her motion for summary judgment must be denied.

Major Locke first disputes that she "personally participated in or caused the unconstitutional actions of Co-Defendant Kohlrus." Defs.' Mem., d/e 216, at 17.  But Major Locke's argument misapprehends the nature of Ms. Farris's claim.  "Individual defendants like [Major Locke], who are responsible for setting prison policy, can be held liable for a constitutional violation if they are aware of a systematic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy."  Sinn, 911 F.3d at 423 (citing Steidl, 151 F.3d at 741) (cleaned up).  "[I]f a plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding and pervasive or noted by prison officials in the past, and a defendant has been exposed to information regarding the risk, then the evidence could be sufficient to permit a trier of fact to find that the official in fact had actual knowledge." Mayoral v. Sheahan, 245 F.3d 934, 938–39 (7th Cir. 2001). Ultimately, then, Major Locke need not have known that Ms. Farris was particularly susceptible to harm—or that Erik Kohlrus could have committed custodial sexual abuse—to violate Ms. Farris's Eighth Amendment rights.

Instead, a reasonable jury could find that Major Locke knew that staff-on-prisoner sexual abuse pervaded Logan.  See id.  Major Locke testified that "staff were [not] properly trained to deal with female offenders" during her tenure.  A. Locke Dep., d/e 235-3, at 80:20–25.  When asked about a spate of resignations by staff members accused of sexual misconduct, Major Locke admitted she "didn't have to raise any concern" regarding the staff members' conduct "because everybody -- I mean, everybody knew about it.  So I didn't have to tell anybody that there's concern.  I think everybody at that point had concerns."  Id. at 78:22–79:6.

A reasonable jury also could find that Major Locke "was aware of systematic lapse in enforcement of a policy critical to ensuring inmate safety yet fail[ed] to enforce that policy."  Sinn, 911 F.3d at 423.  As before, Major Locke's own testimony and statement of undisputed facts would—standing alone—support such a finding.  Major Locke testified that Logan staff needed "training . . . to be gender specific to the female so that the staff knew how to deal with them."  See A. Locke Dep., d/e 235-3, at 81:1–6.  She also acknowledged taking no steps to provide gender-informed training to an overwhelmingly male staff.  See id. at 83:14–16 ("Q: As

warden, did you have the ability to order additional training for staff at Logan?  A: I could have, yes."); <u>but see</u> <u>id.</u> at 82:15–20 ("Q: Did you implement any training during your tenure as acting warden to account for this issue of staff, as you said, needing additional training to understand their new population of prisoners?  A: I personally did not.").  Major Locke also received comprehensive training on IDOC's PREA-implementing regulations and administrative directives while at Logan.  <u>Id.</u> at 73:15–21.  Yet she "did not participate in any PREA audits, review of the PREA policy, or the way the PREA policy was implemented while she was Acting Warden at Logan."  Defs.' Mem., d/e 216, at 4 (citation omitted). And the record contains substantial evidence that, under Major Burke's watch, Logan failed to monitor prisoners and staff who reported sexual misconduct for possible retaliation—despite clear federal and state mandates to do so.  All of this would support a jury finding in line with Ms. Farris's interpretation of events: that Warden Locke knew that enforcing PREA-aligned policies was of utmost importance but failed to do so.

Major Locke lastly contends that her return to Decatur severed any causal link to "events that occurred months after she left

Logan."  See Defs.' Reply, d/e 244, at 42.  But the "requisite causal connection" for constitutional tort liability can be satisfied "if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights."  Conner v. Reinhard, 847 F.2d 384, 397 (7th Cir. 1988).  The Court has explained how a reasonable jury could find Major Locke responsible for setting Logan on a constitutionally deficient course.  The same jury could find that her responsibility—and her liability—were not vitiated by her departure.  See Hernandez v. Foster, 657 F.3d 463, 487 (7th Cir. 2011)).

In short, a reasonable jury could find that Major Locke fostered a "culture that permitted and condoned violations of policies that were designed to protect inmates."  Woodward v. Corr. Med. Servs. of Illinois, Inc., 368 F.3d 917, 929 (7th Cir. 2004).  And a reasonable jury could conclude that Ms. Farris's assault was an inevitable byproduct of Major Locke's leadership.  Her motion for summary judgment on Count III is denied.

### 3. Defendant Brannon is not entitled to summary judgment on Count III.

Defendant Christine Brannon succeeded Major Locke as Logan's warden in June 2015.  She ended her term the following February.  Ms. Farris alleges that Warden Brannon left Ms. Farris and other women at Logan exposed to an acute risk of custodial sexual abuse.  Like Major Locke, Warden Brannon disputes that she had any involvement in depriving Ms. Farris of her Eighth Amendment rights.  A reasonable factfinder could disagree.

First, Warden Brannon's argument confuses vicarious liability, which is not cognizable under Section 1983, for policymaker liability, which is.  See generally Sinn, 911 F.3d at 423 (citing Steidl, 151 F.3d at 741) ("Individual defendants . . . who are responsible for setting prison policy . . . can be held liable for a constitutional violation if they are aware of a systematic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy.").  Her argument also belies an overwhelming mass of contrary record evidence, which suggests that Warden Brannon neglected, or at best misunderstood, all of her obligations. In fact, Warden Brannon's deposition testimony—standing alone—

creates a genuine dispute of material fact on each element of Ms.

Farris's deliberate indifference claim.

As Judge Scudder has keenly observed, the "confinement

setting is a tinderbox for sexual abuse." <u>J.K.J.</u>, 960 F.3d at 382.

Warden Brannon, however, could demonstrate only a slight grasp of

that proposition:

- "Q: Do you believe that . . . sexual harassment or sexual
  misconduct are a problem in prisons?  A: I think there are  --
  I'm sure there may be cases of this, but I don't think it's a
  longstanding, widespread issue."  C. Brannon Dep., d/e 218-
  6, at 24:8–24.

- "Q: Do you believe that sexual assault and sexual harassment
  were a problem at Logan Correctional Center?  A: No, I do not."
  <u>Id.</u> at 48:1–4.

- "Q: Do you recall making any specific inquiries [after becoming
  Warden] about whether sexual assault or sexual harassment
  were a problem at Logan?  A: No, I do not."  <u>Id.</u> at 26:1–4.

This testimony does not disprove Warden Brannon's

knowledge of custodial sexual abuse at Logan.  A correctional

officer's "own testimony that he was subjectively unaware of a

substantial risk of serious harm is not enough for summary

judgment if a jury could find otherwise from the evidence in the

record."  <u>Boyd v. Pork</u>, No. 01-cv-7957, 2003 WL 21011805, at *4

(N.D. Ill. May 2, 2003) (citing Cavalieri v. Shepard, 321 F.3d 616, 621 (7th Cir. 2003) (finding correctional officer's deposition testimony, which suggested that officer had ignored obvious risks of harm, "not enough to eliminate a genuine issue of fact")).  Further, Warden Brannon's testimony belies both the recollections of her codefendants and the substantial evidence in the record of staff-on-prisoner sexual misconduct.  Regardless of whether she appreciated the risk of sexual abuse at Logan, a reasonable jury could discredit her pleas of ignorance and find that risk too obvious to ignore.

The same must be said of Warden Brannon's testimony on her statutorily and internally mandated PREA obligations.  Warden Brannon's chief responsibility was "to ensure the safety of the staff and offenders" at Logan.  Defs.' Mem., d/e 218, at 14.  As for IDOC's PREA program, Warden Brannon "was responsible for ensuring compliance with PREA postings and guidelines, that the PREA Compliance Manager had the appropriate training and held required meetings, and that the proper notifications were made if a PREA complaint was made."  Id. at 32.  She also bore "the ultimate responsibility to make sure [PREA] retaliation monitoring was done at Logan."  Id. at 14.  Warden Brannon testified both that she could

not recall much, if anything, about her PREA-related work and that she followed IDOC's administrative directives to the letter.  See C. Brannon Dep., d/e 218-6, at 162:17–24 ("Q: And do you think there was still difficulties with getting the word out [on] PREA policies when you were warden at Logan?  A: I don't recall.  Q: You don't recall any problems with getting the word out?  A: I don't -- I don't recall.  I just don't really recall.  I don't recall."); but see id. at 247:21–248:9 ("Q: So again, did you do anything to investigate the number of substantiated allegations of sexual abuse against guards at Logan?  A: No, I did not.  Q: Did you take any steps to try to reduce the number of sexual assaults that were occurring or sexual abuse that was being committed by guards at Logan?  A: I just ensur[ed] that the PREA protocol was followed and staff was following the procedures.  Q: I know you already discussed that.  Is there anything else we haven't already discussed?  A: Nothing additional.").  A jury must resolve these factual discrepancies. Warden Brannon's motion for summary judgment is denied.

### 4. Defendants Charron, Ashley, and Johnson are not entitled to summary judgment on Count III.

Defendant Clara Charron served as Logan's PREA compliance manager from 2013 until December 2015, when she was replaced by Defendant Norine Ashley.  Their backup PREA compliance manager was Defendant Lisa Johnson, the head of Logan's health-care unit.  As PREA compliance managers, these Defendants were charged with ensuring "that the PREA Guidelines were initiated," with overseeing Logan's annual PREA compliance audit, and with monitoring PREA complainants for retaliation.  See Defs.' Mem., d/e 217, at 9–11.  In Count III, Ms. Farris alleges that their enforcement of IDOC's PREA standards was constitutionally deficient.  Assistant Warden Charron, Dr. Ashley, and Ms. Johnson all move for summary judgment.  However, several triable issues of material fact remain as to whether any of these Defendants satisfied their PREA-compliance obligations—or if they did anything more than complete the occasional round of paperwork.

Take retaliation monitoring, which Warden Brannon testified was "always done" during her tenure.  C. Brannon Dep., d/e 218-6, at 84:23–85:1.  Neither Dr. Ashley nor Assistant Warden Charron

testified to doing it. In fact, while Dr. Ashley claimed that
retaliation monitoring was within Assistant Warden Charron's
remit, Assistant Warden Charron could not recall "taking any
actions to monitor retaliation"—or whether PREA prohibited
retaliation in the first place. <u>Compare</u> N. Ashley Dep., d/e 235-4, at
76:5–80:4 (testifying to "not doing the retaliation monitoring,"
because "that was being done by AWP [Assistant Warden of
Programs] Charron") <u>with</u> C. Charron Dep., d/e 235-8, at 159:15–
163:24 ("A: I can't remember who monitored [retaliation]."). Ms.
Johnson admitted to having borne responsibility for retaliation
monitoring; she further testified to overseeing some retaliation
monitoring after instances of inmate-on-inmate sexual misconduct.
<u>see</u> A. Johnson Dep., d/e 218-4, at 51:2–20. But Ms. Johnson, too,
could not recall doing retaliation monitoring herself. <u>Id.</u> at 50:22–
51:14. Whether these three Defendants ever conducted retaliation
monitoring must be decided by a jury.

The Court locates another triable issue of material fact in the
gap between Defendants' actions and IDOC's policies. To illustrate,
Dr. Ashley testified that her role as PREA compliance manager was
a "very important job," and that it "should be more than just an

accounting process."  N. Ashley Dep., d/e 235-4, at 61:19–62:2.
Yet Dr. Ashley also testified that "accounting"—"making sure that
paperwork was done, that we could pass the audit"—was precisely
the expected scope of her portfolio.  See id.  Assistant Warden
Charron's recollections aligned with those of Dr. Ashley.  See C.
Charron Dep., d/e 218-5, at 91:22–92:5 ("Q: Do you recall any
aspects of your position as PREA Compliance Manager as you sit
here today?  A: Just to ensure that the process was followed if
reported and documented and then passed through the process.").
Construing the record in the light most favorable to Ms. Farris, a
jury reasonably could find that these Defendants left Ms. Farris
with no procedural guardrails to protect her from custodial sexual
abuse.  Their motion for summary judgment on Count III is denied.

### 5. Defendants Keane, Funk, and Pasley are not entitled to summary judgment on Count III.

Defendant Patrick Keane was IDOC's systemwide PREA
coordinator between July 2013 and November 2015, when he was
succeeded by Defendant Michael Funk.  Defendant Alan Pasley,
Logan's R&C Superintendent, served as a backup systemwide PREA
coordinator at all relevant times.  These Defendants primarily were

tasked with ensuring IDOC facilities' compliance with PREA, facilitating PREA-related staff trainings and overseeing IDOC's federally mandated PREA audit. Ms. Farris alleges that these Defendants knew of an ongoing, acute risk of sexual abuse at Logan and "abjectly disregarded their responsibilities" nonetheless. Pl.'s Resp., d/e 240, at 107.

A reasonable factfinder, construing the record in Ms. Farris's favor, could agree. All three men readily acknowledged the gravity of their obligations and the consequences of poor compliance and oversight. See, e.g., P. Keane Dep., d/e 235-14, at 169:21–170:8 ("Q: Do you think you owed a responsibility to the women at Logan Correctional Center to do your best job to protect them from sexual abuse by male staff? A: I owed it to every inmate of the Illinois Department of Corrections. I owed it to every -- staff of the Illinois Department of Corrections to do the job -- to do my job as best as I knew how, which is exactly what I did."). These Defendants further acknowledged that they had fallen well short. According to Mr. Funk, Mr. Keane summarized his two-plus years as PREA coordinator as involving database management and developing a single course of compliance training. M. Funk. Dep., d/e 235-15,

at 253:20–254:6.  And when asked if he believed that his tenure as "agency-wide PREA Coordinator was a success," Mr. Keane said that he did, because he "didn't get fired."  P. Keane Dep., d/e 235-14, at 251:1–5.  A reasonable jury could evaluate these Defendants' job performances far more harshly.  Their motion for summary judgment is denied.

## B. Failure to Intervene (Count IV)

Defendant Alex Adams, a Logan correctional officer, was stationed in Housing Unit 15's control room at the time of Ms. Farris's assault.  From there, Officer Adams could monitor electronically any movement in the B-Wing.  He also had a window directly into the housing unit's laundry room.  In Count IV, Ms. Farris alleges that Officer Adams "could see or had the opportunity to see the harm occurring to Plaintiff as she was raped, or knew the rape was going to occur," but consciously failed to intervene on Ms. Farris's behalf.  Second Am. Compl. ¶¶ 70–77, d/e 170.  Contending that the record contains "no evidence, save Plaintiff's speculation," of his awareness of the assault, Officer Adams now seeks summary judgment.  Defs.' Mem., d/e 218, at 36.

A correctional officer "who fails to intervene to try to prevent known cruel or unusual force, despite a reasonable opportunity to do so, may be held liable under § 1983." Wilborn v. Ealey, 881 F.3d 998, 1007 (7th Cir. 2018).  To succeed on her claim for failure to intervene, Ms. Farris must prove that Officer Adams "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." Gill v. City of Milwaukee, 850 F.3d 335, 342 (7th Cir. 2017).  "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Lanigan v. Vill. of E. Hazel Crest, Ill., 110 F.3d 467, 478 (7th Cir. 1997); see also Abdullahi v. City of Madison, 423 F.3d 763, 774 (7th Cir. 2005) (characterizing Lanigan's formulation as a "stringent standard").

The undisputed record shows that Officer Adams was well positioned—and obligated—to see Ms. Farris's assault as it occurred.  As a control officer, Officer Adams was "the eyes for the housing unit." A. Adams Dep., d/e 235-5, at 88:8–10.  Officer Adams testified that "if there were prisoners outside of their cell on

the 11 to 7 unit, . . . [he had the] responsibility to notice that and take action in response." Id. at 88:14–19.  And from his vantage point in the control room, as Alan Pasley and others testified, Officer Adams had a "clear view" of the laundry room and its occupants.  A. Pasley Dep., d/e 235-6, at 268:17–23.

Whether Officer Adams saw (or could see) Officer Kohlrus or Ms. Farris remains unanswered.  Officer Adams testified that he could not "recall that day one way or the other."  See A. Adams Dep., d/e 235-5, at 86:2–87:6.  Yet Robert Allison's incident report, completed just six hours after Ms. Farris's assault, quotes Ms. Farris as expressing concern for "everyone else in the bubble [control room] who was watching out for" Erik Kohlrus.  Pl.'s Resp. ex. 62, d/e 235-62, at 2.  Construing all this evidence in the light most favorable to Ms. Farris, a reasonable jury could find that Officer Adams saw what was occurring in the laundry room and did nothing.  His motion for summary judgment on Count IV is denied.

## C. Section 1983 Conspiracy (Count V)

In Count V, Ms. Farris alleges that nearly all the Defendants involved here—Locke, Snyder, Brannon, Charron, Ashley, Johnson, Gabor, Adams, Keane, Funk, and Pasley—engaged in two discrete

conspiracies to deprive her of her constitutional rights.  See Second Am. Compl. ¶¶ 70–77, d/e 170.  In the first, Officer Adams and Erik Kohlrus (along with a third, since-dismissed correctional officer) conspired to facilitate and then cover up Kohlrus's sexual abuse of Ms. Farris.  Id. ¶¶ 71–74.  In the second, the remaining Defendants conspired to "deprive Plaintiff and other prisoners" of their First, Eighth, and Fourteenth Amendment rights and to "protect one another" from any potential liability.  Id. ¶¶ 75–77.  These Defendants now move for summary judgment on Count V.

A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, "the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage."  Cooney v. Casady, 735 F.3d 514, 519 (7th Cir. 2013).  An express agreement between the conspirators is unnecessary; the participants simply must share the same general conspiratorial objective.  Id.  Direct proof of such an agreement is rarely available, of course, since conspiracies are by their nature secretive endeavors.  See Beaman v. Freesmeyer, 776 F.3d 500, 511 (7th Cir. 2015).  Even still, although a conspiracy "certainly may be

established by circumstantial evidence, . . . such evidence cannot be speculative." <u>Williams v. Seniff</u>, 342 F.3d 774, 785 (7th Cir. 2003).  To survive summary judgment, Ms. Farris must identify facts from which a reasonable jury could find "(1) an express or implied agreement among defendants to deprive plaintiff of . . . her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." <u>Scherer v. Balkema</u>, 840 F.2d 437, 442 (7th Cir. 1988).

Defendants argue that Ms. Farris's conspiracy claims rest on speculation rather than evidence.  The Court agrees.  As in most conspiracies, the record here does not contain evidence of an overt agreement between any of these Defendants.  <u>Cf.</u> <u>Amundsen v. Chicago Park Dist.</u>, 218 F.3d 712, 718 (7th Cir. 2000) (plaintiff must show that defendants "directed themselves toward an unconstitutional action by virtue of a mutual understanding" with evidence suggesting a "meeting of the minds").  Nor does the record contain sufficient evidence from which an inference of an implicit agreement could be drawn.  Construed in the light most favorable to Ms. Farris, the record instead reflects an endemic indifference toward an obvious risk of custodial sexual abuse.  That may well be

the sort of systemic pattern or practice cognizable under Monell.

Cf. Woodward, 368 F.3d at 929 (affirming Monell jury verdict "based on repeated failures to ensure [prisoner's] safety . . . as well as a culture that permitted and condoned violations of policies that were designed to protect inmates like [him]"). But it is not a civil conspiracy. Defendants are entitled to summary judgment on Count V.

## D. Deprivation of Procedural Due Process (Count VI)

Count VI alleges that Defendants Brannon, Charron, Ashley, Johnson, and Gabor revoked Ms. Farris' boot-camp eligibility without notice or a hearing. Second Am. Compl. ¶¶ 78–84, d/e 170. As Ms. Farris does not contest these Defendants' motion for summary judgment on Count VI, see Pl.'s Resp., d/e 241, at 147 n.8, that motion is granted.

## E. First Amendment Retaliation (Count VII)

In Count VII, Ms. Farris alleges that seven of the named Defendants retaliated against her after she made "statements about her sexual assault to prisoners and prison staff." See Second Am. Compl. ¶¶ 85–92, d/e 170. The First Amendment "protects speakers from threats of punishment that are designed to

discourage future speech." Fairley v. Andrews, 578 F.3d 518, 525 (7th Cir. 2009). To survive summary judgment, Ms. Farris must identify evidence from which a jury could find (1) that she engaged in protected First Amendment activity, (2) that she suffered a deprivation likely to deter future protected speech, and (3) that her protected speech was "at least a motivating factor" in Defendants' decision to take the retaliatory action. Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009).

## 1. Defendants are not entitled to qualified immunity from Count VII.

Before proceeding to the merits, the Court must address Defendants' invocation of qualified immunity. As with Count III, Defendants offer only a brief, generalized argument toward that end. See Defs.' Mem., d/e 216, at 23 ("As thoroughly discussed supra, the facts here do not give rise to a constitutional violation by Defendants Locke and Snyder and, for the forgoing reasons, they are entitled to qualified immunity to the respective claims."). A prisoner's "right to tell the officers his account of events" without consequence, however, has long been clearly established First Amendment law. McKinley v. Schoenbeck, 731 F. App'x 511, 514

(7th Cir. 2018) (citing <u>Bridges</u>, 557 F.3d at 551); <u>see also</u> <u>Hughes v.</u> <u>Farris</u>, 809 F.3d 330, 334 (7th Cir. 2015) ("Allegations of retaliation for complaining about abuse support a claim under the First Amendment.").  And "the First Amendment protects against retaliation even if the retaliatory action itself does not amount to an independent constitutional violation." <u>Holleman v. Zatecky</u>, 951 F.3d 873, 878 (7th Cir. 2020).  Defendants are not entitled to qualified immunity from Count VII.

### 2. Defendants Charron, Ashley, and Johnson are entitled to summary judgment on Count VII.

Ms. Farris "does not contest summary judgment on her retaliation claims against Charron, Ashley, and Johnson."  Pl.'s Resp., d/e 239, at 180 n.19.  Their motion for summary judgment on Count VII is, therefore, granted.

### 3. Defendants Brannon, Gabor, Locke, and Snyder are not entitled to summary judgment on Count VII.

Ms. Farris first claims that Warden Brannon and Investigator Gabor committed unlawful retaliation when, immediately after Ms. Farris reported her assault, they confined her to Logan's health-care unit for more than a week and required her to sign an

agreement not to discuss her assault.  A prison transfer—whether to a particular cell or a different facility—can be retaliatory if it would "deter a person of ordinary firmness from engaging in protected activity."  Holleman v. Zatecky, 951 F.3d 873, 881 (7th Cir. 2020).  "[A] transfer initiated to punish a prisoner for engaging in protected activity would satisfy the causation element of retaliation, but a transfer initiated as a rational, justifiable response to the substance of the prisoner's complaint would not."  Id. at 879.

This Court must give considerable "deference to prison officials' decisions when . . . maintaining order in a volatile environment, and [to] the justifications offered for those decisions."  Id. at 880 (citing Bell v. Wolfish, 441 U.S. 520, 547 (1979)).  That deference requires the Court not to become too "enmeshed in the minutiae of prison operations."  Bell, 441 U.S. at 562.  Still, the Court cannot find, as a matter of law, that Investigator Gabor's interview tactics were lawfully coercive.  Nor can the Court conclude that a weeklong stint in segregation was intended to protect Ms. Farris rather than punish her.  Investigator Gabor and Warden Brannon's motion for summary judgment on Count VII is denied.

The same must be said of Major Locke and Lt. Snyder's liability on Count VII.  Ms. Farris claims that these Defendants unlawfully punished her "for allegedly discussing the assault . . . while incarcerated at Decatur Correctional Center," nearly four months after Erik Kohlrus's resignation and several months after IDOC had concluded its internal investigation.  Second Am. Compl. ¶ 91, d/e 170.  A reasonable jury could agree.

There can be no dispute that the subject of Ms. Farris's speech—her sexual abuse at the hands of a correctional officer— was protected by the First Amendment.  See, e.g., Hughes, 809 F.3d at 334.  Yet Major Locke and Lt. Snyder maintain that their prosecution of Ms. Farris was justified by valid penological concerns.  They say that Ms. Farris's actions could have "compromised" the "integrity of the ongoing investigation of Plaintiff's sexual assault" and posed a "safety risk" to her and others.  Defs.' Mem., d/e 216, at 22.

Major Locke and Lt. Snyder's liability cannot be resolved at summary judgment.  The record indicates that IDOC "had no policy against sexual assault victims speaking to others about their sexual assaults, even if there is an ongoing investigation."  Pl.'s Resp., d/e

239, at 81; see also A. Pasley Dep., d/e 235-6, at 248:5–10 ("Q:
There's no policy requiring [prisoners] not to talk about their sexual
assault, correct?  A: Not to my knowledge, no.  Q: Was there a
policy that required them not to talk about open investigations?  A:
Not to my knowledge.").  Moreover, Investigator Gabor ended his
investigation as early as January 28 and no later than March 7.  Lt.
Snyder filed her disciplinary report weeks—if not months—
afterward.  So even if Lt. Snyder and Major Locke would have had a
reasonable justification for charging Ms. Farris with insolence
during the investigation's active period, that justification evaporated
upon the investigation's conclusion.  Their motion for summary
judgment on Count VII is denied.

## F. State-Law Negligent Spoliation (Count XIII)

Count XIII alleges that Defendants Brannon, Charron,
Johnson, Ashley, Gabor, Keane, Funk, and Pasley negligently failed
to preserve photographic and video evidence of Ms. Farris's rape.
Second Am. Compl. ¶¶ 117–121, d/e 170.  These Defendants now
move for summary judgment on Count XIII.

The Court finds that summary judgment on Count XIII is
premature.  As the Seventh Circuit has recognized, a claim of

spoliation of evidence "is connected to the merits of the underlying

suit." <u>Borsellino v. Goldman Sachs Grp., Inc.</u>, 477 F.3d 502, 510

(7th Cir. 2007).  If Ms. Farris "cannot prevail in the underlying suit

even with the allegedly lost or destroyed evidence, then [her] claim

for spoliation will fail because [she] cannot prove damages." <u>Id.</u>

Seeing as this claim "might not need to be tried at all based on the

jury's verdicts on the other claims," the Court will deny Defendants'

motions for summary judgment on Count XIII, though with leave to

refile "once all other claims have been resolved." <u>Duran v. Town of

Cicero</u>, 653 F.3d 632, 637 (7th Cir. 2011).

## V. CONCLUSION

For these reasons, Defendants' motions for summary

judgment are resolved as follows:

1. The Motion for Summary Judgment filed by Defendants
   Locke and Snyder (d/e 215) is GRANTED IN PART and
   DENIED IN PART.  Judgment shall enter in favor of these
   Defendants on Count V of Plaintiff's Second Amended
   Complaint.  The motion is otherwise DENIED.

2. The Motion for Summary Judgment filed by Defendants
   Brannon, Charron, Ashley, Johnson, Adams, and Gabor
   (d/e 217) is GRANTED IN PART and DENIED IN PART.

Judgment shall enter in favor of these Defendants on Counts V and VI of Plaintiff's Second Amended Complaint. The motion is otherwise DENIED, except that Defendants may renew their motion for summary judgment on Count XIII after trial.

3.  The Motion for Summary Judgment filed by Defendants Keane, Funk, and Pasley (d/e 219) is GRANTED IN PART and DENIED IN PART. Judgment shall enter in favor of these Defendants on Count V of Plaintiff's Second Amended Complaint. The motion is otherwise DENIED, except that Defendants may renew their motion for summary judgment on Count XIII after trial.

4.  A status conference in this matter is hereby SET for October 12, 2023, at 2:30 p.m. Counsel for all parties— including counsel for Defendant Kohlrus—shall participate by videoconference, the instructions for which are attached. Counsel should be prepared to discuss (1) the status of Plaintiff's claims against Defendant Kohlrus and (2) new trial settings.

**IT IS SO ORDERED.**

**ENTERED:  SEPTEMBER 29, 2023**

**FOR THE COURT:**

*s/ Sue E. Myerscough*

**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**